**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

Securities and Exchange Commission,       :

        :      **ECF Case**

       **Plaintiff,**       :

        :      **09 Civ. 4755 (PGG)**

       **- against -**       :

        :

FTC Capital Markets, Inc.,       :

FTC Emerging Markets, Inc., also d/b/a FTC Group,   :

Guillermo David Clamens,       :

Lina Lopez a/k/a Nazly Cucunuba Lopez,      :

        :

       **Defendants.**       :

------------------------------------------------------------------ x

### MEMORANDUM OF LAW OF DEUTSCHE BANK TRUST COMPANY AMERICAS IN OPPOSITION TO MOTION OF THE SECURITIES AND EXCHANGE COMMISSION FOR APPROVAL OF DISTRIBUTION PLAN

William G. Primps
Peter Baumgaertner
Jeffrey Chubak
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for Deutsche Bank Trust Company*
*Americas*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

ARGUMENT ..............................................................................................................................5

I.      The Distribution Plan is Unfair and Unreasonable ..............................................................5

        A.      The Distribution Plan Prevents the Trustee from Fulfilling its
                Responsibilities under the Indenture and the Trust Indenture Act and
                Asserting Claims for Fees and Expenses ................................................................6

        B.      The Distribution Plan Prevents Innocent Investors that Purchased or
                Otherwise Acquired Notes from Receiving Distributions in Respect of
                Such Notes ...........................................................................................................8

II.     The Distribution Plan Should be Amended in a Manner Which Ensures that the
        Trustee May File Proofs of Claim Which May be Approved by the Fund
        Administrator and that Noteholders May Receive Distributions.........................................9

CONCLUSION ..........................................................................................................................11

## TABLE OF AUTHORITIES

**Page**

**CASES**

*In re The Reserve Fund Sec. and Derivative Litig.*, 673 F. Supp. 2d 182 (S.D.N.Y. 2009)............5

*SEC v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009).......................................................................5

*SEC v. Wang*, 944 F.2d 80 (2d Cir. 1991) ......................................................................................5

**STATUTES**

11 U.S.C. § 501(a) ............................................................................................................................6

15 U.S.C. § 77ooo(c) ........................................................................................................................6

15 U.S.C. § 77qqq(a)(2).....................................................................................................................6

**RULES**

Fed. R. Bankr. P. 3003(c)(5)..............................................................................................................6

Deutsche Bank Trust Company Americas (the "<u>Trustee</u>"), by and through its undersigned counsel, respectfully submits this memorandum of law (the "<u>Memorandum of Law</u>") in opposition to the motion of the Securities and Exchange Commission (the "<u>SEC</u>"), dated as of May 27, 2011, for approval of a Distribution Plan (as defined below) [Docket No. 70] (the "<u>Motion</u>").

<u>**PRELIMINARY STATEMENT**</u>

The proposed distribution plan attached to the Motion (the "<u>Distribution Plan</u>") must be considered "fair and reasonable" before it can be approved by this Court.  The Trustee submits that the Distribution Plan is unfair and unreasonable for two reasons.

First, the Distribution Plan prevents the Trustee from fulfilling its responsibilities under the Indenture (as defined below) and the Trust Indenture Act.  "FTC" is defined in the Distribution Plan as "FTC Capital Markets, Inc. and/or FTC Emerging Markets, Inc."  Because the definition of "FTC" excludes FTC International SPC (the "<u>Company</u>") and the Issuers (as defined below), the Trustee cannot file proofs of claim on behalf of holders of Notes (as defined below) for outstanding principal and interest payments owed by the Issuers.  Pursuant to the Distribution Plan, any such proofs of claim filed by the Trustee would not be approved by the Fund Administrator (as defined below), and the Trustee will not even receive notice of the claims solicitation process.  In addition, as a result of the definition of "FTC" under the Distribution Plan, the Trustee cannot file proofs of claim for fees and expenses it has incurred, in contravention of the terms of the Indenture.

Second, because the Trustee cannot file proofs of claims which may be approved by the Fund Administrator, innocent investors which purchased or otherwise acquired Notes will be unable to receive distributions in respect of such Notes pursuant to the Distribution Plan.  Such a

result is inconsistent with the stated purpose of the Distribution Plan: achieving "the prompt, fair, and efficient allocation of the FTC Fund to investors that suffered a loss as a result of their investment with FTC and to FTC's creditors."

Therefore, the Distribution Plan should be amended to, among other things, include the Company and the Issuers within the definition of "FTC."  Such a change would enable the Trustee to fulfill its responsibilities under the Indenture and the Trust Indenture Act and Noteholders to receive their fair share of the FTC Fund.

## BACKGROUND

1.    The Trustee is party to the following agreements, each of which is attached to the Declaration of Rodney Gaughan in support of the Trustee's Memorandum of Law, filed contemporaneously herewith (the "Gaughan Declaration"):

    (i)    the Indenture, dated as of May 30, 2007, among the Company, the Issuers, the Trustee, as Trustee, Securities Intermediary, Custodian, Rule 144A Note Paying Agent, and Rule 144A Note Registrar, Deutsche Bank Luxembourg S.A., as Regulation S Note Registrar, Deutsche Bank AG, London Branch, as Regulation S Note Paying Agent, and FTC Emerging Markets, Inc., as Note Calculation Agent and Disposal Agent (the "Indenture"); and

    (ii)    the following three Supplemental Indentures (together, the "Supplemental Indentures"):

        (a)    the Supplemental Indenture, dated as of March 3, 2008, pursuant to which the Company, acting on behalf of and for the account of the Series 2008-4-C-NF-U Segregated Portfolio (the "Series 4 Issuer"), issued USD $10,000,000 in aggregate principal amount of Series 2008-4-C-NF-U Tranche 1 Notes due March 3, 2010 (ISIN XS0350019054) (the "Series 4 Notes");

        (b)    the Supplemental Indenture, dated as of March 10, 2008, pursuant to which the Company, acting on behalf of and for the account of the 2008-5-C-NF-M Segregated Portfolio (the "Series 5 Issuer"), issued MXN $80,000,000 in aggregate principal amount of Series 2008-5-C-NF-M Tranche 1 Notes due March 9, 2010 (ISIN XS0351533905) (the "Series 5 Notes"); and

(c) the Supplemental Indenture, dated as of August 20, 2008, pursuant to which the Company, acting on behalf of and for the account of the Series 2008-6-C-NF-U Segregated Portfolio (the "Series 6 Issuer," and together with the Series 4 and 5 Issuers, the "Issuers"), issued USD $50,000,000 in aggregate principal amount of Series 2008-6-C-NF-U Tranche 1 Notes due February 21, 2011 (ISIN XS0383952206) (the "Series 6 Notes," and together with the Series 4 and 5 Notes, the "Notes").

2.     The Notes are payable from collateral pledged to secure such Notes, which, for each series of Notes, consists of a 1992 ISDA Master Agreement (Multicurrency – Cross Border) between the Company and FTC Emerging Markets, Inc. (as supplemented, a "Swap").[1]   FTC Holdings LLC guaranteed FTC Emerging Markets, Inc.'s payment obligations under the Swaps pledged to secure the Series 4 and 6 Notes pursuant to separate Guarantees, dated as of March 3, 2008 and August 20, 2008, respectively.   FTC Capital Markets, Inc. was the initial purchaser of the Notes.

3.     Following the commencement of the SEC's action against the defendants on May 20, 2009, the Issuers failed to pay the principal and interest due in respect of each series of Notes.   The Trustee declared an event of default following each such payment default, but has thus far not accelerated the Notes.[2]

---

[1]  The collateral pledged to secure the Series 5 Notes includes a "Performance Account" maintained by FTC Capital Markets, Inc. at Penson Financial Services, Inc. (Account No. 11405727) (the "Performance Account").  The Performance Account is among the assets frozen by the Court pursuant to its *Stipulation and Order Imposing Asset Freeze and Other Relief Against Defendants FTC Capital Markets, Inc., FTC Emerging Markets, Inc. also d/b/a FTC Group and Guillermo David Clamens*, entered on June 29, 2009 [Docket No. 12].

[2] Pursuant to Section 5.1 of the Indenture, the Trustee is not required to accelerate the Notes of a particular series unless, following the occurrence of an event of default, the Trustee is so directed by a majority in aggregate principal amount of the Notes of such series or by an extraordinary resolution of the holders of the Notes of such series.

4.     On August 26, 2010, the Court entered final judgments against defendants FTC Capital Markets, Inc., FTC Emerging Markets, Inc., Guillermo David Clamens, and Nazly Cucunuba Lopez [Docket Nos. 48-51].  Pursuant to such final judgments, each defendant except Ms. Lopez relinquished all legal and equitable rights in their U.S. assets (including the Performance Account, which served as collateral for the Series 5 Notes), which were ordered to be converted to cash as soon as practicable and deposited into an interest-bearing account with the Court Registry Investment System (the "FTC Fund").

5.     On May 27, 2011, the SEC filed the Motion, which seeks entry of an order approving the Distribution Plan and appointing John J. Graubard, a Senior Attorney in the SEC's Division of Enforcement, as administrator of the FTC Fund (the "Fund Administrator").

6.     Section V.A of the Distribution Plan provides that the Fund Administrator shall distribute the balance of the FTC Fund on a pro rata basis to "Eligible Claimants."  As described below, the Trustee, as a creditor of the Company and the Issuers, is not and cannot be considered an "Eligible Claimant" under the Distribution Plan.

7.     A person or entity is considered an "Eligible Claimant" under the Distribution Plan if it falls into one of the following categories: (i) a "Pre-Qualified Claimant" that agrees with the amount of its claim, as identified by the Fund Administrator; (ii) a "Pre-Qualified Claimant" that files a proof of claim in an amount that differs from the amount of its claim, as identified by the Fund Administrator; and (iii) a "Potentially Eligible Claimant" with a claim which is approved following the filing of a proof of claim.

8.     Thus, to be considered an "Eligible Claimant," a person or entity must be considered a "Pre-Qualified Claimant" or a "Potentially Eligible Claimant."  The Distribution Plan defines "Pre-Qualified Claimant" as "any FTC Investor that the Fund Administrator has

identified as eligible for a distribution from the FTC Fund."  The Distribution Plan defines "Potentially Eligible Claimant" as "any FTC Investor or FTC Creditor who may have a claim to recover from the FTC Fund other than a Pre-Qualified Claimant."

9.      The Trustee is not and cannot be considered an "FTC Investor" or an "FTC Creditor" based upon the definitions of such terms in the Distribution Plan.  The Distribution Plan defines "FTC Investor" as "any Person who invested funds with FTC during the Covered Period," *i.e.*, April 1, 2008 through May 31, 2009.  The Distribution Plan defines "FTC Creditor" as "any person other than an FTC Investor who is owed money by FTC."  As noted above, "FTC" is defined in the definition of "Eligible Claimant" as "FTC Capital Markets, Inc. and/or FTC Emerging Markets, Inc."

## ARGUMENT

## I.      The Distribution Plan is Unfair and Unreasonable

10.      In order for this Court to approve the Distribution Plan, such plan must be "fair and reasonable."  *See*, *e.g.*, *In re The Reserve Fund Sec. and Derivative Litig.*, 673 F. Supp. 2d 182, 195 (S.D.N.Y. 2009) (citing *SEC v. Wang*, 944 F.2d 80, 88 (2d Cir. 1991)) ("Where courts have used their equitable powers to adopt distribution plans, the Second Circuit has required that the plans be 'fair and reasonable'"); *SEC v. Byers*, 637 F. Supp. 2d 166, 168 (S.D.N.Y. 2009) ("As a District Court sitting in equity, it is my responsibility to approve a distribution plan only if it is fair and reasonable").

11.      The Distribution Plan does not satisfy this standard unless it is modified in the manner described below because the Distribution Plan effectively prevents the Trustee from fulfilling its responsibilities under the Indenture and the Trust Indenture Act and prevents innocent investors who purchased or otherwise acquired Notes from receiving distributions in respect of such Notes.

**A.      The Distribution Plan Prevents the Trustee from Fulfilling its Responsibilities under the Indenture and the Trust Indenture Act and Asserting Claims for Fees and Expenses**

12.      Section 5.3 of the Indenture provides as follows:

> [I]n the case of the pendency of any … insolvency … or other judicial proceeding relative to the Issuer or its property, the Trustee shall be entitled and empowered … to take one or more of the following actions: (i) file and prove claims for the whole amount of the balance of the principal amount of, accrued and unpaid interest on, and all other amounts, if any, owing in respect of each Series of Notes and file such other papers … as may be necessary or advisable in order to have the claims of the Trustee … and the Holders allowed in such judicial proceeding; and (ii) collect and receive any moneys or other property payable or deliverable on any such claims and distribute the same.

13.      This section is consistent with section 317(a)(2) of the Trust Indenture Act, which requires that trust indentures authorize the indenture trustee to file proofs of claim.  15 U.S.C. § 77qqq(a)(2).  *See also* 11 U.S.C. § 501(a) ("an indenture trustee may file a proof of claim" in a bankruptcy case); Fed. R. Bankr. P. 3003(c)(5) ("An indenture trustee may file a claim [in a bankruptcy case] on behalf of all known or unknown holders of securities issued pursuant to the trust instrument under which it is trustee").

14.      In addition, pursuant to Section 6.1(b) of the Indenture, the Trustee is required to "use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  *See also* 15 U.S.C. § 77ooo(c) ("The indenture trustee shall exercise in case of default … such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs").

15.      Prudence would dictate that the Trustee file proof of claims for outstanding principal and interest payments owed to holders of each series of Notes.  However, pursuant to

the Distribution Plan, the Trustee is not eligible to file any such proofs of claim and any such proofs of claim filed by the Trustee would not be approved.  Sections V.B, V.D, and V.F of the Distribution Plan provide that only "Pre-Qualified Claimants" or "Potentially Eligible Claimants" are eligible to file proofs of claim with the Fund Administrator.  Further, Section V.E provides that the Fund Administrator need only serve deficiency notices, if appropriate, upon "Pre-Qualified Claimants" or "Potentially Eligible Claimants" which filed proofs of claim.  In addition, Section VI provides that only claims of "Eligible Claimants" which have been approved by the Fund Administrator are eligible to receive distributions.

16.     As noted above, because the definition of "FTC" excludes the Company and the Issuers, the Trustee is not considered a "Pre-Qualified Claimant," a "Potentially Eligible Claimant," or an "Eligible Creditor."  Accordingly, pursuant to the Distribution Plan, the Trustee is not eligible to file proofs of claim on behalf of Noteholders, in accordance with Section 5.3 of the Indenture and the Trust Indenture Act, and any such proofs of claim filed by the Trustee would not be approved.

17.     Pursuant to Section V.C of the Distribution Plan, the Trustee will not even receive notice of the proof of claim solicitation process from the Fund Administrator.  Section V.C of the Distribution Plan provides that (i) following the entry of an order approving the Distribution Plan, the Fund Administrator shall mail "Claims Packets" and notices to "those FTC Creditors known to the Fund Administrator" and "Pre-Qualified Claimants;" and (ii) "Potentially Eligible Claimants" may download a "Claims Packet" online from the SEC's website.   As noted above, because the definition of "FTC" set forth in the Distribution Plan excludes the Company and the Issuers, the Trustee is not considered a "Pre-Qualified Claimant," a "Potentially Eligible Claimant," or an "FTC Creditor."

18.     Further, Section 6.7(a) of the Indenture provides for payment by the Issuers of the Trustee's fees and expenses.  Specifically, Section 6.7(a) of the Indenture provides, among other things, that "[t]he Issuer agrees: (i) to pay … to the Trustee … compensation for all services rendered by it hereunder … [and] (ii) to reimburse … the Trustee … in a timely manner upon its request for all reasonable expenses … incurred … by the Trustee … (except any such expense … as may be attributable to the Trustee's gross negligence … or bad faith)."

19.     The Distribution Plan does not purport to modify the Trustee's fiduciary obligations under the Trust Indenture Act or the Indenture or the Trustee's contractual right to fees and expenses under the Indenture, nor could it under applicable law.  Therefore, the Distribution Plan is unfair and unreasonable its current form because it effectively prohibits the Trustee from filing proofs of claim on behalf of Noteholders or for fees and expenses which the Trustee has incurred.

**B.     The Distribution Plan Prevents Innocent Investors that Purchased or Otherwise Acquired Notes from Receiving Distributions in Respect of Such Notes**

20.     In certain instances the FTC entities deposited the Notes into the accounts of innocent investors who believed that they were purchasing different investment products.  For example, on March 9, 2009, CITGO Petroleum Corporation and PDV Holding, Inc. commenced an action by filing a complaint against the defendants in this action and FTC Holdings LLC alleging such conduct (the "CITGO Complaint," a copy of which is attached hereto as Exhibit A).  *See* Case No. 09-cv-02116 (JSR) [Docket No. 1].  Paragraphs 47-48 of the CITGO Complaint provide as follows:

> Plaintiffs instructed Defendant Lopez to invest $100 million on behalf of CITGO and $10 million on behalf of PDVH in 7-day CDs on April 23, 2008 …. Instead of making those investments, as instructed, and without Plaintiffs' knowledge or consent, Defendant Clamens, or an FTC employee at his direction,

> purchased into the CITGO account $10 million face amount of
> [Series 4 Notes], issued under Defendant Emerging Markets'
> Credit Linked Notes (CLN) program.

*See also* SEC Complaint [Docket No. 1] at ¶39 ("on August 21, 2008, Clamens and Lopez

caused CITGO's FTC account to purchase $25 million of [Series 6 Notes] and PDV's FTC

account to purchase $25 million of [Series 4 Notes]").

21.     In addition, as set forth in the Gaughan Declaration, the Trustee has been

contacted by Municipio de Atzapan de Zaragoza, a Mexican municipal entity which voluntarily

purchased MXN $50,000,000 in aggregate principal amount of the Series 5 Notes, *i.e.*, 62.5% of

the outstanding Series 5 Notes.

22.     Moreover, Section II of the Distribution Plan states that its purpose is to "achieve

the prompt, fair, and efficient allocation of the FTC Fund to investors that suffered a loss as a

result of their investment with FTC and to FTC's creditors."  Noteholders have suffered losses as

a result of their investments, and by excluding the Company and the Issuers from the definition

of "FTC," thereby preventing Noteholders from receiving distributions in respect of their Notes,

the Distribution Plan fails to accomplish its stated purpose.

**II.     <ins>The Distribution Plan Should be Amended in a Manner Which Ensures that the
Trustee May File Proofs of Claim Which May be Approved by the Fund
Administrator and that Noteholders May Receive Distributions</ins>**

23.     To ensure that the Trustee can file proofs of claim which may be approved by the

Fund Administrator and that Noteholders may receive distributions in respect of their Notes, the

Distribution Plan should be amended to include the Company and the Issuers within the

definition of "FTC."   In addition, conforming changes should be made to the investor and

creditor proof of claim forms to reflect such revised definition.

24.     Further, because any distributions to Noteholders must be made through the

Trustee pursuant to Section 5.3 of the Indenture, the Distribution Plan should specify that

distributions to Noteholders shall be made by and through the Trustee and the Trustee shall have satisfied its obligations under the Distribution Plan, the Indenture, and the Supplemental Indentures by making distributions to Noteholders as of the last day of the "Covered Period" under the Distribution Plan, *i.e.*, May 31, 2009.

25.     The Distribution Plan should, at the very least, include  provisions (i) exculpating the Trustee for any act or omission in connection with or arising out of the liquidation and distribution of the assets of the Company, the Issuers, FTC Capital Markets, Inc., FTC Emerging Markets, Inc., FTC Holdings LLC, their affiliates, Mr. Clamens, and Ms. Lopez, and (ii) cancelling the Indenture, the Supplemental Indentures, and the Notes, subject to the proviso that the Indenture, the Supplemental Indentures, and the Notes shall remain in effect solely for the purposes of allowing the Trustee to receive and distribute cash to Noteholders pursuant to the Distribution Plan and allowing the Trustee to exercise and assert its charging lien, payment priority rights, and indemnification rights under the Indenture.

## **CONCLUSION**

The Motion should be denied unless the Distribution Plan is amended to include (i) the Company and the Issuers within the definition of "FTC" (conforming changes should also be made to the investor and creditor proof of claim forms); (ii) a provision specifying that distributions to Noteholders shall be made by and through the Trustee and the Trustee shall have satisfied its obligations under the Distribution Plan, the Indenture, and the Supplemental Indentures by making distributions to Noteholders as of May 31, 2009; and (iii) provisions exculpating the Trustee and cancelling the Indenture, the Supplemental Indentures, and the Notes, as described above and subject to the limitations described above.

Dated: June 23, 2011                                Respectfully Submitted,
      New York, New York

                                                  /s/ Jeffrey Chubak
                                                  William G. Primps
                                                  Peter Baumgaertner
                                                  Jeffrey Chubak
                                                  DEWEY & LEBOEUF LLP
                                                  1301 Avenue of the Americas
                                                  New York, New York 10019
                                                  Tel: (212) 259-8000
                                                  Fax: (212) 259-6333

                                                  *Attorneys for Deutsche Bank Trust Company*
                                                  *Americas*

# EXHIBIT A

**(CITGO Complaint)**

JUDGE RAKOFF

09 CV 2116

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

CITGO PETROLEUM CORPORATION and
PDV HOLDING, INC.,

            Plaintiff,

     -against-

FTC CAPITAL MARKETS, INC., FTC
EMERGING MARKETS, INC., FTC
HOLDINGS LLC, FTC GROUP,
GUILLERMO DAVID CLAMENS, and LINA
LOPEZ,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.

**COMPLAINT**

JURY TRIAL DEMANDED

RECEIVED
MAR 09 2009
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiffs CITGO Petroleum Corporation ("CITGO") and PDV Holding, Inc. ("PDVH"),

by their attorneys, Morgan, Lewis & Bockius LLP, for their Complaint herein against

Defendants FTC Capital Markets, Inc., FTC Emerging Markets, Inc., FTC Holdings LLC, FTC

Group, Guillermo David Clamens, and Lina Lopez (collectively "Defendants"), allege as

follows, based upon knowledge, with respect to their own acts, and based upon facts obtained by

the investigation of their counsel:

     1.   This action involves a fraudulent scheme in which Defendants FTC Capital Markets,

Inc., Guillermo David Clamens and Lina Lopez, in violation of Plaintiffs' trust and instructions,

and in derogation of their duty to Plaintiffs, diverted and misused Plaintiffs' investment funds as

a "slush fund" to finance Defendants' own self-interested, unauthorized and speculative trading

in unregistered, risky, illiquid investments in which they had financial interests, the full extent of

which remain unknown to Plaintiffs at this time. From the inception of their relationship with

Plaintiffs, Defendants FTC Capital Markets, Clamens and Lopez encouraged Plaintiffs to invest

their operating funds in low-risk, short-term certificates of deposit and IMAXX and DRTXX money market funds that they offered to Plaintiffs on a daily basis. Yet these Defendants did not follow a single investment instruction given by Plaintiffs to make those investments. Rather, these Defendants used Plaintiffs' money for their own untoward purposes and issued materially false and misleading transaction confirmations, daily investment reports and monthly account statements that were intended to (i) deceive Plaintiffs into believing that their operating funds were being invested in safe and liquid short-term investments, as instructed, and (ii) conceal from Plaintiffs Defendants' illegal conduct. When Plaintiffs' demands for redemption of their investments exceeded what was left of their funds as a result of Defendants' unlawful trading, the fraudulent self-dealing activity was revealed and the scheme collapsed, causing Plaintiffs tens of millions of dollars in losses.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (the "Exchange Act"), and 28 U.S.C. §§ 1331, 1337 and 1367.

3. The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. 240.10b-5), as well as under state law.

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ § 1391(b) and (c). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District, Defendants conducted other substantial business within this District and at least one of the Defendants is headquartered in this District.

5. In connection with the acts and omissions complained of herein, Defendants, directly

or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mail and interstate telephone and electronic communications.

## PARTIES

6. Plaintiff CITGO Petroleum Corporation ("CITGO") is a Delaware corporation with its principal place of business located at 1293 Eldridge Parkway, Houston, TX 77077-1670.

7. Plaintiff PDV Holding, Inc. ("PDVH") is a Delaware corporation with its principal place of business located at 1293 Eldridge Parkway, Houston, TX 77077-1670. CITGO is an indirect wholly owned subsidiary of PDVH.

8. Defendant FTC Capital Markets, Inc. ("FTC"), a broker-dealer registered with FINRA (CRD# 125805), is a Delaware corporation with its principal place of business located at 126 East 56th Street, 11th Floor, New York, New York 10022. At all times relevant to the matters alleged herein, FTC acted as an introducing broker pursuant to a fully disclosed clearing agreement concluded between it and BNP Paribas Securities Corp. ("BNP Paribas"). Pursuant to that clearing agreement, FTC introduced customer accounts to BNP Paribas, which would act as clearing broker for the accounts. As set forth fully herein, in or around April 2008, FTC introduced and opened cash accounts at BNP Paribas in the name of CITGO and PDVH.

9. Upon information and belief, Defendant FTC Emerging Markets, Inc. ("Emerging Markets") is a Panamanian company with a place of business located at 126 East 56th Street, 11th Floor, New York, New York 10022. On information and belief, Emerging Markets is an investment advisory business that trades on a proprietary basis and also trades on behalf of, and advises, exclusively non-U.S. persons. Emerging Markets acted as arranger and dealer in respect to a series of Secured First-to-Default Credit-Linked Notes issued by FTC International SPC.

10. Defendant FTC Holdings, LLC ("Holdings") wholly owns Defendant FTC and

-3-

directs the management or policies of FTC. Holdings is a Delaware limited liability company with a registered agent for service of process listed by the Delaware Secretary of State as National Corporate Research, Ltd., 615 South Dupont Highway, Dover, Delaware 19901. Holdings' principal executive office is located at 126 East 56 St., Suite 3110, New York, New York 10022.

11. Upon information and belief, FTC Group ("FTC Group") is a conglomerate of financial services companies that, according to FTC Group's website, provides investment banking services to foreign banks, pension funds, insurance companies, asset managers and financial advisers. FTC Group advertises that it maintains offices in New York, Miami, London, Caracas, Lima and Mexico. Its New York office is located at 126 East 56 St., Suite 3110, New York, New York 10022, and its Miami office is located at 2 South Biscayne Boulevard, Suite 3790, Miami, Florida 33131.

12. Defendant Guillermo David Clamens ("Clamens") is the president of Defendant Emerging Markets, the chairman of Defendant FTC and the president of Defendant FTC Group. He is also the president and chief executive officer of Defendant Holdings, and directs the management or policies of that entity. Clamens is registered with FINRA (CRD #4310447) as an employee and chairman of FTC whose business address is 126 East 56 St., New York, New York. Upon information and belief, Clamens resides at 120 E. 87th St., Apt. P20D, New York, New York 10128-1194.

13. Upon information and belief, Defendant Lina Lopez ("Lopez") is an employee of Defendants FTC Group and/or Capital Markets, and works out of the FTC Group office in Miami. On information and belief, she is a resident of Miami, Florida.

-4-

**OTHER PERSONS**

14. Upon information and belief, FTC International SPC ("FTC International") is an exempted segregated portfolio company with limited liability incorporated under the laws of the Cayman Islands. FTC International was the issuer of certain notes secretly and illegally purchased and sold by Defendants FTC and Clamens with funds belonging to CITGO and PDVH and held in Plaintiffs' respective accounts at BNP Paribas. FTC was the Arranger and Dealer for the issuance of the notes traded illegally by FTC and Clamens in the accounts and, pursuant to ordinary custom and practice, stood to derive a financial benefit from the sale of those notes in the form of underwriting discounts and commissions. Defendant Emerging Markets was the "Default Swap Counterparty" and Defendant Holdings was the "Default Swap Guarantor" with respect to certain transactions related to the notes issued by FTC International.

15. Enrique Antonio Ocampo ("Ocampo") is registered with FINRA (CRD# 4271744) as an employee of both Defendants FTC and Emerging Markets, and his office is located at Defendant FTC's offices at 126 East 56th Street, New York, New York.

**FACTS**

16. CITGO is a refining and marketing company and is indirectly wholly owned by Petróleos de Venezuela, S.A. ("PDVSA"), the national oil company of the Bolivarian Republic of Venezuela.

17. CITGO operates nationwide with its corporate operations and principal place of business based in Houston, Texas.

18. CITGO's Treasury Department ("Treasury") manages and monitors the CITGO's operating cash flow on an intraday basis. Excess cash in the CITGO's operating account is routinely invested daily. Because operating account funds are used for CITGO's day-to-day

operations, company policy mandates that their investment must be consistent with the objective of maintaining adequate liquidity to meet the company's short-term cash flow requirements. Approved investments are limited to short-term, low-risk investments such as certificates of deposit ("CD's") or money market mutual funds.

19. Treasury determines how long to invest the funds based on the company's cash flow demands. For example, where the demand for operating funds is light, CITGO may invest excess funds for 7 or 14 days or, in very limited circumstances, for 30 days. Where cash liquidity needs are greater, excess funds might be invested only on an overnight basis.

20. At all relevant times, Treasury was also responsible for monitoring the cash flow for PDVH, and for investing its excess operating funds, if any. Because PDVH's cash demands were less than those of CITGO, PDVH's funds tended to be placed in longer term, low-risk investments of no longer than 30 days.

**Defendant FTC Introduces CITGO and PDVH Accounts to BNP Paribas**

21. In or around early 2008, CITGO's Treasurer, Maritza Villanueva ("Villanueva") learned about Defendant Clamens from a trusted business associate of CITGO's parent company, PDVSA.

22. In and around March 2008, Villanueva received from Defendant Clamens Customer Cash Account Agreements, portions of which would need to be completed and executed by CITGO and PDVH in order to open investment accounts at BNP Paribas. Thereafter, having been encouraged by Clamens to do so, a member of Villanueva's staff contacted Defendant Lopez for direction as to what portions of the Agreements were necessary to complete and return to Lopez. The Agreements were completed and returned to Lopez as Lopez directed.

23. One of the portions of the Agreements that was left blank by CITGO and PDVH,

-6-

respectively, when returned to Defendant Lopez was the portion titled "Investment Objectives," in which prospective accountholders were asked to choose from among eight descriptions the one that was consistent with their investment objectives.  Short-term, low-risk investment was not among the eight descriptions and, accordingly, CITGO and PDVH, respectively, returned their Agreements to Lopez without completing that portion.

24. On information and belief, without CITGO's knowledge or consent, and contrary to CITGO's stated investment objectives, Defendants Lopez and/or Clamens completed the "Investment Objectives" portion of the Customer Cash Account Agreement returned by CITGO, checking the description "Speculative (want increase in value of investments – High Risk)". This investment objective designation assured that Defendant FTC, through Lopez and/or Clamens, could engage in speculative trading in the account (purportedly on CITGO's behalf) without fear of inquiry from BNP Paribas.

25. On information and belief, Defendants Lopez and/or Clamens forwarded the falsified CITGO account form and the PDVH account form to BNP Paribas to effectuate the opening of the investment accounts.

26. In April 2008, the accounts were opened at BNP Paribas.  An account in the name of CITGO Petroleum Corporation was assigned the customer account number 31600066 (the "CITGO account") and an account in the name of PDVH was assigned the customer account number 31600085 (the "PDVH account").  Both accounts identified Defendant FTC as the "Account Executive" for the account.

27. Thereafter, CITGO received a proposal from Defendant Lopez that contained investment information about certain BNP Paribas money market funds and certificates of deposit.  Also in or around April 2008, Villanueva and her Treasury colleague, Fatima Romero

-7-

("Romero"), spoke with Defendants Clamens and Lopez about CITGO's investment objectives, making clear that the company sought only those short-term investments that would optimize the rate of return on investments, consistent with the goals of safety and liquidity, and maintain adequate liquidity to meet the company's short-term cash flow requirements. They also conveyed CITGO's corporate investment policy to Clamens to ensure that he understood what investments were suitable and authorized.

28. From the opening of the CITGO and PDVH accounts in April 2008 until November 19, 2008 – when, based on their discovery of Defendants' fraudulent and unauthorized conduct, Plaintiffs revoked Defendant FTC's authority to order trades or provide any other instructions with respect to the accounts – Defendants FTC, Lopez and Clamens were responsible to act as Plaintiffs' trusted intermediaries in connection with investments made and redeemed in those accounts.

29. Investment instructions were generally formulated and communicated as follows. Each weekday morning, Defendant Lopez sent an e-mail to Treasury, including Villanueva, Romero, Oscar Rodriguez ("Rodriguez") (CITGO's supervisor of cash operations) and, sometimes, Eric Peña ("Peña") (Treasury Analyst), in which she purported to provide the interest rates available on that date for investments in BNP Paribas certificates of deposit and/or the IMAXX or DRTXX money market funds. As a matter of course, Lopez copied Defendant Clamens on each of these "Daily Rate" e-mails. Romero and Rodriguez, under the supervision of Villanueva, would then would review the investments and rates offered in Lopez' e-mail, and determine, based on CITGO's and PDVH's respective operating capital liquidity needs, whether and how much to invest, for how long and at what rate. Specific investment instructions typically were communicated by Romero, Rodriguez or Peña to Lopez by way of a "reply to all"

-8-

e-mail, such that both Lopez and Clamens received the information.

30. On information and belief, Defendant Clamens, a registered securities professional, would, in turn (but, as it turns out, only in theory) execute the investment instructions provided by CITGO and PDVH, or instruct another registered trader employed by FTC to do so. Defendant Lopez would then contact BNP Paribas to provide information about the transactions that Clamens or other FTC traders undertook, so that BNP Paribas could process and settle those transactions in the CITGO or PDVH account, as appropriate.

31. On information and belief, Defendant Lopez provided settlement instructions to BNP Paribas in New York from her office in Florida by way of electronic and/or telephonic communications.

32. Defendant Lopez would then "confirm" to CITGO and/or PDVH, as appropriate, receipt and implementation of their respective instructions by way of the "reply to all" e-mail function, such that Defendant Clamens was made aware of her representations in that regard.

33. At no time did Defendants FTC, Lopez or Clamens offer or confirm, or did CITGO or PDVH authorize, investments other than short-term CD's and money market mutual funds.

34. Each of the Daily Rate e-mails contained information about CD's and money market fund investments only.

35. For example, at 8:37 a.m. on April 23, 2008, Defendant Lopez sent a Daily Rate e-mail to Rodriguez, Romero and Villanueva, copy to Defendant Clamens, that read as follows:

> Goor [sic] morning!
> These are today's rates:
> BNP CD (7 Days Fixed Rate) 3.22%
> BNP CD (14 Days Fixed Rate) 3.24%
> Daily Income Fund Money Market Portfolio – Retail Shares 2.22%
> Daily Income Fund Money Market Portfolio – Institutional Service Shares 2.77%

36. At 10:28 a.m., Rodriguez responded, with a copy to all, including Clamens:

-9-

> Lina,
> CITGO would like to invest $100MM in BNP CD (7 Days Fixed Rate) 3.22%
> PDVH Holding would like to invest $10MM in BNP CD (7 Days Fixed Rate) 3.22%
> Please lets [sic] us know ASAP if there is anything else on CITGO or PDV Holding Side [sic] that needs to be done prior to completing these two purchases.

37. After several exchanges relating to the logistics of wire transfers to fund each of these investments, Defendant Lopez confirmed at day's end, with a copy to Defendant Clamens, "Good afternoon, this e-mail is to confirm you [sic] that the funds were received on each account."

38. In addition to Defendant Lopez' Daily Rate e-mails and attendant confirmatory e-mails, Defendant FTC, through Lopez and Clamens, provided periodic reports and account statements purporting to reflect activity, balances and investments in the CITGO and PDVH accounts.

39. CITGO and PDVH representatives repeatedly emphasized their desire and need for daily position information in the accounts and timely monthly statements. Unlike other brokers with whom Plaintiffs worked, Defendant FTC did not provide on-line access through which Plaintiffs could obtain account information readily.

40. Accordingly, beginning in May 2008 and at all relevant times thereafter, Defendant FTC, through Defendants Lopez and Clamens, provided a daily Leverage Trades Finance Report, which purported to show the daily position in each account, including the account number, the investment, the start and end date of the investment, the rate, the principal, and the accrued interest. Typically these reports were sent by e-mail by Defendant Lopez, with a copy to Defendant Clamens.

41. Plaintiffs relied on the daily Leverage Trades Finance Report to verify their internally-generated Daily Investment Worksheets, which tracked all investments of CITGO and

-10-

PDVH operating funds, including those placed through Defendants FTC, Lopez and Clamens. Treasury employees would use the daily Leverage Trades Finance Reports to validate that the information received from FTC matched the record kept by Treasury and ensure that each investment transaction was properly recorded.

42. In addition, Defendant FTC, through Defendants Lopez and Clamens, undertook to provide detailed monthly account statements, which, they were told repeatedly by Treasury, were necessary to perform Treasury's corporate accounting functions and reconcile its internal accounting systems with information provided by Plaintiffs' brokers and financial institutions.

43. As alleged more specifically below, at all times, the daily Leverage Trades Finance Reports and the monthly account statements provided by Defendants FTC, Lopez and Clamens for the CITGO and PDVH accounts reflected that all funds invested on Plaintiffs' behalf were put in short-term CD's and money market mutual funds, as directed by Plaintiffs.

44. Plaintiffs relied on this daily information, provided by their fiduciaries, to keep accurate books and records and to monitor and safeguard the companies' daily operating funds.

**Defendants' Fraudulent and Unauthorized Conduct**

45. Unbeknownst to Plaintiffs, from the inception of activity in the CITGO and PDVH accounts, Defendants engaged in a fraudulent course of conduct that was designed to benefit them, while putting in peril and, ultimately, depriving Plaintiffs of their funds and the immediate cash liquidity on which they relied to fund their daily operations.

46. Defendant FTC, through Defendants Lopez and Clamens, failed to execute and follow the very first instructions given them in each account.

47. On April 23, Plaintiffs instructed Defendant Lopez to invest $100 million on behalf of CITGO and $10 million on behalf of PDVH in 7-Day CD's on April 23, 2008, as alleged in

-11-

paragraphs 35-37, above.

48. Instead of making those investments, as instructed, and without Plaintiffs' knowledge or consent, Defendant Clamens, or an FTC employee at his direction, purchased into the CITGO account $10 million face amount of FTC International SPC Floating Rate Secured First-To-Default Credit-Linked Notes, Series 2008-4-C-NF-U Tranche 1, issued under Defendant Emerging Markets' Credit Linked Notes (CLN) program.

49. According to the Offering Circular and Offering Circular Supplement for these notes – neither of which was provided to Plaintiffs by any Defendant at the time of the investment and were only recently obtained by Plaintiffs – the notes bear an interest rate of 6%, paid every six months, and are due March 3, 2010.  The Offering Circular states that these notes are sold through FTC, as dealer.

50. The Offering Circular warns that investment in the notes involves significant risks, including liquidity risk, that are directly contrary to the investment guidelines governing investment of CITGO's and PDVH's operating funds, which, as alleged in paragraph 27 above, Plaintiffs communicated to Defendants FTC, Lopez and Clamens.  The Offering Circular states that:

> Investment in the Notes may only be suitable for investors who:
>
> (a)     are particularly knowledgeable in investment matters and have the knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Notes and rights attaching to the Notes;
>
> (b)     are capable of bearing the economic risk of an investment in the Notes for an indefinite period of time;
>
> (c)     are acquiring the Notes for their own account for investment, not with a view to resale, distribution or other disposition of the Notes (subject to any applicable law requiring that the disposition of the investor's property be within its control); and

-12-

(d)     recognize that it may not be possible to make any transfer of the Notes for a substantial period of time; if at all.

51. The FTC International notes are payable solely from the collateral pledged to secure the notes, which consists solely of an asset swap agreement between the issuer (FTC International) and Defendant Emerging Markets.  The proceeds of the sale of the notes are to be transferred to Emerging Markets upon issuance of the notes.

52. The notes also include a credit default swap feature.  Note holders are subject to a reduction of their principal if there is a "credit event" with respect to specified entities – PDVSA or Republica Bolivariana de Venezuela.  A "credit event" generally includes a default on any payment obligation of those entities. The Offering Circular also discloses that, as the Dealer for the issuance of the notes, Defendant FTC was to receive compensation in the form of underwriting fees and commissions upon their sale.  In addition, the Offering Circular documents identify Defendant Emerging Markets as the Default Swap Guarantor and Asset Swap Guarantor with respect to the asset swap and default features described herein.  An Offering Circular Supplement explicitly describes the obligations of Emerging Markets as Asset Swap Counterparty and Default Swap Counterparty to be "unconditionally and irrevocably guaranteed" by Defendant Holding pursuant to a guarantee issued in favor of FTC International.

53. Based on the foregoing, Defendants FTC, Lopez and Clamens had an economic motive and the opportunity to engage in the fraudulent purchase of the notes into the CITGO account and all Defendants, including Emerging Markets and Holdings, directly benefited from FTC's, Lopez' and Clamens' self-interested, illegal and undisclosed conduct.  Plaintiffs are currently unaware of the full extent of the benefit to Defendants.

54. Also on April 23, 2008, Defendant FTC, through Defendants Lopez and Clamens,

-13-

made undisclosed and unauthorized purchases into the CITGO account of $10 million face amount of bonds issued by the Bolivarian Republic of Venezuela, bearing an interest rate of 9.25% and due September 15, 2027.

55. In total, Defendants FTC, Lopez and Clamens diverted $19,380,555.56 of CITGO's $100 million investment to fund these self-dealing, risky and unauthorized note and bond purchases.

56. Defendants FTC, Lopez and Clamens did not invest the remaining $80.62 million of CITGO's initial $100 million investment in a 7-Day BNP CD, as instructed by CITGO and confirmed by Lopez. Rather, the funds were placed in an unauthorized and undisclosed daily income money market fund.

57. Similarly, Defendants FTC, Lopez and Clamens failed to invest the $10 million provided by PDVH in a 7-Day BNP CD, as instructed on April 23. Rather, the funds were placed in an unauthorized and undisclosed daily income money market account.

58. A week later, on April 29, in response to the Daily Rates email sent by Defendant Lopez, Treasury, on behalf of CITGO, instructed that Defendant FTC re-invest the initial $100 million, as well as an additional $100 million into 7-Day BNP CD's at a rate of 3.23%. A short while later, Lopez responded, "Hi Oscar, just to let you that [sic] the funds have been received in the account and the investment was executed." Per standard practice, Defendant Clamens was copied on this entire exchange.

59. Contrary to Defendant Lopez' representation, Defendants FTC, Lopez and Clamens did not invest and re-invest $200 million into 7-Day BNP CD's, but rather deposited the funds into a daily income money market fund.

60. Thereafter, by email from Defendant Lopez, with a copy to Defendant Clamens,

-14-

DB1/62462125.5

Defendant FTC provided to Plaintiffs account statements for the month of April that purported to reflect activity in the CITGO and PDVH accounts in that month.

61. The FTC-generated April account statement for the CITGO account falsely states that two 7-Day BNP CD's were purchased into the account, one on April 23 and the other on April 29, and that first CD, which purportedly expired on April 30, was re-invested into a 7-Day BNP CD. The statement also included a pie-chart falsely indicating that 100% of CITGO's portfolio was invested in 7-Day BNP CD's, and zero percent was invested in money market funds.

62. Defendants FTC, Lopez and Clamens even went so far as to calculate accrued interest on the fictitious CD investments, and to designate that interest in the statement.

63. Defendants FTC, Lopez and Clamens knowingly misrepresented and concealed in the April confirmations and account statements that (1) Plaintiffs' operating funds had not been invested in the safe, liquid, short-term CD investments that CITGO and PDVH had directed; and (2) FTC, Lopez and Clamens had diverted nearly $20 million of CITGO's funds to finance unauthorized and unsuitable purchases of illiquid international bonds in which all Defendants had an economic interest, and deposited the balance in an unauthorized and undisclosed money market fund.

64. The falsity of the confirmations and statements provided by Defendants FTC, Lopez and Clamens is demonstrated by account records kept by BNP Paribas, the existence of which only recently became known to Plaintiffs. The BNP Paribas records show that, at no time during the course of the parties' relationship did FTC, Lopez or Clamens purchase a CD investment on behalf of CITGO. Indeed, on information and belief, none of the Defendants is or was then an authorized agent of BNP Paribas for the purpose of soliciting or accepting CD's.

65. The BNP Paribas account records further confirm Defendants FTC's, Lopez' and

-15-

Clamens' secret diversion of nearly $20 million of CITGO's funds in April 2008 to purchase the unauthorized and risky international bond positions into the account.

66. Defendants FTC, Clamens and Lopez similarly misrepresented and concealed their activity in the PDVH account in April 2008.

67. The April account statement provided by Defendants FTC, Lopez and Clamens for the PDVH account states falsely that FTC, Lopez and Clamens followed and executed PDVH's instruction to invest $10 million in an interest-bearing CD. The BNP Paribas account records show that no CD investment was ever made in the account, and, instead, FTC, Lopez and Clamens secretly deposited the $10 million provided by PDVH in April into a daily money market fund.

**Defendants FTC, Clamens and Lopez Continue To Ignore Plaintiffs' Investment Instructions and Make False Statements to Protect Their Ability to Divert Plaintiffs' Funds to Their Speculative and Unauthorized Trading Scheme**

68. In May 2008, Defendants FTC, Lopez and Clamens continued to solicit CITGO and PDVH to invest in short-term BNP CD's and the IMAXX and DRTXX money market funds by means of the Daily Rate e-mails, and to confirm falsely those supposed investments to Plaintiffs, all the while keeping the money in an unauthorized and undisclosed daily income money market fund from which they made withdrawals as necessary to finance their continuing course of wrongful trading.

    a. On May 2, in response to Lopez' Daily Rates e-mail, Rodriguez instructed FTC to invest an additional $50 million in a 7-Day fixed rate BNP CD in the PDVH account.

        i. In an e-mail later that day, Lopez wrote, "The Funds have been received and the investment has been executed." Clamens was copied on the e-

-16-

DB1/62462125.5

mail.

    ii.  In fact, however, no CD investment was made in the account, and the funds were instead deposited into an unauthorized daily income money market fund.

b.  On May 6, 2008, Rodriguez instructed Lopez, with a copy to Clamens, to redeem $100 million from the CITGO account and re-invest it in another 7-Day BNP CD. He also informed Lopez that CITGO would wire an additional $150 million to be invested in a 7-Day CD.

    i.  Later that day, Lopez confirmed, "[T]he funds have been received in the account and the investment and re-investment have been executed." Clamens was copied on the e-mail.

    ii.  Both purported CD investments were listed in the daily Leverage Trades Finance Report that FTC provided on May 8, 2008. In fact, however, no CD investments were made in the account on May 7 or thereafter.

c.  On May 7, 2008, Rodriguez instructed Lopez, with a copy to Clamens, to re-invest expiring 7-Day CD's in the CITGO and PDVH accounts into 7-Day fixed rate CD's.

    i.  Lopez responded, copy to Clamens, "Oscar, both re-investments have been executed."

    ii.  FTC provided Leverage Trades Finance Reports to PDVH on May 8 and to CITGO on May 9 that showed the investments were made as directed. In fact, however, there were no CD positions in either account and, consequently, no re-investments made.

-17-

d.  On May 9 and again on May 20, 2008, in connection with the fabricated CD offerings, Lopez advertised Daily Rates for 7- and 14-Day CD's, with the admonitions, "For re-investment only" and "This offer is valid only for re-investments. We are not accepting new orders at this time." Rodriguez instructed the re-investment of CD's purportedly held in the CITGO and PDVH accounts into certain of the "re-investment only" offerings announced by Lopez.

   i.  FTC issued daily Leverage Trades Finance Reports on May 9 and May 21 showing that the re-investments were made as directed.

   ii.  In fact, however, there were no CD positions in the CITGO and PDVH accounts and, consequently, no re-investments were made.

e.  Treasury employees directed additional CD re-investment instructions on May 13, 14, 15, 20, 21, 27 and 28, yet FTC, Lopez and Clamens did not implement those instructions.

   i.  For example, on May 13, 2008, in response to a question from Treasury, Lopez falsely represented that two CD's in the CITGO account had reached their maturity.

   ii.  In reliance on her representation, Treasury directed re-investment of the purported CD positions into another 7-Day CD.

   iii.  The May 13 daily Leverage Trades Finance Report provided by FTC falsely showed that the investments had been made as directed.

   iv.  Daily Leverage Trades Finance Reports provided by FTC for May 14, 15, 20, 21, 27 and 28 were similarly false, confirming fictitious CD positions and re-investments when, unbeknownst to Plaintiffs at the time, FTC,

-18-

Lopez and Clamens had not executed a single one of Plaintiffs'
instructions to invest or re-invest in CD's.

    v.   These statements were knowingly false, as there were no CD positions in
the account at that or any other time.

   f.   On May 16, 2008, in response to Lopez' Daily Rates e-mail, Treasury directed
FTC to redeem PDVH's $50 million CD position and invest the redemption
proceeds into the IMAXX fund. On May 21, 2008 Treasury directed Lopez to
redeem the IMAXX investment and put it into a 7-Day CD.

    i.   Daily Leverage Trades Finance Reports dated May 21 and May 23 falsely
show that the redemptions and re-investment were made as directed.

    ii.   In fact, however, as FTC, Lopez and Clamens were aware, the
redemptions and CD and IMAXX investments directed by PDVH and
confirmed by FTC, Lopez and Clamens had never occurred.

69. The oral and written representations made by Defendant FTC, through Defendants
Lopez and Clamens, did not disclose that, throughout the month of May, instead of executing
CITGO's instructions, Clamens, or an FTC employee at his direction (again) effectuated
numerous risky and unauthorized transactions in CITGO's account. In early May, Clamens or
his designee purchased $10 million face amount of Bolivarian Republic of Venezuela bonds, due
September 15, 2028, and bearing 9.25% interest. At the end of the month, Clamens or his
designee sold the bonds at a profit of nearly $420,000.00.

70. At no time were Plaintiffs aware of, nor did they authorize, nor did Defendants FTC,
Lopez or Clamens disclose, this speculative trading in the CITGO account.

71. Also in the month of May, Defendant FTC, through Defendant Clamens or his

-19-

designee, secretly purchased a total of $30 million face value of bonds issued by the Bolivarian

Republic of Venezuela. By month's end, more than 10 percent of the actual CITGO account

portfolio consisted of international bond positions. This amount did not even include the FTC

International note position that was the result of the unauthorized and undisclosed trading in the

account in April. On information and belief, BNP Paribas was unable to find sufficient market

information about the note and trading in the note to value it.

72. Plaintiffs recently learned through BNP Paribas account records that, because of the

unauthorized trades concealed by Defendants FTC, Lopez and Clamens, the actual CITGO

account balance at the end of May 2008 was more than $45 million less than CITGO reasonably

expected, based on its investment instructions and its reliance on the false and misleading

statements and documents provided by FTC, Lopez and Clamens.

73. Plaintiffs also learned recently that the PDVH account was actually invested 100% in

unauthorized and undisclosed money market funds as of the end of May 2008, not in CD's, as

Treasury had instructed and Defendant Lopez had repeatedly confirmed.

74. The unlawful conduct of Defendants FTC, Lopez and Clamens continued in June

2008.

75. On five occasions that month, Treasury employees directed re-investment or

redemption of what they believed were CD positions in the CITGO account. Defendant Lopez,

with a copy to Defendant Clamens, falsely confirmed each of Treasury's instructions.

76. On three occasions that month, Treasury directed re-investment or redemption of

what were believed to be positions in CD and IMAXX positions in the PDVH account.

Defendant Lopez, with a copy to Defendant Clamens, falsely confirmed each of Treasury's

instructions.

-20-

77. The June 2008 account statements provided by Defendant FTC, as in prior months, conformed exactly to what Plaintiffs had instructed.

78. Those statements concealed, however, that no CD investments or redemptions were effected in either account because there were never any CD positions to begin with. The CITGO statement also failed to reflect that Defendants FTC, Lopez and Clamens had repeatedly purchased and sold Venezuelan bonds in the accounts throughout June.

79. July brought more of the same. Plaintiffs provided instructions, Defendant Lopez provided confirmations and daily reports on which Defendant Clamens was copied, and Defendant FTC sent monthly account statements concealing the true nature of FTC's, Lopez' and Clamens' activity.

80. As in prior months, the statements and documentation provided by Defendants FTC, Lopez and Clamens did not reflect what had actually happened in the accounts. Plaintiffs recently learned from the BNP Paribas account records that their instructions to FTC, Lopez and Clamens were roundly ignored and FTC, Lopez and Clamens instead made whatever use of Plaintiffs' funds as would serve Defendants' self-interest, including the unauthorized and undisclosed trading in the risky and illiquid international notes and bonds alleged above.

81. On July 22, 2008, adding a new dimension to the FTC deception, Defendant Lopez threatened Treasury with a penalty for early redemption of a (fictitious) CD investment when Treasury mistakenly sent a redemption request to Lopez that was intended for another broker in relation to another investment.

**As Plaintiffs' Cash Flow Demands Require Increasingly Immediate**
**Return of Investment Proceeds, Defendants' Scheme Begins to Unravel**

82. In August 2008, Defendants FTC, Lopez and Clamens' ability to maintain free but improper use of Plaintiffs' money was frustrated by CITGO's increasing need for operating cash

-21-

liquidity.

83. In an effort to keep Plaintiffs' money "invested" and available to finance the illegal trading scheme, Defendant Lopez sent an e-mail on August 19, 2008 seeking instructions with respect to a $150 million "CD" position that purportedly was to expire on that date. Treasury directed Lopez to re-invest the proceeds into the overnight IMAXX fund. Lopez responded, with a copy to Defendant Clamens, "[Y]our order has been executed!"

84. In fact, however, Defendants FTC, Lopez and Clamens did not deposit the funds into the IMAXX fund.

85. On August 20, 2008, Treasury directed that the entire IMAXX position it believed sat in the CITGO account be redeemed, and the redemption proceeds of $151.3 million be wired directly to CITGO. The wire was made and received.

86. Just days later, on August 25, Treasury directed the redemption of the two remaining "CD" positions (totaling more than $150.7 million) in the account, and asked that the funds be wired on a rush basis directly to CITGO's account at Citibank.

87. In reliance on the confirmations, daily Leverage Trades Finance Reports and monthly account statements provided to CITGO by Defendants FTC, Lopez and Clamens, CITGO reasonably believed that the redemptions ordered on August 25 could and would be honored, and that the proceeds would be remitted to its operating account at Citibank on a timely basis.

88. Plaintiffs recently learned, however, that due to the fraudulent, speculative and unauthorized trading in the account, there were insufficient funds available to fund CITGO's August 25 wire transfer request. At the time, Defendants FTC, Lopez and Clamens concealed the shortfall by asserting that the wire could not be sent because CITGO had not made its request in a timely fashion. Lopez then e-mailed CITGO, with a copy to Clamens:

Guillermo [Clamens] have been [sic] contacted the MMK Fund and advised them of this big redemption ([s]ent after the cut-off time). They can make and [sic] exception of 100MM for today and the difference for tomorrow. Please let me know if you will like [sic] to proceed with this wire.

89. Defendant Lopez' statement was knowingly and patently false when made, because the reason Defendant FTC could not effectuate the wire was because the illegal trading by FTC and Defendant Clamens (the specifics of which were known to Lopez as she reported them to BNP Paribas for processing) had created a shortfall in the account.

90. Indeed, on August 7, 2008, using CITGO's funds, Defendants FTC and Clamens purchased, without authorization or disclosure, an additional $30.625 million face amount of international bonds. On August 13, 2008, they sold those bonds, at a modest profit.

91. On August 20, 2008, they siphoned another $25 million from the CITGO account to finance the unauthorized purchase of $25 million face amount of a second tranche of FTC International notes, the sale of which benefited all Defendants, directly or indirectly, as alleged in paragraphs 51-53, above.

92. As a consequence, only $111.1 million was available in the account on August 25 to honor CITGO's $150.3 million wire request.

93. Faced with likely detection if the wire request was not honored in full, Defendants FTC and Clamens sold a total of $60 million face amount of the FTC International note positions out of the CITGO account on August 20 and 25. Defendant FTC also sold $5 million face amount of the undisclosed Bolivarian Republic of Venezuela bond position out of the account on August 25.

94. Unfortunately for Plaintiffs, Defendants FTC, Lopez and Clamens secretly sold the illiquid (and undisclosed) FTC International notes into the PDVH account, thereby helping themselves to PDVH's funds to hide the fraudulent trading they had conducted in the CITGO

-23-

account.

95. In the August month-end statements provided by Defendant FTC for the CITGO and PDVH accounts, there is no reflection of this activity.

96. The PDVH account is shown falsely to have an account balance of $60,558,752.03, comprised of a 30-day BNP CD ($55,267,425.19) and an IMAXX position ($5,291,326.84).

97. In fact, the month end balance in the account was just $10,155,278.42, consisting of $155,278.42 in an unauthorized money market fund, and $10 million face amount of FTC International notes. An additional position of $50 million face amount of FTC International notes was in the account, but assigned zero market value by BNP Paribas.

98. The CITGO account statement provided by Defendant FTC falsely reflects a zero balance, with the only activity in the account for the month being investments, re-investments and redemptions in CD's and money market funds.

99. In fact, the month-end account balance in the account was $1,226,884.56, all in a money market fund. Plaintiffs recently learned that the BNP account records confirm the unauthorized trading as alleged in paragraphs 93-94, above.

100. In September 2008, Defendants FTC, Lopez and Clamens continued their ruse of offering and confirming BNP CD and IMAXX investments, while never actually effectuating investments in either, but instead depositing the investment funds into an undisclosed daily income money fund from which they financed their speculative trading in international notes and bonds.

101. In this regard, on September 4, 8, 11, 18 and 19, Defendant Lopez confirmed that CITGO's investment and redemption instructions relating to CD investments had been executed. Defendant Clamens was copied on each of these communications. In fact, no CD investments

-24-

were made or redeemed in the account in September, or at any other time. Also in September, Defendants FTC, Lopez and Clamens accepted funds from CITGO for investment into IMAXX, and wired funds to CITGO in response to requests to redeem the supposed IMAXX investments.

102.    The September account statement from Defendant FTC falsely reflects only investments in and redemptions of the fictitious CD and IMAXX positions that occurred in that month. The month-end account balance was reflected as $6,200,000.00, all in IMAXX.

103.    The FTC account statement did not reflect that Defendants FTC, Lopez and Clamens actually had purchased into and sold out of the account $22 million face amount of bonds issued by the Bolivarian Republic of Venezuela. The trading of these bonds generated more than $800,000.00 in losses.

104.    In September, based upon Treasury's instructions and Defendant Lopez' confirmations, the daily Leverage Trades Finance Reports and the monthly account statement, PDVH reasonably believed it was invested in a 30-day CD and the IMAXX money fund.

105.    Indeed, on September 26, 2008, Defendant Lopez falsely confirmed to PDVH, with a copy to Defendant Clamens, "[Y]ou have re-invested $55,400,527.57 in a 30 Days CD at a rate of 3.35%."

106.    Moreover, the month-end account statement provided by Defendant FTC showed only the fictitious CD and IMAXX investments.

107.    In fact, however, there was no CD in the account in September or at any other time. Rather, PDVH's funds remained invested in the illiquid and largely worthless FTC International notes that Defendant FTC had sold to the account in August, when the illegal activity in the CITGO account prompted them to sell those positions out of that account to avoid detection.

-25-

108.     In addition, the account had only $462,889.19 in an unauthorized daily income fund – over $4.8 million less than Defendants FTC, Lopez and Clamens represented.

**In October and Early November 2008, No Longer Able to Manipulate Plaintiffs' Funds and Continue Their Scheme, Defendants FTC, Clamens and Lopez Failed to Honor CITGO's Redemption Request, Made Additional Misrepresentations and Repeatedly Broke Their Promises to Reimburse CITGO for the Losses They Caused**

109.     In October 2008, CITGO's cash flow needs caused Treasury to shun investments even in short-term CD's, and to invest exclusively on an overnight basis in the IMAXX fund.

110.     On October 1-3, 6, 7, 9, 14-17, 20, 21, 23, 24, 27-30, CITGO directed Defendant FTC to invest a total of nearly $550 million in the IMAXX overnight fund.  On all but two occasions, CITGO requested redemption of each day's investment on the next business day.

111.     The redemption that was owed CITGO on October 21, 2008, however, was not made on a timely basis.  On October 24, 2008, after having been informed by Treasury that the redemption wire had not yet been received, Defendant Lopez claimed to have resent the wire.  Curiously, when the wire was finally received, the principal and interest had been wired separately because, Lopez claimed, the investment funds had not been received in the CITGO account in time to earn the overnight interest.

112.     Interest was again wired separately from principal on October 24 and October 30.

113.     On Friday, October 31, 2008, CITGO requested the redemption of $21.6 million (plus $1,650.00 in interest) that it wired the day before for investment in IMAXX.  CITGO instructed that the redemption and interest proceeds be wired directly to CITGO's operating account at Citibank.

114.     When later that day the funds had still not been wired into the Citibank account, Treasury requested that Defendant Lopez provide a FED wire number (a tracking number for wire transfers).  Lopez responded that she did not have a wire number yet, because "all the

-26-

operations are running late for the month's closing." Defendant Clamens was copied on this exchange.

115.     This began a series of excuses and fabrications put forth by Defendants FTC, Lopez and Clamens – and another employee apparently employed by Defendant FTC – in an effort to conceal that the redemption request could not be funded because unlawful trading in the account had robbed it of liquid cash and left it only with an unsalable, worthless position in FTC International notes.

116.     When Treasury again contacted Defendant Lopez on Monday November 3, Lopez, with a copy to Defendant Clamens, responded that "the wire transfer had passed the cut-off time on Friday because of the volume of the transactions for the month closing. The wire remains on the FED since Friday afternoon and the funds will be released on the [m]orning."

117.     On November 3, 2008, Defendant Lopez confirmed to Treasury, with a copy to Defendant Clamens, a wire of $4.7 million in response to a separate redemption request made on CITGO's behalf on that day. Lopez made no mention of the missing $21,601,650.00 wire payment that had been requested on October 31.

118.     Because of Defendant FTC's failure to wire the funds requested on October 31, CITGO was overdrawn in its operating account at Citibank. As a result, CITGO was compelled to tap into its Citibank Credit Facility. Treasury informed Defendants Lopez and Clamens of this situation.

119.     On November 4, 2008, Defendant Clamens advised Villanueva and Romero that he was in talks with BNP regarding CITGO's complaint about the missing funds.

120.     Defendant Clamens also assured Villanueva that Defendant FTC would cover all costs associated with CITGO's overdraft situation in the Citibank account. Defendant Lopez

-27-

later requested the name of CITGO's contact at Citibank so she could coordinate with the bank directly.

121.    The following day, Defendant Lopez represented that delivery of the funds to Citibank had been coordinated.

122.    Villanueva responded "Please let me know at what time this wire will hit our account. Please push this to occur ASAP."

123.    On November 5, 2008, having still not received the wire, Treasury contacted BNP Paribas. On information and belief, a BNP Paribas representative in turn contacted Defendant Clamens, who informed him that the funds would be released, at the earliest, on November 6 or 7, 2008.

124.    On or about November 6, 2008, Defendant Clamens informed Romero that the funds had already been approved and that he was "waiting for the letter." Romero then asked him "when will the funds be credited?" and also asked for the October 2008 account statement.

125.    Defendant Lopez responded on Defendant Clamens' behalf by sending October's statements, but she provided no answer as to when the funds would be credited.

126.    On November 10, 2008, the funds were still outstanding. Defendant Clamens sent the following e-mail to Treasury:

> Dear Fatima and Maritza:
>
> Your funds are going to be show end of today in account we Back value the 30/10/2008 [sic]
>
> we are going to sent a letter via e-mail to explain the events, also can you sent Mr. Phil Reeder e-mail. [sic]
>
> let me assured that BNP and FTC will compensated CITGO regarding this confusion. [sic]
>
> we want to have a conference call tomorrow with BNP and CITGO. please tell

-28-

me a want time is more connivance. [sic]

Regards,

Guillermo

127. Later that day, Defendant Lopez finally sent a FED wire number and what looked like a receipt for wire payment in the amount of $21,601,650.00. But by day's end, CITGO had yet to receive the funds in its Citibank account.

128. Treasury contacted Citibank to confirm the FED wire number and was told that there was no information under that number. Upon request, Defendant Lopez confirmed the correctness of the wire number.

129. On or about November 11, 2008, Treasury's Fatima Romero received a voice-mail and a follow-up e-mail from someone identifying himself as Enrique Ocampo. Ocampo's e-mail address had an ftcfinance.com domain. Ocampo claimed that he was in charge of helping with the transfer to Citibank. He also claimed the FED number that Treasury had received from Defendant Lopez was correct, but said that he would be unable to accomplish anything until November 12 because the banks were closed on November 11 for Veterans Day. When Villanueva and Romero followed up on Ocampo's messages and contacted him by telephone, Ocampo denied any knowledge of the situation generally and the wire transfer specifically. He referred Villanueva and Romero to Defendant Clamens for answers.

130. On or about November 12, 2008, Defendant Clamens sent an e-mail to Villanueva pointing the finger back to Ocampo by telling her that Ocampo who was working on her case and that the FED number was correct. He also placed blame on BNP Paribas, advising Villanueva that CITGO needed to send him a formal complaint about the wire so as to put pressure on BNP Paribas to wire the funds.

-29-

131.    Treasury immediately sent Defendant Clamens a formal complaint regarding FTC's failure to honor the October 31, 2008 redemption request.

132.    Defendant Lopez acknowledged the formal complaint by e-mail, stated that she had forwarded the complaint to BNP Paribas that afternoon, and assured CITGO that "the funds should be released and received in your banking account at Citibank no later than tomorrow afternoon."

133.    The October month-end statement sent by Defendant Lopez for the CITGO account falsely shows the $21,601,650.00 as having been wired from the account, notwithstanding that the wire transfer was never made.

134.    Every one of the communications from Defendant Lopez, Defendant Clamens and Enrique Ocampo regarding the supposed efforts and difficulties they encountered in trying to honor CITGO's October 31 redemption request was knowingly false.  Neither Lopez, nor anyone else at FTC, had even communicated CITGO's redemption request to BNP Paribas on that date, as Lopez and Clamens claimed.  It was not until November 3 that Lopez instructed BNP Paribas to process the wire payment, and she was promptly informed by BNP Paribas on that date that the account balance was insufficient to fund the wire.  At 1:37 p.m. on November 3, 2008 she instructed BNP Paribas:

> Good afternoon, please accept this e-mail as authorization to CANCEL this outgoing wire request value date today 11.03-08.
>
> Thanks!

135.    Defendants FTC, Lopez and Clamens made no subsequent effort to effectuate a wire transfer from the CITGO account, notwithstanding the elaborate stories they told to CITGO throughout November about the pendency of the request and the reasons why the wire was not forthcoming.

-30-

136.     In furtherance of their fraud, Defendants FTC, Lopez and Clamens then provided CITGO with an October month-end statement that concealed the deficit in the CITGO account, and the reasons for it.  Plaintiffs recently learned through BNP Paribas account records that its account was in arrears because, on October 30, Defendant FTC had diverted account funds to buy back into the account $42 million face amount of the illiquid FTC International notes that it had previously and secretly sold to the PDVH account.

137.     The FTC October month-end statement did not reflect the FTC International note purchases, and also failed to show unauthorized purchases and sales of $1.25 million face amount of the Venezuelan bonds, which generated a trading loss of $260,703.12.

138.     Plaintiffs recently learned from BNP Paribas account records that this illegal activity had put the CITGO account more than $62 million in arrears as of October 30, 2008.  In a desperate effort to avoid detection and cover the shortfall, Defendants FTC and Clamens had sold $20 million of the FTC International notes out of the CITGO account on October 31.  The proceeds of that sale were nonetheless insufficient to generate enough cash to honor the $21,601,650.00 million wire request made on that day.

139.     All that is left in the account today is the remainder of the unauthorized and undisclosed FTC International notes position which, despite having a face amount of $22 million, is carried by BNP Paribas as having zero market value.

140.     In addition to damages in the amount of $21,601,650.00, CITGO incurred bank charges of $11,853.97 when, as a result of not receiving the FTC wire, CITGO's account at Citibank was in overdraft.

141.     PDVH too was damaged by the fraudulent conduct of Defendants FTC, Lopez and Clamens.

-31-

142.     On October 30, 2008, Treasury instructed Defendant Lopez to redeem $41.5 million of its IMAXX investment, and to wire the proceeds to PDVH's account at J.P. Morgan to cover a dividend payment.

143.     The October statement provided by Defendant FTC showed that, as of October 30, PDVH had $60.8 million invested in IMAXX.

144.     However, as Plaintiffs recently learned from BNP account records, there never was an IMAXX investment and the account in fact held less than $500,000 in an unauthorized money market fund.  What balance remained was tied up in the unauthorized and undisclosed FTC International note positions.

145.     To fund the $41.5 million wire request, Defendants FTC, Lopez and Clamens quickly sold $42 million face amount of those notes out of the PDVH account and into the CITGO account.  This fraudulent move freed up funds for PDVH, but left the CITGO account in a deficit.  (See paragraph 136, above.)

146.     The wire to J.P. Morgan did not arrive on October 30 as directed by PDVH because Defendants FTC, Lopez and Clamens were unable to arrange the sale of the notes to the CITGO account in time to complete the wire.

147.     When, on October 31, Treasury demanded an explanation why the wire was outstanding, Defendant Lopez first claimed that Treasury had sent faulty wire instructions on October 30.  When shown that was not the case, she acknowledged that any mistake in transmitting the instructions on October 30 was hers.  She then asserted that the delay was actually the fault of BNP Paribas, and that BNP's "investigations department" would provide a written explanation.

148.     On information and belief, Lopez' statements were false and misleading, as she

did not provide BNP Paribas with wire instructions on October 30, but waited instead until October 31.

149.    On November 4, Treasury requested an additional redemption of $18.5 million from the PDVH account.

150.    Unknown to Plaintiffs, Defendant FTC was unable to readily wire the funds to PDVH because the only value in the PDVH account as of that date was what remained of the FTC International note position and less than $1.5 million in an unauthorized money market fund.

151.    By this time, Defendants FTC, Lopez and Clamens had exhausted their ability to "sell" the FTC International notes between the CITGO and PDVH accounts to conceal their illegal activity. All that was left in the CITGO account was approximately $37,000 in an unauthorized money market fund, and the illiquid and largely worthless FTC International notes that had been sold into the account in October to fund the redemption wire to PDVH.

152.    As a consequence, Defendants FTC, Lopez and Clamens had to scramble to find a way to honor the PDVH wire request so as to avoid tipping Plaintiffs off that something was amiss.

153.    On information and belief, Defendant Clamens directed that $18.5 million be wired to PDVH from the account maintained by Emerging Markets at Wachovia Bank.

154.    Based upon PDVH's investment and redemption and instructions, and its expectations regarding earned interest income as a result of the representations, confirmations, account statements and daily Leverage Trades Reports provided by Defendants FTC, Lopez and Clamens, the PDVH account should have been left with a positive balance of $836,203.56 after PDVH's receipt of the $18.5 million wire.

-33-

155.    In fact, all that is left in the account today is approximately $15,000.00 in an unauthorized money market fund and the illiquid and largely worthless unauthorized position in FTC International notes discussed above.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST
## DEFENDANTS FTC, CLAMENS AND LOPEZ
### (Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder)

156.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

157.    This count is based upon Section 10 of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10-b.

158.    Defendants FTC, Lopez and Clamens, with knowledge of or reckless disregard for the truth, disseminated or approved the false investment offerings, investment confirmations, daily Leverage Trades Reports and monthly account statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

159.    By virtue of their positions at Defendant FTC, Defendants Lopez and Clamens had actual knowledge of the materially false and misleading statements and misleading omissions alleged herein, and intended thereby to deceive Plaintiffs or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.  Defendant Lopez prepared and disseminated false confirmations, daily Leverage Trades Reports and monthly account statements, knowing them to be false by virtue of her direct communication to BNP Paribas of processing instructions for transactions that were neither authorized by Plaintiffs nor disclosed in the materials she disseminated to

-34-

Plaintiffs. Defendant Clamens received a copy of each of the false and misleading statements disseminated by Lopez and knew, or was reckless in not knowing, that those statements hid the unauthorized trading that he conducted, or directed to be conducted, in the Plaintiffs' accounts. Other representations made by Lopez and Clamens in the course of their dealings with Plaintiffs were also false and made with the knowledge of their falsity or with reckless disregard for their truth, including their representations in response to CITGO's October 31 redemption request. The knowing falsity of those representations is established by these Defendants' contemporaneous communications with BNP Paribas (to which Plaintiffs were neither party nor privy and about which they were until recently unaware) which show that these Defendants were never in a position to honor the redemption request, and never made a meaningful effort to do so.

160.    Defendants FTC, Lopez and Clamens (a) employed devices, schemes and artifices to defraud Plaintiffs; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that were intended to, and did, operate as a fraud upon Plaintiffs in an effort to obtain Plaintiffs' investment funds under false pretenses for the purpose of diverting those funds to uses, including the unauthorized and undisclosed purchases and sales of securities, that advanced the direct and indirect economic interests of all Defendants named herein., in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants FTC, Lopez and Clamens are sued as primary participants in the wrongful and illegal conduct charged herein.

161.    Defendants FTC, Lopez and Clamens, individually and in concert, directly and indirectly, by the use, means and instrumentalities of interstate commerce and/or the facilities of the mails and other interstate communications, engaged and participated in a continuous course of conduct to conceal their unlawful objective and conduct.

-35-

162.    At all material times, Plaintiffs, and each of them, relied to their detriment upon the foregoing material misrepresentations and/or omissions and, under the circumstances, this reliance was entirely justified.

163.    But for these material misrepresentations and/or omissions, Plaintiffs, and each of them, would never have agreed to direct the hundreds of millions of dollars they directed to Defendants FTC, Lopez and Clamens for investment of their respective operating capital funds.

164.    As a direct and proximate result thereof, CITGO has been damaged, in an amount to be determined at trial, but estimated at this time to be not less than $21,613,503.97, exclusive of interest.

165.    As a direct and proximate result thereof, PDVH has been damaged, in an amount to be determined at trial, but estimated at this time to be not less than $836,203.56, exclusive of interest.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT CLAMENS
### (Section 20(a) of the Securities Exchange Act)

166.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

167.    Defendant Clamens acted as controlling person of Defendants FTC, FTC Group, Emerging Markets and Holdings within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By reason of his senior executive position, he had the power and authority to cause those Defendants and Defendant Lopez to engage in the wrongful conduct complained of herein.

168.    As a direct and proximate result of the wrongful conduct of Defendants FTC, Lopez and Clamens, Plaintiffs were damaged as alleged above.

-36-

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE DEFENDANTS FTC, CLAMENS AND LOPEZ
### (Fraud)

169.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

170.    Defendants FTC, Lopez and Clamens, with knowledge of, or reckless disregard for the truth, disseminated or approved the false investment offerings, investment confirmations, daily Leverage Trades Reports and monthly account statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

171.    By virtue of their positions at Defendant FTC, Defendants Lopez and Clamens had actual knowledge of the materially false and misleading statements and misleading omissions alleged herein, and intended thereby to deceive Plaintiffs or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.

172.    Defendants FTC, Lopez and Clamens (a) employed devices, schemes and artifices to defraud Plaintiffs; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that were intended to, and did, operate as a fraud upon Plaintiffs in an effort to obtain Plaintiffs' investment funds under false pretenses for the purpose of diverting those funds to uses, including the unauthorized and undisclosed purchases and sales of securities, that advanced the direct and indirect economic interests of all Defendants named herein.

173.    At all material times, Plaintiffs, and each of them, relied to their detriment upon

-37-

the foregoing material misrepresentations and/or omissions and, under the circumstances, this reliance was entirely justified.

174.     But for these material misrepresentations and/or omissions, Plaintiffs, and each of them, would never have agreed to direct the hundreds of millions of dollars they directed to Defendants FTC, Lopez and Clamens for investment of their respective operating capital funds.

175.     As a direct and proximate result thereof, Plaintiffs have been damaged, as alleged above.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS FTC, CLAMENS AND LOPEZ
### (Conversion)

176.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

177.     Defendants FTC, Lopez and Clamens caused and/or permitted the misappropriation of hundreds of millions of dollars of the Plaintiffs' funds by disregarding Plaintiffs' investment instructions and instead directing those funds into various international notes and bonds, some which resulted in direct and/or indirect financial benefit to all Defendants, without authorization by, or disclosure to Plaintiffs.  This conduct was for the benefit of defendants and was unrelated to any purpose set forth in any agreement between the parties. This constitutes conversion of those funds.

178.     Defendants FTC, Lopez and Clamens have failed and/or refused to comply with Plaintiffs' demand that they remit the converted funds.

179.     The converted funds in question are specifically identifiable in that their transfer to the BNP Paribas accounts maintained on behalf of CITGO and PDVH at BNP Paribas is direct and documented, and the uses to which those funds were put are traceable through account records and trade confirmations maintained by BNP Paribas, as well as investment instruction,

-38-

wire transfer and other documentation.

180.     This conversion has been the direct and proximate cause of material damage to

Plaintiffs, as alleged above.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS FTC, CLAMENS AND LOPEZ
#### (Breach of Fiduciary Duty)

181.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

182.     Plaintiffs entrusted their assets to their introducing broker, Defendant FTC, and to

Defendants Clamens and Lopez and, as a result, these Defendants owed fiduciary duties to

Plaintiffs.

183.     Defendants FTC, Lopez and Clamens breached their duties to Plaintiffs, including

but not limited to the duty to (i) act with loyalty and in good faith toward Plaintiffs; (ii) fully and

fairly disclose all material facts and keep Plaintiffs informed as to each transaction; (iii) exercise

reasonable care in handling Plaintiffs' funds, including by faithfully carrying out Plaintiffs'

instructions promptly and accurately and in a manner best suited to serve Plaintiffs' interests; (iv)

transact business only after receiving approval from Plaintiffs; and (v) act responsibly to protect

Plaintiffs' interests, including by refraining from conduct in conflict with those interests.

184.     As a result of these breaches, Plaintiffs were damaged, as alleged above.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS FTC, CLAMENS AND LOPEZ
#### (Negligence – Unauthorized Trading, Failure to Execute and Follow Instructions)

185.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

186.     By advertising, touting and holding themselves out to be investment and financial

advisors, and by virtue of their role as introducing broker for the BNP Paribas accounts,

Defendants FTC, Lopez and Clamens owed to Plaintiffs a duty of care concerning consultation,

-39-

direction and/or advice in connection with Plaintiffs' objective and instructions regarding the investment of their critical operating funds in short-term, low-risk BNP CD's and IMAXX and DRTXX money market funds. This duty of care included, *inter alia*, the duty to direct Plaintiffs to investments that were suitable for Plaintiffs' investment objectives and the duty to purchase the investments as directed by Plaintiffs.

187.    Defendants FTC, Lopez and Clamens breached their duty of care by, among other things, (a) advising Plaintiffs that they were investing in low-risk, short-term, and readily liquid investments, and instead engaging in unauthorized and undisclosed purchases and sales of securities that resulted in Plaintiffs' funds being tied-up in investments that were completely unsuitable for Plaintiffs' operating needs and investment objectives; (b) failing to protect Plaintiffs' assets by illegally investing Plaintiffs' funds in international notes that may currently hold no value and are by no means liquid; and (c) directing Plaintiffs' funds to investments that resulted in a financial benefit to themselves all Defendants, in a clear conflict of interest to the duties Defendants FTC, Lopez and Clamens owed to Plaintiffs.

188.    The conduct as described herein departed from the ordinary standards of care due to a customer and was in clear violation of the standards of commercial honor and principles of trade required by Rule 2110 of the NASD (FINRA) Manual. The conduct was, at minimum, negligent.

189.    The damages sustained by Plaintiffs were a direct and foreseeable result of, and were proximately caused by, the conduct and breaches of duty committed by Defendants FTC, Lopez and Clamens.

190.    As a direct and proximate result of the Defendants' actions, Plaintiffs have been damaged, as alleged above.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS FTC, CLAMENS AND LOPEZ
### (Promissory Estoppel)

191.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

192.    Defendants FTC, Lopez and Clamens made a clear and unambiguous promise to Plaintiffs that their funds would invested, at Plaintiffs' direction, in short-term, low-risk, and readily liquid investments that were required by CITGO's investment and were offered by these Defendants in Lopez' Daily Rates e-mails.

193.    Plaintiffs reasonably relied on that promise in choosing to place their trust in Defendants FTC, Lopez and Clamens and in directing hundreds of millions of their critical operating funds to the BNP Paribas accounts and designating FTC as Account Executive for the purpose of executing and following Plaintiffs' investment instructions.

194.    Plaintiffs' losses in the accounts, as alleged above, were the reasonably foreseeable result of Defendants FTC's, Lopez' and Clamens' diversion of Plaintiffs' assets to unauthorized, undisclosed and self-dealing transactions in high risk international notes with limited to no liquidity.

195.    Plaintiffs have suffered substantial damage, as alleged above, in connection with these Defendants' failure to perform their promises.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Unjust Enrichment)

196.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

197.    All Defendants financially benefited from the unlawful acts alleged above to the detriment of the Plaintiffs. Plaintiffs' provided hundreds of millions of their critical operating capital funds to Defendants FTC, Lopez and Clamens for investment, reasonably expecting the return of the principal amount of that investment, together with the investment interest that FTC,

-41-

Lopez and Clamens represented would be earned, and further represented was earned, thereon. These Defendants accepted Plaintiffs' funds with complete knowledge and acknowledgment of Plaintiffs' expectations. Through Clamens and FTC, Plaintiffs' funds were diverted to the unauthorized purchase of the FTC International notes, in which all Defendants had an economic interest, as alleged above.

198. Those unlawful acts caused Plaintiffs to suffer injury and monetary loss.

199. As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

200. Each Defendant should pay its own unjust enrichment to Plaintiffs.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Imposition of a Constructive Trust and an Order of Conveyance)

201. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

202. Defendants FTC, Lopez and Clamens had a fiduciary duty to Plaintiffs, pursuant to which they promised (and were obligated to) accept and invest Plaintiffs' funds the low-risk, short-term investments directed by Plaintiffs.

203. Defendants FTC, Lopez and Clamens breached this duty, as alleged above, among other things by diverting those investment funds to the unlawful, unauthorized and undisclosed purchase of the FTC International notes, pursuant to which all Defendants received a direct or indirect economic benefit, as alleged above.

204. All Defendants have wrongfully retained tens of millions of dollars of these wrongfully diverted funds, in an amount to be determined at trial, and presently estimated to be not less than $21,613,503.97 as to Plaintiff CITGO and $836,203.56 as to Plaintiff PDVH.

205. Plaintiffs are entitled to have a constructive trust imposed and all money and other property within possession, custody or control of Defendants, including without limitation, on (i)

-42-

monies collected or received as brokerage fees; and (2) assets otherwise available to pay Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a. Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including appropriate interest thereon;

b. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

c. Declaring that Defendants have unjustly enriched themselves and imposing a constructive trust to recoup the unjust benefits and other assets for the benefit of Plaintiffs;

d. Awarding Plaintiffs their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

e. Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DB1/62462125.5

Dated:  New York, New York.
        March 9, 2009

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: _Michele Coffey_____

       Michele A. Coffey (MC-8650)
101 Park Avenue
New York, NY  10178-0600
Tel:  212.309.6000
Fax:  212-309-6001

Attorneys for Plaintiffs
CITGO Petroleum Corporation and PDV
Holding, Inc.

-44-