# EXHIBIT A- PART 1

**FTC INTERNATIONAL SPC**
as Company

**THE ISSUERS PARTY HERETO**
as Issuers

**DEUTSCHE BANK TRUST COMPANY AMERICAS**
as Trustee, Securities Intermediary, Custodian and Rule 144A Note Paying Agent and Rule
144A Note Registrar

**DEUTSCHE BANK LUXEMBOURG S.A.**
as Regulation S Note Registrar

**DEUTSCHE BANK AG, LONDON BRANCH**
as Regulation S Note Paying Agent

**FTC EMERGING MARKETS, INC.**
as Note Calculation Agent and as Disposal Agent

INDENTURE

Dated as of May 30, 2007

**EMERGING MARKETS CLN/ELN PROGRAM**

# TABLE OF CONTENTS

Page

**Article I**     **DEFINITION** ................................................................**2**
    Section 1.1.    Definitions ................................................................**2**
    Section 1.2.    Calculations as to the Collateral ..............................21

**Article II**     **THE NOTES** ...........................................................**21**
    Section 2.1.    Execution, Authentication and Delivery.......................**21**
    Section 2.2.    Paying Agents, Note Calculation Agent and Authenticating Agents ........21
    Section 2.3.    Intentionally Omitted ..............................................24
    Section 2.4.    Registration, Registration of Transfer and Exchange .................26
    Section 2.5.    Intentionally Omitted ..............................................26
    Section 2.6.    Mutilated, Defaced, Destroyed, Lost or Stolen Notes .................33
    Section 2.7.    Persons Deemed Owners ..........................................33
    Section 2.8.    Cancellation ........................................................34
    Section 2.9.    No Gross-Up ........................................................34

**Article III**     **CONDITIONS PRECEDENT** ...................................**35**
    Section 3.1.    General Provisions .................................................**35**
    Section 3.2.    Denominations ....................................................35
    Section 3.3.    Procedures for Issuance ...........................................35
    Section 3.4.    Additional Issues of Same Series..................................35
    Section 3.5.    Restrictions on Further Issues and Transactions....................37
    Section 3.6.    Rights and Liability of the Issuer...................................38

**Article IV**     **SEGREGATION OF COLLATERAL; DISTRIBUTIONS** .................**39**
    Section 4.1.    Segregation of Collateral; Collateral Accounts ......................39
    Section 4.2.    Distributions.......................................................39
    Section 4.3.    Interest and Other Calculations....................................39
    Section 4.4.    Rounding...........................................................39
    Section 4.5.    Calculations........................................................40
    Section 4.6.    Determination and Publication of Interest Rates, Interest Amounts and Redemption Amounts.................41
    Section 4.7.    Determination or Calculation by Trustee............................41
    Section 4.8.    Intentionally Omitted ..............................................41
    Section 4.9.    Rate of Interest After a Default....................................42
    Section 4.10.   Receipt of Monies by the Trustee; Deposits to Collateral Accounts ........42
    Section 4.11.   Deposit Interest ...................................................42
    Section 4.12.   Payments to Noteholders ..........................................43
    Section 4.13.   Payments to Default Swap Counterparty ...........................43
    Section 4.14.   Intentionally Omitted ..............................................43
    Section 4.15.   Eligible Investments................................................44
    Section 4.16.   Duties of Disposal Agent ..........................................44
    Section 4.17.   Disposition of Collateral ...........................................44
    Section 4.18.   Prescription .......................................................46

**Article V**          **EVENTS OF DEFAULT; REMEDIES** ...................................................46
Section 5.1.   Events of Default ...........................................................................46
Section 5.2.   Acceleration of Maturity; Rescission and Annulment............................46
Section 5.3.   Trustee May File Proofs of Claim ....................................................47
Section 5.4.   Trustee May Enforce Claims Without Possession of Notes ...................48
Section 5.5.   Application of Money Collected........................................................49
Section 5.6.   Limitation on Suits.........................................................................49
Section 5.7.   Unconditional Rights of Noteholders to Receive Principal and Interest..........................................................................................51
Section 5.8.   Restoration of Rights and Remedies...................................................51
Section 5.9.   Rights and Remedies Cumulative.......................................................51
Section 5.10.  Delay or Omission Not Waiver..........................................................52
Section 5.11.  Control by Noteholders....................................................................52
Section 5.12.  Waiver of Past Defaults...................................................................52
Section 5.13.  Waiver of Stay or Execution Laws .....................................................53

**Article VI**         **THE TRUSTEE AND OTHER AGENTS**...............................................53
Section 6.1.   Certain Duties and Responsibilities ...................................................53
Section 6.2.   Notice of Default............................................................................53
Section 6.3.   Certain Rights of Trustee .................................................................56
Section 6.4.   Not Responsible for Recitals or Issuance of Notes................................56
Section 6.5.   May Hold Notes..............................................................................57
Section 6.6.   Money Held in Trust........................................................................58
Section 6.7.   Compensation and Reimbursement .....................................................58
Section 6.8.   Corporate Trustee Required; Eligibility................................................58
Section 6.9.   Resignation and Removal; Appointment of Successor.............................59
Section 6.10.  Acceptance of Appointment by Successor............................................60
Section 6.11.  Merger, Conversion, Consolidation or Succession to Business of Trustee.......................................................................................61
Section 6.12.  Co-Trustees ...................................................................................61
Section 6.13.  Certain Duties of the Trustee Related to Delayed Payment of Proceeds; Investment Agreement Insurance Policies ...........................61
Section 6.14.  The Securities Intermediary ..............................................................62
Section 6.15.  Fiduciary For Noteholders; Agent for the Securities Intermediary and the Default Swap Counterparty .................................................63
Section 6.16.  Appointment of Disposal Agent ..........................................................65
Section 6.17.  Duties of Agents Generally................................................................65
Section 6.18.  Duties of the Note Calculation Agent ..................................................65

**Article VII**        **COVENANTS** ...........................................................................67
Section 7.1.   Payment of Principal and Interest.......................................................67
Section 7.2.   Maintenance of Process Agent...........................................................67
Section 7.3.   Money for Note Payments to be Held in Trust........................................68
Section 7.4.   Existence of the Issuer; Tax Residence; Separate Existence.....................68
Section 7.5.   Protection of Collateral....................................................................69
Section 7.6.   Intentionally Omitted.......................................................................70
Section 7.7.   Performance of Obligations................................................................71

Section 7.8.   Issuer's Covenants ............................................................72
Section 7.9.   Negative Covenants ...........................................................75
Section 7.10.  Statement as to Compliance..............................................75
Section 7.11.  Company and Issuer May Consolidate, etc., Only on Certain Terms........76
Section 7.12.  Successor Substituted.......................................................78
Section 7.13.  Certain Tax Matters ..........................................................78

**Article VIII        SUPPLEMENTAL INDENTURES ....................................78**
Section 8.1.   Supplemental Indentures Without Consent of Noteholders........78
Section 8.2.   Supplemental Indentures with Consent of Noteholders............80
Section 8.3.   Execution of Supplemental Indentures ..............................82
Section 8.4.   Effect of Supplemental Indentures ...................................82
Section 8.5.   Reference in Notes to Supplemental Indentures...................82

**Article IX         REDEMPTION OF NOTES; REDEMPTION PROCEDURES ........83**
Section 9.1.   Final Redemption..............................................................83
Section 9.2.   Mandatory Redemption ....................................................83
Section 9.3.   Redemption for Taxation Reasons......................................84
Section 9.4.   Redemption upon Termination of Default Swap ..................85
Section 9.5.   Early Redemption Amount ...............................................85
Section 9.6.   Notice of Early Redemption .............................................86
Section 9.7.   Purchases.........................................................................86
Section 9.8.   Cancellation .....................................................................86
Section 9.9.   Liquidation of Segregated Portfolios .................................87

**Article X          COLLECTIONS, REPORTS AND TAX MATTERS ...............87**
Section 10.1.  Collection of Money .........................................................87
Section 10.2.  Collateral Accounts..........................................................87
Section 10.3.  Reports by Trustee ...........................................................87
Section 10.4.  Reports to Noteholders .....................................................87
Section 10.5.  Custody and Release of Collateral .....................................87
Section 10.6.  Provision of Information by Default Swap Counterparty........89
Section 10.7.  Reports to the Default Swap Counterparty..........................89
Section 10.8.  Tax Matters .....................................................................89

**Article XI         NOTEHOLDERS' RELATIONS....................................91**
Section 11.1.  Standard of Conduct .........................................................91
Section 11.2.  Beneficial Ownership Certifications....................................91

**Article XII        MISCELLANEOUS .....................................................92**
Section 12.1.  Form of Documents Delivered to Trustee ...........................92
Section 12.2.  Acts of Noteholders .........................................................92
Section 12.3.  Notices, etc., to Trustee, the Issuer and the Default Swap
              Counterparty ...................................................................92
Section 12.4.  Notices to Noteholders; Waiver.........................................93
Section 12.5.  Effect of Headings and Table of Contents...........................94
Section 12.6.  Successors and Assigns.....................................................95

Section 12.7.   Separability ..................................................................................
Section 12.8.   Benefits of Indenture ......................................................................95
Section 12.9.   Legal Holidays ...............................................................................95
Section 12.10. Governing Law ..............................................................................95
Section 12.11. Counterparts ..................................................................................95
Section 12.12. No Issuer Office Within the United States .....................................96
Section 12.13. Non-Recourse .................................................................................96
Section 12.14. Stamp Duties and Taxes .................................................................96
Section 12.15. USA PATRIOT Act .......................................................................96
                                                                                                                97

## SCHEDULES

| | |
|---|---|
| Schedule A | Provision for Meeting of Noteholders |
| Schedule B | Additional Guidelines for Effectuating Replacements |
| Schedule C | Form of Supplemental Indenture |

## EXHIBITS

| | |
|---|---|
| Exhibit A-1 | Form of Regulation S Global Note |
| Exhibit A-2 | Form of Rule 144A Global Note |
| Exhibit A-3 | Form of Definitive Registered Note |
| Exhibit B | Form of Investor Representation Letter |
| Exhibit C-1 | Form of Regulation S Transferor Certificate |
| Exhibit C-2 | Form of Rule 144A Transferor Certificate |
| Exhibit D | Form of Beneficial Ownership Certificate |
| Exhibit E | Form of Joinder Agreement |
| Exhibit F | Opinion of U.S. Counsel to the Issuer as to corporate, securities law and other matters |
| Exhibit G | Opinion of Cayman Islands Counsel to the Issuer as to corporate, tax and security interest matters |
| Exhibit H | Opinion of U.S. Counsel to the Trustee |

# INDENTURE

INDENTURE, dated as of May 30, 2007, among FTC International SPC, an exempted company with limited liability incorporated and registered as a segregated portfolio company pursuant to Part XIV of the Companies Law (2004 Revision) of the Cayman Islands (the "Company", and when acting for the account of a Segregated Portfolio specified in the relevant Supplemental Indenture, together with its permitted successors hereunder, the "Issuer"), each issuer that becomes a party hereto on or after the Closing Date upon execution of a Joinder Agreement substantially in the form of <u>Exhibit E</u> hereto (each, an "Issuer" and, together with each other Issuer, the "Issuers"), Deutsche Bank Trust Company Americas, a New York banking corporation ("<u>DBTC Americas</u>"), as trustee (herein, together with its permitted successors in the trusts hereunder, called the "<u>Trustee</u>"), as securities intermediary (herein, together with its permitted successors in such capacity, called the "<u>Securities Intermediary</u>"), as Note registrar in respect of the Rule 144A Notes (the "<u>Rule 144A Note Registrar</u>"), as Custodian (herein, together with its permitted successors in such capacity the "<u>Custodian</u>"), and as Rule 144A Note paying agent (herein, together with its permitted successors in such capacity, the "<u>Rule 144A Note Paying Agent</u>"), Deutsche Bank AG, London Branch, an entity incorporated under the laws of Germany ("<u>DB London</u>") as Regulation S Note paying agent (the "<u>Regulation S Note Paying Agent</u>"), Deutsche Bank Luxembourg S.A., an entity incorporated under the laws of Luxembourg ("<u>DB Luxembourg</u>"), as Note registrar in respect of the Regulation S Notes (herein, together with its permitted successors hereunder, called the "<u>Regulation S Note Registrar</u>"), and FTC Emerging Markets, Inc., an entity incorporated under the laws of Panama ("<u>FTCEM</u>"), as note calculation agent (herein, together with its permitted successors hereunder, called the "<u>Note Calculation Agent</u>") and as disposal agent (herein, together with its permitted successors hereunder, called the "<u>Disposal Agent</u>").

## PRELIMINARY STATEMENT

The Company is duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture in separate Series, and if desired separate Tranches within a Series, from time to time, which Notes shall be secured separate and apart from the Notes of any other Series. All covenants and agreements made by each Issuer herein are for the benefit and security of the relevant Secured Parties as their interests may appear. The Company is entering into this Indenture, and the Trustee is accepting the trusts created hereby, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

The Company is an exempted company incorporated in the Cayman Islands and is registered as a segregated portfolio company pursuant to Part XIV of the Companies Law (2004 Revision) of the Cayman Islands. As a segregated portfolio company, the Company shall segregate substantially all of its assets and liabilities into separate portfolios (each a "<u>Segregated Portfolio</u>"), and the assets of one Segregated Portfolio will not be available to meet the obligations of any other Segregated Portfolio or the general obligations of the Company. The obligations of the Company hereunder and in relation to the Notes of a given Series shall be allocated to the Segregated Portfolio identified with respect to such Notes in the relevant Supplemental Indenture and only the assets of the Segregated Portfolio shall be available to meet the obligations of the relevant Issuer under such Notes, this Indenture (as defined below) and all other Transaction Documents.

For avoidance of doubt, all references to the Issuer in this Indenture are to FTC International SPC, acting for the account of the relevant Segregated Portfolio or to another Issuer, if any, who has agreed to be bound by the terms of this Indenture as an "Issuer" pursuant to the related Supplemental Indenture, and not to FTC International SPC generally or to FTC International SPC acting on behalf of or for the account of any other Segregated Portfolio.

All things necessary to make this Indenture a valid agreement of the Issuer in accordance with the agreement's terms have been done.

## GRANTING CLAUSES

The Granting Clauses for any Series of Notes shall be set forth in the related Supplemental Indenture.

Article I

DEFINITION

Section 1.1.    <u>Definitions</u>

Except as otherwise specified herein or (with respect to the Notes of a Series, in the relevant Supplemental Indenture) or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture and each Supplemental Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms. Unless the context otherwise requires, terms used herein that are defined in the UCC and not otherwise defined herein shall have the meanings set forth in the UCC. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision. References to agreements or documents in this Indenture or any Supplemental Indenture shall be construed to include all such agreements and documents as amended, modified or supplemented from time to time pursuant to the terms thereof. References to statutes in this Indenture or any Supplemental Indenture shall be construed to include all statutory provisions consolidating, amending or replacing, from time to time, the statute to which reference is made and all regulations promulgated pursuant to such statutes.

"<u>Act</u>":  In respect of the Noteholders of any Series of Notes, as defined in Section 12.2.

"<u>Additional Business Center</u>":  In respect of a Note, as applicable, the meaning specified in the relevant Supplemental Indenture.

"<u>Additional Payment Determination Date</u>":  As defined in Section 4.3(b).

"Administration Agreement": The administration agreement dated on or about May 30, 2007 between Maples Finance Limited and the Company, as amended from time to time, in accordance with the terms thereof.

"Affected Reference Entity": In respect to a Series of Notes, the Reference Entity with respect to which a Credit Event Notice has been given in accordance with the relevant Default Swap.

"Affiliate" or "Affiliated": In respect of any Person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity of person means ownership of a majority of the voting power of the entity or person.

"Agents": Each Paying Agent, each Authenticating Agent, the Disposal Agent, the Transfer Agent, the Note Registrar and the Note Calculation Agent.

"Aggregate Outstanding Principal Amount": In respect of any Series of Notes at any time on any day, an amount in the Denomination Currency determined by the Note Calculation Agent as the greater of:

(a)     the Notes Principal Amount for that Series, minus

(i)     the sum of all related Collateral Principal Amounts (if any) that are applied by the Issuer to the payment of amounts due on settlement of the relevant Default Swap calculated under the Default Swap at the relevant Calculation Date, as it would have been determined had any increase or decrease in the Notes Principal Amount been taken into account when calculating the Collateral Principal Amounts; and

(ii)     following payment of the Redemption Amount on the Scheduled Maturity Date, the Redemption Amount; and

(b)     zero.

"Applicable Procedures": In respect of any Series of Notes, as defined in Section 2.1(e).

"Articles of Association": The amended and restated articles of association of the Company dated April 4, 2007.

"Authenticating Agent": In respect of the Notes or a Series of the Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to Section 2.2 hereof.

"Authorized Officer": In respect of the Issuer, any Officer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer. In respect of the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be

considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Beneficial Ownership Certification": As defined in Section 11.2.

"Benefit Plan Investor": Any "employee benefit plan" (as defined in Section 3(3) of ERISA that is subject to the provisions of Title I of ERISA), any "plan" (as defined in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code) or any entity whose underlying assets include "plan assets" (within the meaning of 29 C.F.R. Section 2510.3-101) by reason of any such employee benefit plan's or plan's investment in the entity.

"Board of Directors": In respect of the Company, the directors of the Company duly appointed in accordance with the terms of its organizational documents.

"Board Resolution": In respect of the Company, a resolution of the Board of Directors of the Company.

"Business Day": means:

(a)    a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in London, New York City, Luxembourg and any Additional Business Center; and

(b)    either (i) in relation to any sum payable in a Settlement Currency other than euro, a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in the principal financial center of the country of the relevant Settlement Currency (if other than London and any Additional Business Center specified in the Offering Circular Supplement and which if the Settlement Currency is Australian dollars or New Zealand dollars or Japanese yen or Singapore Dollar shall be Sydney, Auckland, Tokyo and Singapore respectively) or (ii) in relation to any sum payable in euro, a TARGET Settlement Day.

"Business Day Convention": Where any date referred to in this Indenture or any Supplemental Indenture is specified to be subject to adjustment in accordance with a Business Day Convention and would otherwise fall on a day that is not a Business Day, then, if the Business Day Convention specified is (a) the "Floating Rate Business Day Convention," such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event (i) such date shall be brought forward to the immediately preceding Business Day and (ii) each subsequent such date shall be the last Business Day of the month in which such date would have fallen had it not been subject to adjustment, (b) the "Following Business Day Convention," such date shall be postponed to the next day that is a Business Day, (c) the "Modified Following Business Day Convention," such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day or (d) the "Preceding Business Day Convention," such date shall be brought forward to the immediately preceding Business Day.

"Calculation Date": In respect of a Reference Entity, the date on which the Final Price can first be determined in respect of Deliverable Obligations of an Affected Reference Entity as defined in the relevant Default Swap.

"Cash Settlement": As described in the definition of "Settlement Election Notice."

"Cash Settlement Amount": In respect of a Default Swap with respect to which the conditions to settlement of the relevant Default Swap has been satisfied, an amount equal to the product of (i) the notional amount of the Default Swap and (ii) 100% minus the Final Price of the Deliverable Obligation of the Affected Reference Entity selected in accordance with the Default Swap.

"Cash Settlement Date": In respect to any Series of Notes with respect to which the Settlement Election Notice specifies Cash Settlement or with respect to which the Settlement Election Notice specifies Physical Settlement but the Default Swap Counterparty is not able to deliver Deliverable Obligations on the Physical Settlement Date, the day that is five Business Days after the date on which the final price for the Deliverable Obligations has been determined.

"Certificate of Authentication": As defined in Section 2.1(a).

"Clearing Agency": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Agency Participant": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Clearing Systems": Collectively, Euroclear, Clearstream and DTC.

"Clearstream": Clearstream Bank, société anonyme, a corporation organized under the laws of Luxembourg.

"Code": The United States Internal Revenue Code of 1986, as amended.

"Collateral": In respect of any Series of Notes, as defined in the relevant Supplemental Indenture.

"Collateral Account": In respect of any Series of Notes, as defined in the relevant Supplemental Indenture.

"Collateral Investments": As applicable, the Eligible Investments, Principal Investments and Other Collateral.

"Collateral Issuer": In respect of any Series of Notes, the obligor specified as such in the relevant Supplemental Indenture.

"Collateral Principal Amount": As applicable, (a) on Scheduled Maturity Date or following a Cash Settlement, the Collateral remaining in the Collateral Account less any Cash

Settlement Amount and (b) following a Physical Settlement, Deliverable Obligations selected by the Default Swap Counterparty pursuant to the Settlement Marketing Agreement having a face amount equal to the Aggregate Outstanding Principal Amount of the relevant Series of Notes (or, in the case of a Series of FX Dependent Notes, such number of units of the Settlement Currency as can be obtained with an amount of the Denomination Currency equal to the Aggregate Outstanding Principal Amount of the FX Dependent Notes), in each case as determined by the Note Calculation Agent.

"Collateral Securities": In respect of any Series of Notes, on any date of determination, the relevant Collateral Investments that have been Granted to the Trustee, in each case to the extent not released from the lien of this Indenture and the relevant Supplemental Indenture pursuant to the terms hereof and thereof.

"Common Depositary": DB London, and any successor thereto, as common depositary for Euroclear or Clearstream.

"Company": Has the meaning set forth in the introductory paragraph.

"Corporate Trust Office": The principal corporate trust office of the Trustee, currently located at 60 Wall Street, 27th Floor, New York, New York 10005, or such other address as the Trustee may designate from time to time by notice to the Noteholders, the Default Swap Counterparty and the Issuer or the principal corporate trust office of any successor Trustee.

"Credit Event": In respect of a Default Swap consisting of (a) a credit default swap, a "credit event" (as defined in the 2003 ISDA Credit Derivatives Definitions) specified in the confirmation for the related Default Swap or (b) an equity default swap, a "knock-in event" (as defined in the 2002 ISDA Equity Derivatives Definitions) or similar term specified in the confirmation for the related Default Swap.

"Credit Event Determination Date": In respect of a Default Swap, the first date on which both a Credit Event Notice and a Notice of Publicly Available Information have been delivered by the Default Swap Counterparty to the Issuer and the Trustee in accordance with the terms of such Default Swap.

"Credit Event Notice": In respect of a Default Swap, the notice of occurrence of a Credit Event given to the Issuer and Trustee by the Default Swap Calculation Agent on the Credit Event Determination Date. Such notice will specify a date, that is thirty calendar days from the Credit Event Determination Date (or, if such day is not a Business Day, the next following Business Day), on which the Default Swap will terminate and the Notes of that Series will be redeemed.

"Custodian": Has the meaning set forth in the introductory paragraph.

"Cut-Off Date": In respect to each Series of Notes, the applicable Scheduled Termination Date determined based on Greenwich Mean Time.

"Daily Average": In respect of any Interest Period and any amount, the amount calculated by the Note Calculation Agent by aggregating such amount, determined as at 5.00

p.m. (New York City time) on each calendar day of such Interest Period and dividing by the number of calendar days in such Interest Period.

"DB London": Has the meaning set forth in the introductory paragraph.

"DB Luxembourg": Has the meaning set forth in the introductory paragraph.

"DBTC Americas": Has the meaning set forth in the introductory paragraph.

"Default Swap": In respect of a Series of Notes, each credit default swap transaction or equity default swap transaction entered into by the Issuer and the Default Swap Counterparty. The term "relevant Default Swap" means, unless the context otherwise requires, the Default Swap in respect of a single Series of Notes.

"Default Swap Calculation Agent": FTCEM or any Affiliate thereof as may be specified in the relevant Supplemental Indenture, as calculation agent under the relevant Default Swap.

"Default Swap Counterparty": In respect of any Series of Notes, FTCEM or any Affiliate thereof as may be specified in the relevant Supplemental Indenture (which shall be the "relevant Default Swap Counterparty" in respect of such Series of Notes).

"Default Swap Guarantee": The guarantee executed by the Default Swap Guarantor in respect of the payment obligations of the Default Swap Counterparty under any Default Swap.

"Default Swap Guarantor" or "FTC Holdings": FTC Holdings LLC, a Delaware limited liability company and any successors or assigns.

"Definitive Registered Notes": In respect of any Series of Notes, as defined in Section 2.1 and in substantially the form attached hereto as Exhibit A-2.

"Deliver" or "Delivery": In respect of any Series of Notes, as defined in the relevant Supplemental Indenture.

"Deliverable Obligations": The obligations that are deliverable by the Default Swap Counterparty to the Issuer on a Physical Settlement Date under the relevant Default Swap.

"Denomination Currency": In respect of any Series of Notes, the currency in which the principal amount (and interest accrued thereon) is denominated, as specified in the relevant Supplemental Indenture.

"Derivatives Definitions": Collectively, the 2003 ISDA Credit Derivatives Definitions and the 2002 ISDA Equity Derivatives Definitions, each published by the International Swaps and Derivatives Association, Inc. (ISDA).

"Determination Date": An Additional Payment Determination Date or an Interest Determination Date.

"<u>Disposal Agent</u>": FTCEM as note disposal agent under this Indenture, together with any additional note disposal (s) appointed by the Issuer under a Supplemental Indenture and any successor(s) in such capacity.

"<u>Disposal Collateral Proceeds</u>": In respect of any Series of Notes, (i) in the case of any Collateral other than Investment Agreements, the proceeds of the sale (net of any incidental costs (including taxes) of such sale) of the relevant portion of the Collateral required to be sold pursuant to Section 4.15 of this Indenture and the relevant Supplemental Indenture, including any accrued interest, and (ii) in the case of Investment Agreements, the proceeds of the withdrawal of all amounts invested thereunder.

"<u>Disposal Date</u>": In respect of any Series of Notes, as defined in Section 4.16(a).

"<u>Disqualified Transferee</u>": As defined in Section 2.4(h).

"<u>Distribution</u>": Any payment of principal or interest or any dividend or premium payment made on, or, any other distribution in respect of, any item of Collateral.

"<u>Dollar</u>" or "<u>$</u>": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"<u>Due Date</u>": Each date on which a Distribution is due on a Collateral Security.

"<u>DTC</u>": Depository Trust Company.

"<u>Early Redemption Amount</u>": In respect of any Series of Notes, as defined in Section 9.5.

"<u>EI Minimum Long-Term Rating</u>": A long-term rating of "BBB" from S&P or "Baa3" from Moody's.

"<u>EI Minimum Short-Term Rating</u>": A short-term rating of "A-1+" from S&P and "P-1" from Moody's.

"<u>Eligible Investments</u>": Any Settlement Currency denominated investment that is one or more of the following obligations or securities:

(a)     direct obligations of, and obligations the timely payment of principal of and interest under which is fully and expressly guaranteed by, a Qualifying Country or any agency or instrumentality of a Qualifying Country, the obligations of which are fully and expressly guaranteed by such Qualifying Country;

(b)     demand and time deposits in, certificates of deposit of and bankers' acceptances issued by, any depository institution or trust company incorporated under the laws of a Qualifying Country with, in each case, a maturity of no more than 180 days and subject to supervision and examination by governmental banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution

in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or the contractual commitment providing for such investment have a long-term credit rating of not less than the EI Minimum Long-Term Rating or a short-term credit rating of not less than the EI Minimum Short-Term Rating; *provided* that in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have, at the time of such investment, a long-term credit rating of not less than the EI Minimum Long-Term Rating;

(c)    commercial paper or other short-term obligations having, at the time of such investment, a short-term credit rating of not less than the EI Minimum Short-Term Rating and that either are bearing interest or are sold at a discount to the face amount thereof and have a maturity of not more than 183 days from their date of issuance; *provided* that if such security has a maturity of longer than 91 days, the issuer thereof must also have, at the time of such investment, a long-term credit rating of not less than the EI Minimum Long-Term Rating;

(d)    off-shore funds investing in the money markets rated at all times not less than the EI Minimum Long-Term Rating; and

(e)    cash.

"ERISA":   The United States Employee Retirement Income Security Act of 1974, as amended.

"ETA":   In respect of any Series of Notes, an amount equal to the aggregate of any amounts payable by or to the Issuer under the relevant Default Swap upon early termination of the Default Swap transaction which shall be expressed as a positive number if such amount is payable to the Issuer and a negative number if such amount is payable by the Issuer.

"Euro":   The lawful currency within the Euro-zone.

"Euroclear":   Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"EURIBOR®":   The offered rate, as determined by the Note Calculation Agent, for Euro interbank term deposits that appears on Telerate Page 248, or if not available, Reuters Page EURIBOR 01 at or about 11.00 a.m (Brussels time) on the second Floating Rate Fixing Day prior to the first day of such Interest Period.

"Euro-zone":   The region comprised of member states of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union.

"Event of Default":   In respect of any Series of Notes, as defined in Section 5.1.

"Exchange Act":   The United States Securities Exchange Act of 1934, as amended.

"Exchanged Global Note":   In respect of any Series of Notes, as defined in Section 2.1.

"Expenses Agreement":  That certain Expenses Agreement dated as of May 30, 2007, entered into by the Company and FTC Holdings pursuant to which FTC Holdings has agreed to indemnify the Company (in all of its capacities) against, among others, any and all costs, fees, expenses and indemnities payable by the Company and the Issuer as set forth in Section 6.7.

"Extraordinary Resolution":  In respect of any Series of Notes, (i) a resolution passed at a Meeting of Noteholders of the relevant Series duly convened and held in accordance with this Indenture by at least 75% of the votes cast; or (ii) a written resolution of Noteholders representing at least 75% of the Notes of the relevant Series outstanding on such date.

"Final Maturity Date":  In respect to each Series of Notes, the earliest of (a) the Scheduled Termination Date of the relevant Default Swap and (b) the latest to occur of the relevant dates described in (i), (ii), (iii) and (iv) below:

(i)    If the Credit Event Determination Date does not occur on or prior to the last day of the relevant Notice Delivery Period, the relevant date will be the date which is two Business Days after the last day of the Notice Delivery Period.

(ii)    If the Credit Event Determination Date occurs during the Notice Delivery Period but the Notice of Physical Settlement has not been delivered on or prior to the Final Settlement Notice Delivery Date, the relevant date will be the date which is two Business Days after the Final Settlement Notice Delivery Date.

(iii)    If the Credit Event Determination Date occurs during the Notice Delivery Period and the Notice of Physical Settlement is delivered on or prior to the Final Settlement Notice Delivery Date, the relevant date will be the date which is two Business Days after the Physical Settlement Date specified in the Notice of Physical Settlement; *provided, however,* that if the Default Swap Counterparty is unable to deliver any Deliverable Obligations on the Physical Settlement Date and the relevant Default Swap is consequently required to be cash settled, then the Final Maturity Date will be the date which is two Business Days after the Cash Settlement Date.

(iv)    Any other relevant date set forth in the Supplemental Indenture for a Series.

"Final Price":  In respect of any Series of Notes and Deliverable Obligations of an Affected Reference Entity, as defined in the relevant Default Swap.

"Final Settlement Notice Delivery Date":  In respect to any Series of Notes, the date on which the notice of Cash or of Physical Settlement is required to be delivered in accordance with the related Default Swap, which, unless otherwise specified in the Supplemental Indenture for such Series, is 30 calendar days following the Credit Event Determination Date.

"Fixed Amounts":  In respect of any Series of Notes, as defined in the relevant Default Swap.

"Floating Rate Fixing Day": A Business Day on which commercial banks and foreign exchange markets settle payments in the relevant financial Center in U.S dollars (in the case of LIBOR) or euro (in the case of EURIBOR®).

"FTCEM": Has the meaning set forth in the introductory paragraph.

"FX Dependent Notes": As defined in Section 3.2.

"FX Hedges":  In respect to FX Dependent Notes, one or more exchange rate hedge agreements entered into by the relevant Issuer as set forth in the relevant Supplemental Indenture in order to hedge any risks to the Issuer associated with fluctuations of the Spot Rate.

"Global Notes": In respect of any Series of Notes, as defined in Section 2.1.

"Grant":  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm.  A Grant of any item of Collateral shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of such item of Collateral, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Hedging Transactions":  Any currency swaps including but not limited to FX Hedges and interest rate swaps entered into between the Issuer and a counterparty, which may include FTCEM or its Affiliates, as amended from time to time, all with market terms as determined at arm's-length including any confirmations evidencing the transactions thereunder.

"Holder" or "Noteholder": In respect of any Series of Notes, the Person in whose name a Note is registered in the Note Register.

"Indenture":   This  instrument  as  originally  executed  and,  if  from  time  to  time supplemented or amended by one or more Supplemental Indentures hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.  All references in this instrument to designated "Articles," "Sections," "Subsections" and other subdivisions are to the designated Articles, Sections, Subsections and other subdivisions of this instrument as originally executed.  The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, Subsection or other subdivision.

"Initial Purchaser": In respect of any Tranche of Notes, each initial purchaser of such Notes from the Issuer pursuant to the relevant Purchase Agreement.

"Interest Amounts": In respect of any Series of Notes, as defined in Section 4.3.

"Interest Commencement Date":  In respect of any Tranche of Notes, the date specified as such in the relevant Supplemental Indenture.

"Interest Determination Date":  In respect of a Note Interest Rate and Interest Period, the date specified as such in the relevant Supplemental Indenture or, if none is so specified, (a) the first day of such Interest Period if the Denomination Currency is Sterling, (b) the day falling two Business Days in London for the Denomination Currency prior to the first day of such Interest Period if the Denomination Currency is neither Sterling nor euro or (c) the day falling two TARGET Settlement Days prior to the first day of such Interest Period if the Denomination Currency is euro.

"Interest Payment Date":  In respect of any Series of Notes, any Interest Payment Date(s) specified in the relevant Supplemental Indenture, together with the Final Maturity Date for such Series (if applicable).

"Interest Period":  In respect of any Note, the period beginning on (and including) the Interest Commencement Date for such Note and ending on (but excluding) the first Interest Payment Date for such Note and each successive period beginning on (and including) an Interest Payment Date and ending on (but excluding) the next succeeding Interest Payment Date.

"Investment Agreement":  In respect of any Series of Notes, the investment agreement or swap of the related Collateral Issuer (and any related guarantee thereof, including (but not limited to) any Investment Agreement Insurance Policy) or the total return or asset swap with respect to Eligible Investments, in each case as so specified in the relevant Supplemental Indenture, and which provides for the investment of the proceeds of such Notes thereunder.

"Investment Agreement Insurance Policy":  In respect of any Investment Agreement, any financial guaranty insurance policy and/or similar instrument provided by any guarantor or insurer of the Collateral Issuer's obligations under such Investment Agreement.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"Investor Representation Letter":  A certificate delivered by a prospective transferee of a Note in the form of Exhibit B hereto.

"Issue Date":  In respect of any Note, the date on which such Note is issued by the Issuer.

"Issuer":  With respect to any Series of Notes, the Company, acting on behalf of and for the account of the relevant Segregated Portfolio for such Series pursuant to the applicable provisions this Indenture and any Supplemental Indenture, and any successor Person in such capacity.

"Issuer Order" and "Issuer Request":  A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer.

"LIBOR":  In respect of each Interest Period, the offered rate, as determined by the Note Calculation Agent, for Dollar deposits of three months that appears on Telerate Page 3750 (or

such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates) as of 11:00 a.m. (London time) on the second Floating Rate Fixing Day prior to the first day of such Interest Period; *provided* that if, on any Floating Rate Fixing Day, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), the Note Calculation Agent will determine the arithmetic mean of the offered quotations of four Reference Banks to prime banks in the London interbank market for Dollar deposits in London of three months, by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such Floating Rate Fixing Day made by the Calculation Agent to the Reference Banks. If, on any Floating Rate Fixing Day, at least two of the Reference Banks provide such quotations, LIBOR will equal such arithmetic mean. If, on any Floating Rate Fixing Day, fewer than two Reference Banks provide such quotations, LIBOR will be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Note Calculation Agent are quoting on the relevant Floating Rate Fixing Day for Dollar deposits for the term of such Interest Period, to the principal London offices of leading banks in the London interbank market.

"Maturity Date": As defined in Section 9.1.

"Meeting of Noteholders": A meeting of Noteholders held in accordance with the procedures set forth in Schedule A.

"Minimum Denomination": In respect of any Series of Notes, the minimum denomination specified in the relevant Supplemental Indenture.

"Moody's": Moody's Investors Service Inc. or any successor thereto.

"Net Investment Income": The net income received by the Issuer on the Collateral Investments (if any) selected by the Note Calculation Agent for investment of amounts on deposit in any Collateral Account. Such amount shall be determined in accordance with the terms and conditions of the particular Collateral Investments and notified to the Note Calculation Agent from time to time.

"Non-U.S. Person": A Person who is not a U.S. Person.

"Note Calculation Agent": FTCEM as note calculation agent under this Indenture, together with any additional calculation agent(s) appointed by the Issuer under a Supplemental Indenture and any successor(s) in such capacity.

"Note Interest Rate": In respect of any Series of Notes, the annualized rate of interest payable from time to time in respect of such Series of Notes and that is either specified or calculated in accordance with Section 4.3(a)(i) hereof and the provisions of the relevant Supplemental Indenture.

"Note Register": The Rule 144A Note Register or the Regulation S Note Register, as the case may be.

"Note Registrar": The Rule 144A Note Registrar or the Regulation S Note Registrar, as the case may be.

"Notes":   Any first loss first-to-default notes of the Issuer issued pursuant to this Indenture and a Supplemental Indenture or, as the context may require, a beneficial interest in such notes.

"Notes Principal Amount":   In respect to a Series of Notes at any time on any day, (a) the aggregate principal amount of that Series of Notes issued on the initial Issue Date of the first Tranche, plus (b) the aggregate principal amount of all fungible Notes issued in accordance with Section 3.4 minus (c) the aggregate principal amount of all Notes of that Series redeemed or purchased by the Issue.

"Notice Delivery Period":   As defined in the Derivatives Definitions.

"Notice of Physical Settlement":   In respect of a Default Swap, a Settlement Election Notice that elects Physical Settlement.

"Number of Notes":   In respect of a Series of Notes, the Aggregate Outstanding Principal Amount of that Series of Notes divided by the lowest Minimum Denomination of such Notes in the Denomination Currency.

"Offering Circular":   The offering circular of the Issuer relating to the Notes dated May 30, 2007, as it may be supplemented and amended from time to time.

"Offering Circular Supplement":   Any supplement to the Offering Circular.

"Officer":   In respect of the Company and any other corporation, the Chairman of the Board of Directors, any Director, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; in respect of any partnership, any general partner thereof; and in respect of any bank or trust company acting as trustee of an express trust or as collateral agent, any Trust Officer.

"Opinion of Counsel":   A written opinion addressed to the Issuer and the Trustee and in form and substance reasonably satisfactory to the Issuer and the Trustee of an attorney at law admitted to practice before the highest court of any state of the United States, or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Default Swap Counterparty or the Trustee and which attorney shall be reasonably satisfactory to the Trustee.

"Other Collateral":   In respect of any Series of Notes, any Collateral described in the relevant Supplemental Indenture purchased with the net proceeds of the issuance and sale of such Notes on the relevant Issue Date, other than Principal Investments.

"Other Secured Obligations":   Notes, bonds and other secured obligations which may be issued by the Issuer in accordance with Section 3.5 and which are not secured by the Collateral pledged to secure any Series of Notes.

"Outstanding":  In respect of any Series of Notes and any date of determination, all Notes of such Series theretofore authenticated and delivered under this Indenture and any Supplemental Indenture except:

(i)     Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

(ii)     Notes or portions thereof for whose payment or Redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided*, that, if such Notes or portions thereof are to be redeemed, notice of such Redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a Holder in due course; and

(iv)     Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.6;

*provided*, that in determining whether the Holders of the requisite principal amount of the Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by the Issuer shall be disregarded and deemed not to be outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that the Trustee knows to be so owned shall be so disregarded.  Notes so owned that have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act in respect of such Notes and that the pledgee is not the Issuer or any other obligor upon the Notes.

"Outstanding Principal Amount":  In respect of any Note, at any time on any day, the Aggregate Outstanding Principal Amount divided by the Number of Notes.

"Paying Agent":  The Rule 144A Note Paying Agent, the Regulation S Note Paying Agent, or any other depository institution or trust company authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.3.

"Payment Date Statement":  As defined in Section 10.4.

"Person":  An individual, corporation (including a business trust or a limited liability company), partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof or other entity.

"Physical Settlement":  As described in the definition of "Settlement Election Notice."

15

"Physical Settlement Amount":  In respect of a Default Swap with respect to which the conditions to settlement have been satisfied, an amount equal to the notional amount of such Default Swap.

"Physical Settlement Date": In respect to any Series of Notes, the physical settlement date specified in the Notice of Physical Settlement delivered by the Default Swap Counterparty under the related Default Swap.

"Plan":  (a) An "employee benefit plan" (as defined in Section 3(3) of ERISA), (b) a "plan" (as defined in Section 4975(e)(1) of the Code) that is subject to Section 4975 of the Code, including individual retirement accounts and Keogh plans and (c) any other entity, including without limitation, as applicable, an insurance company general account, whose underlying assets include plan assets by reason of the investment in such entity.

"Principal":  Any premium payable in respect of the Notes, all Redemption Amounts and all other amounts in the nature of principal payable under this Indenture and the relevant Supplemental Indenture.

"Principal Investments":  In respect of any Series of Notes, any bonds, notes or other obligations comprising a portion of the related Collateral as may be specified in the relevant Supplemental Indenture.

"Priority of Payments":  The provisions of Section 4.2 and Section 5.5 of this Indenture.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Process Agent":  In respect of any Series of Notes, as defined in Section 7.2.

"PTCE":  As defined in Section 2.4.

"Purchase Agreement":  In respect of any Tranche of Notes, the note purchase agreement between the Issuer and the purchaser of such Notes which provides the terms and conditions for the purchase of the Notes on the applicable Issue Date.

"Qualified Institutional Buyer":  A "qualified institutional buyer" within the meaning of Rule 144A.

"Qualified Purchaser":  A "qualified purchaser" within the meaning of Section 3(c)(7) under the Investment Company Act.

"Qualifying Country":  A country that is a member of the Organization for Economic Co-operation and Development.

"Rate Determination Date":  In respect of any Series of FX Dependent Notes, any date(s) specified in the relevant Supplemental Indenture for determination of the applicable Spot Rate.

"Record Date":  In respect of any Notes, the date that is 15 days prior to the applicable Interest Payment Date.

"Redemption Amount":  In respect of any Note redeemed, in whole or in part, on the Scheduled Maturity Date or the Final Maturity Date, unless the Supplemental Indenture specifies otherwise, an amount equal to (a) (i) the greater of the Aggregate Outstanding Principal Amount for the related Series (after giving effect to the application of Collateral Principal Amount to Physical Settlement or Cash Settlement of the related Default Swap)  and (ii) zero; divided by (b) the Number of Notes of the related Series.

"Reference Banks":  The institutions specified as such in the relevant Supplemental Indenture for a Series of Notes or, if none, four major banks selected by the Note Calculation Agent in the inter-bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with a benchmark (which if EURIBOR is the relevant benchmark, shall be the Euro-Zone).

"Reference Entity":  In respect to any Series of Notes, each entity identified in the relevant Supplemental Indenture as a Reference Entity and each replacement Reference Entity.

"Registered Office":  The registered office of the Issuer, which shall be located outside of the United States and initially shall be located at P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

"Regulation S":  Regulation S under the Securities Act.

"Regulation S Note" and "Regulation S Global Note":  In respect of any Series of Notes, as defined in Section 2.1.

"Regulation S Note Paying Agent":  Has the meaning set forth in the introductory paragraph.

"Regulation S Note Register":  In respect of any Series of Regulation S Notes, as defined in Section 2.4.

"Regulation S Note Registrar":  The Person or Persons, which may be the Trustee or Issuer, authorized by the Issuer to exchange or register the transfer of Regulation S Notes.

"Regulation S Transferor Certificate":  A certificate substantially in the form of Exhibit C-1 hereto.

"Relevant Date":  In respect of any Note, the date on which payment in respect of it first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which payment in full of the amount outstanding is made or (if earlier) the date seven days after that on which notice is duly given to the Noteholders that, upon further presentation of the Note being made in accordance with the Indenture and the relevant Supplemental Indenture, such payment will be made, provided that payment is in fact made upon such presentation.

"Responsible Officer": When used in respect of the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee), including any managing director, director, vice president, assistant vice president, assistant treasurer, assistant secretary, trust officer or any other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred within the Corporate Trust Office because of his or her knowledge of and familiarity with the particular subject.

"Rule 144A": Rule 144A under the Securities Act.

"Rule 144A Note" and "Rule 144A Global Note": In respect of any Series of Notes, as defined in Section 2.1.

"Rule 144A Note Paying Agent": Has the meaning set forth in the introductory paragraph.

"Rule 144A Information": As defined in Section 2.4(f).

"Rule 144A Note Register": In respect of any Series of Rule 144A Notes, as defined in Section 2.4.

"Rule 144A Note Registrar": The Person or Persons, which may be the Trustee or Issuer, authorized by the Issuer to exchange or register the transfer of Rule 144A Notes.

"Rule 144A Transferor Certificate": A certificate substantially in the form of Exhibit C-2 hereto.

"S&P": Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc.

"Scheduled Distribution": In respect of any Collateral Security, for each Due Date, the payment of principal and/or interest due on the applicable Due Date in respect of such Collateral Security, determined in accordance with the assumptions specified in Section 1.2 hereof.

"Scheduled Maturity Date": In respect of any Series of Notes, the date specified as such in the confirmation for the relevant Supplemental Indenture.

"Scheduled Termination Date": In respect of any Default Swap, as defined in the relevant Default Swap.

"Secured Parties": In respect of any Series of Notes, as defined in the relevant Supplemental Indenture.

"Securities Intermediary": Has the meaning set forth in the introductory paragraph.

"Section 3(c)7 Reminder Notice": As defined in Section 10.4.

"Segregated Portfolio": As set forth in the preliminary statement hereinabove.

"Securities Act": The United States Securities Act of 1933, as amended.

"Series":  A Tranche of Notes, together with any further Tranche or Tranches of Notes which are (a) expressed to be consolidated and form a single Series and (b) identical in all respects except for their respective Issue Dates, Interest Commencement Dates and/or issue prices.

"Settlement Currency":  In respect of any Series of Notes, United States dollars unless the relevant Supplemental Indenture specifies a different currency.

"Settlement Election Notice";  With respect to a Default Swap relating to any Series with respect to which the Credit Event Determination Date has occurred, a notice from the Default Swap Counterparty to the Issuer with a copy to the Trustee that (i) irrevocably confirms that the Default Swap Counterparty will settle the Default Swap and require performance in accordance with the settlement method elected by it, (ii) states whether the Default Swap Counterparty elects for the Default Swap to be cash settled ("Cash Settlement") or physically settled ("Physical Settlement") (subject to the Cash Settlement fallback), (iii) contains a detailed description of the Deliverable Obligations that the Default Swap Counterparty (acting through the Disposal Agent) will deliver in Physical Settlement or use as the basis for obtaining a Final Price in Cash Settlement (including any Cash Settlement fallback), (iv) specifies the Physical Settlement Date (in the case of Physical Settlement) or the valuation date (in the case of Cash Settlement) and (v) otherwise conforms to the requirement for a Notice of Physical Settlement under the relevant Default Swap Definition.

"Settlement Marketing Agreement":  That certain Settlement Marketing Agreement dated as of [~~_____~~] 2007, entered into by the Default Swap Counterparty, the Company. the Default Swap Calculation Agent, the Trustee, FTCEM, FTC Holdings and each Issuer that becomes party thereto, pursuant to which FTCEM will act as an agent of all of the other parties for the purpose of acquiring or valuing Deliverable Obligations and in the case of Physical Settlement, delivering the Deliverable Obligations to the Issuer or the Noteholders on behalf of the Issuer.

*[handwritten: May 3rd 2007]*

"Spot Rate":  In respect of any Series of FX Dependent Notes, the official rate for the number of units of the Denomination Currency that can be acquired with one unit of the Settlement Currency, as set forth in the Supplemental Indenture in a manner consistent with the 1998 ISDA FX and Currency Option Definitions.

"Spread Fixed Rate":  In respect to any Tranche of Notes, the rate specified as such in the relevant Supplemental Indenture.

"Supplemental Indenture":  In respect of (a) any Tranche of Notes of a Series, the related supplemental indenture entered into by the Issuer, the Trustee, the Securities Intermediary, the Note Registrar(s), the Note Calculation Agent and the Disposal Agent which shall incorporate the relevant Offering Circular Supplement for such Notes and shall be substantially in the form attached hereto as Schedule C and (b) all Series of Notes, any supplemental indenture entered into by the Issuer, the Trustee, the Securities Intermediary, the Note Calculation Agent and the Disposal Agent pursuant to Article VIII.  The term "relevant Supplemental Indenture" means,

"Securities Act": The United States Securities Act of 1933, as amended.

"Series":  A Tranche of Notes, together with any further Tranche or Tranches of Notes which are (a) expressed to be consolidated and form a single Series and (b) identical in all respects except for their respective Issue Dates, Interest Commencement Dates and/or issue prices.

"Settlement Currency":  In respect of any Series of Notes, United States dollars unless the relevant Supplemental Indenture specifies a different currency.

"Settlement Election Notice";  With respect to a Default Swap relating to any Series with respect to which the Credit Event Determination Date has occurred, a notice from the Default Swap Counterparty to the Issuer with a copy to the Trustee that (i) irrevocably confirms that the Default Swap Counterparty will settle the Default Swap and require performance in accordance with the settlement method elected by it, (ii) states whether the Default Swap Counterparty elects for the Default Swap to be cash settled ("Cash Settlement") or physically settled ("Physical Settlement") (subject to the Cash Settlement fallback), (iii) contains a detailed description of the Deliverable Obligations that the Default Swap Counterparty (acting through the Disposal Agent) will deliver in Physical Settlement or use as the basis for obtaining a Final Price in Cash Settlement (including any Cash Settlement fallback), (iv) specifies the Physical Settlement Date (in the case of Physical Settlement) or the valuation date (in the case of Cash Settlement) and (v) otherwise conforms to the requirement for a Notice of Physical Settlement under the relevant Default Swap Definition.

"Settlement Marketing Agreement":  That certain Settlement Marketing Agreement dated as of May 30, 2007, entered into by the Default Swap Counterparty, the Company. the Default Swap Calculation Agent, the Trustee, FTCEM, FTC Holdings and each Issuer that becomes party thereto, pursuant to which FTCEM will act as an agent of all of the other parties for the purpose of acquiring or valuing Deliverable Obligations and in the case of Physical Settlement, delivering the Deliverable Obligations to the Issuer or the Noteholders on behalf of the Issuer.

"Spot Rate":  In respect of any Series of FX Dependent Notes, the official rate for the number of units of the Denomination Currency that can be acquired with one unit of the Settlement Currency, as set forth in the Supplemental Indenture in a manner consistent with the 1998 ISDA FX and Currency Option Definitions.

"Spread Fixed Rate":  In respect to any Tranche of Notes, the rate specified as such in the relevant Supplemental Indenture.

"Supplemental Indenture":  In respect of (a) any Tranche of Notes of a Series, the related supplemental indenture entered into by the Issuer, the Trustee, the Securities Intermediary, the Note Registrar(s), the Note Calculation Agent and the Disposal Agent which shall incorporate the relevant Offering Circular Supplement for such Notes and shall be substantially in the form attached hereto as Schedule C and (b) all Series of Notes, any supplemental indenture entered into by the Issuer, the Trustee, the Securities Intermediary, the Note Calculation Agent and the Disposal Agent pursuant to Article VIII.  The term "relevant Supplemental Indenture" means,

unless the context otherwise requires, the Supplemental Indenture in respect of a single Series of Notes.

"TARGET Settlement Day": A day on which the TARGET System is open.

"TARGET System": The Trans European Automated real-time Gross Settlement Express Transfer (TARGET) System or any successor thereto.

"Tranche": In respect of any Series of Notes, Notes of such Series that are identical in all respects.

"Transaction Documents": In respect to, and to the extent relevant only to, the Notes of a Series, this Indenture, the relevant Supplemental Indenture, the relevant Default Swap, the Default Swap Guarantee, documents under any Hedging Transaction, the Settlement Marketing Agreement, the Purchase Agreement or any other security documents and additional agreements specified in the relevant Supplemental Indenture.

"Transferor Certificates": Collectively, the Regulation S Transferor Certificate and the Rule 144A Transferor Certificate.

"Trustee": Deutsche Bank Trust Company Americas, a New York banking corporation, solely in its capacity as Trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee Letter": The trustee fee letter dated as of May 30, 2007 between the Company and the Trustee.

"Trust Officer": When used in respect of the Trustee, any officer authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office or elsewhere because of his or her knowledge of and familiarity with the particular subject.

"UCC": The Uniform Commercial Code as in effect from time to time in the State of New York.

"United States Regulations": 31 C.F.R. Part 357, Subpart B; 12 C.F.R. Part 615, Subparts O, R and S; 12 C.F.R. Part 987; 12 C.F.R. Part 1511; 24 C.F.R. Part 81, Subpart H; 31 C.F.R. Part 354; 18 C.F.R. Part 1314; and 24 C.F.R. Part 350.

"U.S. Person":

(a)    (i)    a citizen of the United States;

(ii)    a natural person who is a resident of the United States or a resident alien of the United States as defined by section 7701(b) of the Code;

(iii)   any partnership (unless otherwise provided in the regulations), corporation or other entity created, organized or incorporated in or under the laws of the United States, its states, territories or possessions, or the District of Columbia; or

(iv)   any estate or trust as defined by section 7701(a)(30)(D) and (E) of the Code, respectively; or

(b)   as defined in Regulation S, as the context may require.

Section 1.2.   Calculations as to the Collateral

(a)   In connection with all calculations required to be made pursuant to this Indenture in respect of Scheduled Distributions on any Collateral Security, or any payments on any other assets included in the Collateral, and in respect of the income that can be earned on Distributions on such Collateral Securities and on any other amounts that may be received for deposit in the relevant Collateral Account, the provisions set forth in this Section 1.2 shall be applied.

(b)   All calculations in respect of Scheduled Distributions on the Collateral Securities securing the Notes shall be made on the basis of information as to the terms of each such Collateral Security and upon report of payments, if any, received on such Collateral Security that are furnished by or on behalf of the issuer of such Collateral Security and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

(c)   For each Interest Period, the Scheduled Distribution on any Collateral Security shall be the total amount of payments and collections in respect of such Collateral Security (including the proceeds of the sale of such Collateral Security) received during the Interest Period.

(d)   Each Scheduled Distribution receivable in respect of a Collateral Security shall be assumed to be received on the applicable Due Date, and each such Distribution shall be assumed to be immediately deposited in the relevant Collateral Account and, except as otherwise specified, not to be reinvested.

Article II

THE NOTES

Section 2.1.   Execution, Authentication and Delivery

(a)   The Notes of each Series and the Trustee's or Authenticating Agent's certificate of authentication thereon (the "Certificate of Authentication") shall be in substantially the forms required by this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and the relevant Supplemental Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized

Officers of the Issuer executing such Notes as evidenced by their execution of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note. No Note shall be entitled to any benefit under this Indenture or the relevant Supplemental Indenture or be valid or obligatory for any purpose unless there appears on such Note a Certificate of Authentication, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder. The Notes of any Series bearing the manual or facsimile signature of any Person who was at the time the signature was affixed a director or officer or a duly authorized attorney-in-fact of the Issuer shall bind the Issuer, notwithstanding that such Person has ceased to hold office or to be so authorized prior to the authentication and delivery of those Notes or did not hold the relevant office or was not so authorised at the date of delivery of those Notes.

On or prior to the applicable Issue Date, the Issuer shall provide (i) to the Authenticating Agent an Issuer Order setting forth the principal amount of each Tranche of the Notes to be issued on such date in the form of Global Notes and (ii) to the applicable Clearing System written instructions listing the names and addresses of the initial beneficial owners of the Notes to be issued as Global Notes, and the amounts of their respective ownership interests (together with payment instructions, taxpayer information and such other information as the Clearing System reasonably may require).

The Issuer shall deliver each Note executed by the Issuer in accordance with this Section 2.1(a) to, or to the order of, the Trustee or any other Authenticating Agent, upon Issuer Order, for authentication and delivery of those Notes. The Trustee or that other Authenticating Agent, in accordance with such Issuer Order, shall authenticate and deliver those Notes as provided in this Indenture and the relevant Supplemental Indenture and not otherwise. Each Note shall be dated the date of its authentication.

(b)     <u>Regulation S Global Notes</u>. The Notes of each Tranche initially issued to Non-U.S. Persons in "offshore transactions" (within the meaning of Regulation S) in reliance on Regulation S (the "<u>Regulation S Notes</u>") shall be represented by single global notes (the "<u>Regulation S Global Notes</u>") in fully registered form without coupons, authenticated and delivered in substantially the form attached hereto as <u>Exhibit A-1</u>. The Issuer, on behalf of the subscribers for such Notes, shall deposit any Regulation S Global Notes with the Common Depositary, registered in the nominee name of the Common Depositary, in each case to retain as custodian for the respective accounts of Euroclear and Clearstream, for credit by such Clearing System to the respective participant accounts designated by the subscribers of such Notes (or to such other accounts as they may direct) at Euroclear or Clearstream, as applicable.

(c)     Intentionally Omitted.

(d)     <u>Rule 144A Global Notes</u>. The Notes of each Tranche initially issued to U.S. Persons (within the meaning of Rule 144A) in reliance on Rule 144A (the "<u>Rule 144A Notes</u>") shall be represented by single global notes (the "<u>Rule 144A Global Notes</u>") in fully registered form without coupons, authenticated and delivered in substantially the form attached hereto as <u>Exhibit A-2</u>. The Issuer, on behalf of the subscribers for such Notes, shall deposit any Rule 144A Global Notes with the Custodian, registered in the name of the Custodian, in each case to

retain as custodian for the respective accounts of DTC, for credit by such Clearing System to the respective participant accounts designated by the subscribers of such Notes (or to such other accounts as they may direct) at DTC.

(e)  Book-Entry Provisions.  This Section 2.1(e) shall apply only to Global Notes deposited with or on behalf of a Clearing System.  On or prior to the initial Issue Date and any subsequent Issue Date, the Issuer shall provide (i) to the Authenticating Agent an Issuer Order setting forth the principal amount of Global Notes to be issued on such Issue Date, as applicable, in the form of Regulation S Global Notes for each Tranche and (ii) to the applicable Clearing System written instructions listing the names and addresses of the initial beneficial owners of Global Notes, and the amounts of their respective ownership interests (together with payment instructions, taxpayer information and such other information as the Clearing System reasonably may require).  A Global Note subject to this Section 2.1(e) may be initially issued for each Tranche with a principal amount of zero (and the principal amount thereof may be reduced to zero at any time without cancellation).

Beneficial owners of Global Notes may hold their interests in book entry securities through the Clearing Systems.

The applicable rules, regulations and procedures utilized or imposed by any Clearing System (collectively, "Applicable Procedures") shall be applicable to the Global Notes insofar as and to the extent beneficial interests in such Global Notes are held by the agent members of or participants in Euroclear, Clearstream or DTC respectively.  Account holders or agent members of or participants in Euroclear, Clearstream and DTC shall have no rights under this Agreement in respect of such Global Notes, and the Clearing System (or their respective nominees) as registered Holder of any Global Note may be treated by the Issuer, the Trustee, the Note Registrars, the Paying Agents, the Authenticating Agent and the Common Depositary (and any agent of any of the foregoing) as the owner of such Global Notes for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Common Depositary, the Issuer, the Trustee, the Note Registrars, the Paying Agents or the Authenticating Agent from giving effect to any written certification, proxy or other authorization furnished by any Clearing System or impair, as between the Clearing System and its agent members or participants, the operation of customary practices governing the exercise of the rights of a Holder of any Notes.  Requests or directions from, or votes of, the Common Depositary or any Clearing System in respect of any matter shall not be deemed inconsistent if made in respect of (or in separate proportions corresponding to) different beneficial owners.  None of the Common Depositary, the Issuer, the Trustee, the Transfer Agent, the Note Registrars, the Paying Agents nor the Authenticating Agent shall have any duty to monitor, maintain records concerning (or determine compliance with any of the restrictions on transfer set forth herein in respect of) owners of beneficial interests in the Global Notes.  None of the Issuer, the Transfer Agent, the Note Registrars, the Paying Agents, the Authenticating Agent nor the Trustee shall have any liability for the accuracy of the records of any Clearing System, or any actions or omissions of any Clearing System (or of the agent members of or participants in any Clearing System).

(f)  Definitive Registered Notes.  The Global Notes are exchangeable for Definitive Registered Notes if and only if the applicable Clearing System (or alternative Clearing System on behalf of which the related Global Notes may be held) on behalf of which the Global Notes

are held is closed for business for a continuous period of 14 days or more (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so. Definitive Registered Notes shall be issued in registered form only, and will be registered in the name or names of such person or persons as the Issuer shall notify the Note Registrars. It is expected that such notification will be based upon directions received by the Issuer from applicable Clearing System as to ownership of beneficial interests in the Global Notes.

Definitive Registered Notes issued in exchange for interests in Global Notes will bear the legends as set out in Exhibit A-3 hereto.

If Definitive Registered Notes are to be issued, the Issuer will provide the Note Registrars with a written order containing such instructions and other information as the Note Registrars may reasonably require to complete, execute and deliver Definitive Registered Notes.

In such circumstances, the relevant Global Note shall be exchanged for Definitive Registered Notes and the Issuer shall, at the cost of the Issuer (but against such indemnity as the Note Registrars may require in respect of any tax or other duty of whatever nature which may be levied or imposed in connection with such exchange), cause sufficient Definitive Registered Notes to be executed and delivered by the Issuer to the Note Registrars for completion, authentication and dispatch to the relevant Holders. A person having a beneficial interest in a Global Note must provide the Note Registrars (or must ensure that the Clearing Systems provides the Issuer) with a written order containing instructions and such other information as the Issuer and the Note Registrars may require to complete, execute and deliver such Definitive Registered Notes.

The Note Registrars will not register the transfer of, or exchange of interests in, a Global Note for Definitive Registered Notes for a period of 15 calendar days ending on the date for any payment of principal or interest in respect of the Notes.

If less than all of the Global Notes (the "Exchanged Global Notes") of any Series of Notes becomes exchangeable for Definitive Registered Notes in accordance with the above paragraphs, transfers of interests in Notes may not take place between, on the one hand, persons holding Definitive Registered Notes issued in exchange for beneficial interests in the Exchanged Global Note and, on the other hand, persons wishing to purchase beneficial interests in the Notes that are not Exchanged Global Notes.

(g)    Form of Notes.  The Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner, all as determined by the Authorized Officers of the Issuer executing such Notes, as evidenced by the Authorized Officers' execution of such Notes.

Section 2.2.    Paying Agents, Note Calculation Agent and Authenticating Agents

(a)    The Issuer hereby appoints (i) DBTC Americas at its specified office in New York and DB London at its specified office in London as Paying Agents, (ii) FTCEM at its specified office in New York City as Note Calculation Agent and (iii) DBTC Americas at its specified office in New York as the initial Authenticating Agent in respect of each Series of Notes. Each Paying Agent, the Note Calculation Agent and the Authenticating Agent shall act

solely as an agent of the Issuer and do not assume any obligation or relationship of agency or trust for or with any Noteholder. The Issuer reserves the right at any time with the prior written approval of the Trustee to vary or terminate the appointment of any Paying Agent, the Note Calculation Agent and the Authenticating Agent and to appoint additional or other Paying Agents, Note Calculation Agents and the Authenticating Agents provided that the Issuer shall at all times maintain (i) a Note Calculation Agent, (ii) a Paying Agent having its specified office in a major European city, (iii) such other agents as may be required by any stock exchange on which the Notes may be listed, in each case with notice to the Trustee; *provided, however,* that a Paying Agent with a specified office in a European Union member state will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26th to 27th November, 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive.

(b)     Upon the request of the Issuer, the Trustee shall appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with transfers and exchanges thereof hereunder as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by this Indenture to authenticate the Notes; *provided,* that any such appointment shall be upon terms and conditions reasonably acceptable to the Trustee (in respect of which the Trustee may require, among other things, appropriate indemnification for any damages, losses or reasonable costs arising from acts or omissions of such Authenticating Agent).

(c)     Any entity into which any Paying Agent, Note Calculation Agent or Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Paying Agent, Note Calculation Agent or Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Paying Agent, Note Calculation Agent or Authenticating Agent, shall be the successor of such Paying Agent, Note Calculation Agent or Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Paying Agent, Note Calculation Agent or Authenticating Agent or such successor corporation.

(d)     Any Paying Agent, Note Calculation Agent or Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Paying Agent, Note Calculation Agent or Authenticating Agent by giving written notice of termination to such Paying Agent, Note Calculation Agent or Authenticating Agent and the Issuer.

(e)     The Issuer shall pay to any Paying Agent, Note Calculation Agent or Authenticating Agent reasonable compensation and shall reimburse each Paying Agent, the Note Calculation Agent and the Authenticating Agent for expenses reasonably incurred by such Paying Agent, Note Calculation Agent or Authenticating Agent in the performance of its duties as a Paying Agent, Note Calculation Agent or Authenticating Agent, in each case as and to the extent agreed upon between the Issuer and such Paying Agent, Note Calculation Agent or Authenticating Agent; *provided,* that if the appointment of such Paying Agent, Note Calculation Agent or Authenticating Agent is at the election or request of the Issuer, the Trustee's obligation

to make such payments shall be limited to amounts for which it is entitled to be reimbursed pursuant to Section 6.7(a) or (b). The provisions of Article VI shall be applicable to any Paying Agent, Note Calculation Agent or Authenticating Agent.

Section 2.3.   Intentionally Omitted

Section 2.4.   Registration, Registration of Transfer and Exchange

(a)   (i)   The Issuer shall hold a register (the "Regulation S Note Register") at the office of the Regulation S Note Registrar in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Regulation S Notes and the registration of transfers of the Regulation S Notes in global form. DB Luxembourg is hereby appointed as the initial "Regulation S Note Registrar" for the purpose of registering the Regulation S Notes and transfers of such Notes and hereby accepts such appointment. Upon any resignation or removal of the Regulation S Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Regulation S Note Registrar. The Issuer will notify the Regulation S Note Registrar of any Regulation S Notes owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such pledge. The Regulation S Note Registrar shall promptly, upon the written request of a Noteholder or the Issuer, but in no event later than five (5) Business Days following such request, furnish such Noteholder or the Issuer with an excerpt of the Regulation S Note Register showing details of that Noteholder's position of Regulation S Notes; *provided* that the Regulation S Note Registrar shall have no liability to any person for furnishing the Note Register to any Noteholder or the Issuer.

The Issuer shall hold a register (the "Rule 144A Note Register") at the office of the Rule 144A Note Registrar in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Rule 144A Notes and the registration of transfers of the Rule 144A Notes in global form. DBTC Americas is hereby appointed as the initial "Rule 144A Note Registrar" for the purpose of registering the Rule 144A Notes and transfers of such Notes and hereby accepts such appointment. Upon any resignation or removal of the Rule 144A Note Registrar, the Issuer shall promptly appoint a successor or, in the absence of such appointment, assume the duties of Rule 144A Note Registrar. The Issuer will notify the Rule 144A Note Registrar of any Rule 144A Notes owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such pledge. The Rule 144A Note Registrar shall promptly, upon the written request of a Noteholder or the Issuer, but in no event later than five (5) Business Days following such request, furnish such Noteholder or the Issuer with an excerpt of the Rule 144A Note Register showing details of that Noteholder's position of Rule 144A Notes; *provided* that the Rule 144A Note Registrar shall have no liability to any person for furnishing the Rule 144A Note Register to any Noteholder or the Issuer.

Each Note Registrar shall provide the Issuer with a copy of the applicable Note Register upon its creation and promptly thereafter upon any change to the applicable Note Register. The Issuer may rely conclusively upon the information provided by the Note Registrar without any liability on its part.

(ii)     If a Person other than DB Luxembourg is appointed by the Issuer as Regulation S Note Registrar, the Issuer will give DB Luxembourg prompt written notice of the appointment of a Regulation S Note Registrar and of the location, and any change in the location, of the Regulation S Note Registrar, and DB Luxembourg shall have the right to inspect the Regulation S Note Register at all reasonable times and to obtain copies thereof and DB Luxembourg shall have the right to rely upon a certificate executed on behalf of the Regulation S Note Registrar by an Officer thereof as to the names and addresses of the Holders of the Regulation S Notes and the principal amounts and numbers of such Notes.

If a Person other than DBTC Americas is appointed by the Issuer as Rule 144A Note Registrar, the Issuer will give DBTC Americas prompt written notice of the appointment of a Rule 144A Note Registrar and of the location, and any change in the location, of the Rule 144A Note Registrar, and DBTC Americas shall have the right to inspect the Rule 144A Note Register at all reasonable times and to obtain copies thereof and DBTC Americas shall have the right to rely upon a certificate executed on behalf of the Rule 144A Note Registrar by an Officer thereof as to the names and addresses of the Holders of the Rule 144A Notes and the principal amounts and numbers of such Notes.

Subject to the provisions of paragraphs (b), (c) and (e) of this Section 2.4, upon surrender for registration of transfer of any Note, the Issuer shall execute, and the Authenticating Agent shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same Tranche and the same Series, of any Minimum Denomination and of a like principal amount.

(iii)     Subject to the provisions of paragraphs (b), (c) and (e) of this Section 2.4, at the option of the Holder, Notes may be exchanged for other Notes of the same Tranche and Series, in any Minimum Denominations and of a like aggregate principal amount, upon surrender of the Notes to be exchanged at the office of the applicable Note Registrar. Whenever any Notes are so surrendered for exchange, the Issuer shall execute and deliver the Notes that the Holder making the exchange is entitled to receive.

All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall evidence the same ownership interest, and entitled to the same benefits under this Agreement, as the Notes surrendered upon such registration of transfer or exchange. Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing. No fee or service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Issuer, the Note Registrars or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes

(b)     No Note may be sold or transferred (including, without limitation by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws. No purported transfer of any interest in any Note or any portion thereof that is not made in accordance with this Section 2.4 shall be given effect by or be binding upon the Note Registrars, the Trustee or the Issuer and any

such purported transfer shall be null and void *ab initio* and vest in the transferee no rights against the Note Registrars, the Trustee, the Issuer or the Notes.

By its acceptance of a Note or a beneficial interest in a Note, each owner thereof will be deemed to have represented and agreed that transfer thereof is restricted and agrees that it shall transfer such Note or beneficial interest only in accordance with the terms of this Agreement and such Note and in compliance with applicable law.

A Holder may transfer a Note or its beneficial interest in a Note only in accordance with the following provisions:

(i)      Definitive Registered Note to Global Note.   To the extent permitted by the Applicable Procedures, if a Holder of a Definitive Registered Note wishes at any time to transfer its beneficial interest in such Definitive Registered Note to a Non-U.S. Person (in the Case of Regulation S Global Notes) or to a U.S. Person that is a Qualified Institutional Buyer or Qualified Purchaser (in the case of Rule 144A Global Notes), such Holder shall, subject to the provisions of this Section 2.4, transfer its interest in such Definitive Registered Note for an equivalent beneficial interest in the applicable Global Note of the same Tranche and Series.  Upon (A) the surrender to the respective Note Registrar for cancellation of the duly indorsed Definitive Registered Notes representing the beneficial interest to be so transferred and (B) the receipt by the respective Note Registrar and the Issuer of (1) an Investor Representation Letter from such Holder's transferee, (2) a Regulation S Transferor Certificate or a Rule 144A Transferor Certificate, as the case may be, from such Holder, and (3) a written order in accordance with the Applicable Procedures containing information regarding the applicable Clearing System account to be credited with the increase in a Global Note and the name of such account, the Note Registrar shall cancel such Definitive Registered Note and, concurrently with such cancellation, adjust the Common Depositary's position in a Global Note of the same Tranche and Series to reflect an increase of the principal amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Global Note equal to the principal amount of the Definitive Registered Note so cancelled.  In the event of any partial transfer of an interest in a Definitive Registered Note to a Global Note, the Issuer shall execute and provide to the Authenticating Agent, and the Authenticating Agent shall authenticate and return to the Holder, a Definitive Registered Note evidencing the remaining balance thereof (which Definitive Registered Note shall be so mailed or otherwise delivered from a location outside the United States).

(ii)      Regulation S Global Note to Rule 144A Global Note.   To the extent permitted by the Applicable Procedures and the relevant Supplemental Indenture, if a Holder of a beneficial interest in a Regulation S Global Note of a particular Tranche or Series wishes at any time to transfer its beneficial interest in such Regulation S Global Note to a U.S. Person, such Holder shall, subject to the provisions of this Section 2.4, transfer its beneficial interest in such Regulation S Global Note for an equivalent interest in a Rule 144A Global Note.  Upon receipt

by the Issuer of (A) an Investor Representation Letter from such Holder's transferee and (B) a written order given in accordance with the Applicable Procedures, the Issuer shall instruct the applicable Clearing System to adjust its position in the Regulation S Global Note to reflect a reduction of the principal amount thereof by the principal amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, the Issuer shall instruct DTC to credit or cause to be credited to the securities account of the transferee a beneficial interest in the corresponding Rule 144A Global Note equal to the amount of the reduction in the principal amount of the Regulation S Global Note of the same Series.

(iii)    <u>Transfer of Interests in a Definitive Registered Note</u>.  A Holder of a Definitive Registered Note may at any time transfer its interest in such Definitive Registered Note in accordance with this Section 2.4(b)(iii).  Any transfer of an interest in a Definitive Registered Note to a Non-U.S. Person or to a U.S. Person that is a Qualified Institutional Buyer or Qualified Purchaser shall be made only pursuant to Section 2.4(b)(i) above.  Otherwise the respective Note Registrar shall require, prior to any such transfer of a Definitive Registered Note, receipt by the respective Note Registrar and the Issuer of (A) an Investor Representation Letter from such Holder's transferee and (B) the applicable Transferor Certificate from such Holder.  Upon receipt of such letter and certificate, and surrender to the respective Note Registrar of the Definitive Registered Note representing the interest to be so transferred, the respective Note Registrar shall cancel such Definitive Registered Note and the Issuer shall execute and provide to the Authenticating Agent, and the Authenticating Agent shall authenticate and deliver, a Definitive Registered Note to such transferee (and, in the event of a partial transfer, the Issuer shall execute and provide to the Authenticating Agent, and the Authenticating Agent shall authenticate and deliver, a Definitive Registered Note evidencing the remaining balance to the transferring Holder).

(iv)    <u>Transfer of Interests in a Regulation S Global Note</u>.  Transfers of beneficial interests in a Regulation S Global Note may only be made in accordance with Section 2.4(b)(ii) above or by book-entry transfer of beneficial interests in a Regulation S Global Note within the applicable Clearing System (and subject to the Applicable Procedures) to Non-U.S. Persons in accordance with Regulation S in "offshore transactions" (within the meaning of Regulation S).

(v)    <u>Rule 144A Global Note to Regulation S Global Note</u>.  To the extent permitted by the Applicable Procedures and the relevant Supplemental Indenture, if a Holder of a beneficial interest in a Rule 144A Global Note of a particular Tranche or Series wishes at any time to transfer its beneficial interest in such Rule 144A Global Note to a Non-U.S. Person, such Holder shall, subject to the provisions of this Section 2.4, transfer its beneficial interest in such Rule 144A Global Note for an equivalent interest in a Regulation S Global Note.  Upon receipt by the Issuer of (A) an Investor Representation Letter from such Holder's

transferee and (B) a written order given in accordance with the Applicable Procedures, the Issuer shall instruct DTC to adjust its position in the Rule 144A Global Note to reflect a reduction of the principal amount thereof by the principal amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, the Issuer shall instruct Euroclear or Clearstream, as the case may be, to credit or cause to be credited to the securities account of the transferee a beneficial interest in the corresponding Regulation S Global Note equal to the amount of the reduction in the principal amount of the Rule 144A Global Note of the same Series.

(vi)    <u>Transfer of Interests in a Rule 144A Global Note</u>.  Transfers of beneficial interests in a Rule 144A Global Note may only be made in accordance with Section 2.4(b)(v) above or by book-entry transfer of beneficial interests in a Rule 144A Global Note within DTC (and subject to the Applicable Procedures) to transferee who is a Qualified Institutional Investor and a Qualified Purchaser.

(vii)    <u>Securities Act</u>.  No transfer of any Note or any beneficial interest in any Note shall be made unless such transfer (a) is made pursuant to an effective registration statement under the Securities Act and registration or qualification under applicable state securities laws or (b) is exempt from such registration or qualification requirements.

The Investor Representation Letters and the Transferor Certificates furnished pursuant to this Section may be relied on conclusively by the Issuer, the Note Registrars, the Paying Agents, the Authenticating Agent and the Trustee in determining whether the provisions of this Section have been complied with.  None of the Issuer, the Trustee, the Note Registrars, the Paying Agents, the Authenticating Agent or any other person shall be required to register the Notes under the Securities Act or any state securities laws.

(c)    Notes may not be acquired or held by or on behalf of, or with "plan assets" of, any Plan or other Benefit Plan Investor, including an insurance company general account any portion of the assets of which constitute "plan assets" or a foreign, governmental or church plan that is generally not subject to Title I of ERISA or Section 4975 of the Code.

(d)    Intentionally Omitted.

(e)    No Note shall be sold or transferred (including, without limitation, by pledge or hypothecation), except to Non-U.S. Persons in "offshore transactions" in accordance with Regulation S under the Securities Act, unless the purchaser or transferee is a Qualified Institutional Buyer and a Qualified Purchaser. Notwithstanding anything to the contrary in this Agreement, no transfer of a Note may be made if such transfer would require registration of the Issuer under the Investment Company Act (subject, as regards the Authenticating Agent's duties, to Section 2.4(f) below).

(f)    At any time when the Issuer is not subject to Section 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended, upon the request of any Holder, the Issuer shall promptly furnish to such Holder or to a prospective purchaser of any Note designated by such

Holder, as the case may be, the information which the Issuer determines to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information") in order to permit compliance by such Holder with Rule 144A in connection with the resale of such Note by such Holder; *provided that* the Issuer shall not be required to provide audited financial statements more than once a year. Upon request by the Issuer, the Trustee shall cooperate with the Issuer in mailing or otherwise distributing (at the Issuer's expense) to such Holders or prospective purchasers, at and pursuant to the Issuer's written direction, the foregoing materials prepared and provided by the Issuer; *provided that* the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer that such Rule 144A Information was assembled by the Issuer and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(g)    None of the Trustee, any Authenticating Agent, Paying Agent, Transfer Agent or the Note Registrars shall be responsible for ascertaining whether any transfer complies with, or otherwise to monitor or determine compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this Section to be provided to the Authenticating Agent by a prospective transferee, transferor or the Issuer, the Authenticating Agent shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section.

(h)    If a Responsible Officer of the Trustee, the Note Registrars, the Paying Agents or the Authenticating Agent becomes aware that (i) a transfer or attempted or purported transfer of any Note or interest therein was consummated in compliance with the provisions of this Section 2.4 on the basis of a materially incorrect certification from the transferor or purported transferee, (ii) a transferor or transferee failed to deliver to the Note Registrars any Transferor Certificate or Investor Representation Letter required to be delivered hereunder or (iii) the Holder of any Note or interest therein is in material breach of any representation or agreement set forth in any certificate or any deemed representation or agreement of such Holder, the Trustee will direct the Note Registrars not to register such attempted or purported transfer and if a transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding Holder of such Note that was not a Disqualified Transferee shall be restored to all rights as a Holder thereof retroactively to the date of transfer of such Note by such Holder.

(i)    For so long as one or more Global Notes are Outstanding:

(i)    the Trustee, the Note Registrars, the Paying Agents, the Authenticating Agent and their directors, officers, employees and agents may deal with the Common Depositary, in respect of all other Global Notes for all purposes (including the making of distributions on, and the giving of notices in respect of, a Global Notes);

(ii)    unless otherwise provided herein, the rights of beneficial owners in a Global Note shall be exercised only through the applicable Clearing System and

31

shall be limited to those established by law and agreements between such beneficial owners and the applicable Clearing System;

      (iii)    for purposes of determining the identity of and principal amount of Notes beneficially owned by a Holder, the records of the Common Depositary shall be conclusive evidence of such identity and principal amount and the Trustee and the Authenticating Agent may conclusively rely on such records when acting hereunder;

      (iv)    the applicable Clearing System will make book-entry transfers among the participants of the Clearing System and will receive and transmit distributions of principal of and interest on a Global Notes to such participants; and

      (v)    the participants of the applicable Clearing System shall have no rights under this Agreement under or in respect of any of a Global Notes held on their behalf by the Clearing System, and the applicable Clearing System may be treated by the Trustee, the Note Registrars, the Paying Agents, the Authenticating Agent and their agents, employees, officers and directors as the absolute owner of a Global Notes for all purposes whatsoever.

      (j)    Each transferee of a Note (except in respect of a transfer pursuant to Regulation S) will be deemed to represent at time of transfer that the transferee is a Qualified Institutional Buyer and (i) that it is a Qualified Purchaser, (ii) that it is not formed for the purpose of investing in the Notes, unless each of its beneficial owners is a Qualified Purchaser, (iii) that it is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of such dealer, (iv) that it is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan, unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan, (v) that it and each account for which it is purchasing is purchasing Notes in at least the Minimum Denomination and (vi) that it will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee.

      (k)    Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, the applicable Note Registrar and the Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, the applicable Note Registrar and the Issuer to the effect that (i) neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Regulation S, as applicable, and to ensure that neither the Issuer nor any pool of Collateral becomes an investment company required to be registered under the Investment Company Act, and (ii) the Issuer and the pool of Collateral are exempt from registration under the Investment Company Act other than by reason of Section 3(c)(7) thereof.

      (l)    If, notwithstanding the restrictions set forth in this Section 2.4, the Issuer or a Responsible Officer of the Trustee or the Note Registrar determines that any beneficial owner or

Holder of a Note (i) is a U.S. Person and (ii) is not (A) a Qualified Purchaser or (B) a company beneficially owned exclusively by Qualified Purchasers, the Issuer or the Trustee or the Rule 144A Note Registrar may require, by notice to such beneficial owner or Holder, as the case may be, that such beneficial owner or Holder sell all of its right, title and interest in such Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by Qualified Purchasers, with such sale to be effected within thirty (30) days after notice of such sale requirement is given. If such beneficial owner or Holder fails to effect the transfer required within such 30-day period, (x) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner or Holder, as the case may be, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by an investment banking firm selected by the Trustee (whose fees are to be paid exclusively from the proceeds of such sale), in accordance with Article 9 of the UCC as applied to securities that may decline speedily in value) to a Person that certifies to the Trustee, the Rule 144A Note Registrar and the Issuer, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by one or more Qualified Purchasers and (y) pending such transfer, no further payments will be made in respect of such Note (or beneficial interest therein) held by such beneficial owner or Holder.

Section 2.5.   <u>Intentionally Omitted</u>

Section 2.6.   <u>Mutilated, Defaced, Destroyed, Lost or Stolen Notes</u>

If (a) any mutilated or defaced Note is surrendered to a Registrar or evidence to its reasonable satisfaction of the destruction, loss or theft of any Note, and (b) there is delivered to the Issuer, the Trustee and the applicable Note Registrar such security or indemnity as may be required by them to save each of them and any agent of any of them harmless, then, in the absence of notice to the Issuer, the Trustee or the applicable Note Registrar that such Note has been acquired by a protected purchaser, the Issuer shall execute and, upon Issuer Request, the Authenticating Agent shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Note, a new Note, of like tenor (including the same date of issuance) and equal principal amount, registered in the same manner (if applicable), dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously Outstanding. Each of the Note Registrars shall cancel or destroy each mutilated or defaced Note surrendered to it in respect of which a replacement has been delivered.

The Trustee shall notify the Issuer, any Paying Agent and the Note Registrars of the delivery by it of any replacement Global Note or Definitive Registered Note, specifying the number thereof and the number (if any and if known) of the Global Note or Definitive Registered Note which it replaces and confirming (if such is the case) that the Global Note or Definitive Registered Note which it replaces has been cancelled and destroyed.

If, after delivery of such new Note, a protected purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Issuer, the Note Registrars and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or

indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer, the Trustee and either Note Registrar in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Note has become due and payable, the Issuer may in its discretion instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.6, the Issuer or the Trustee or any Note Registrar may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Note issued pursuant to this Section 2.6 in lieu of any mutilated, defaced, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer and such new Note shall be entitled, subject to the second paragraph of this Section 2.6, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 2.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies in respect of the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.7.    Persons Deemed Owners

The Issuer, the Trustee, the Note Registrars, the Paying Agents and any agent of the Issuer, either Note Registrar or the Trustee may treat the Person in whose name any Definitive Registered Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purposes of receiving payments of principal of and interest on such Definitive Registered Note and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary.

Section 2.8.    Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Note Registrars, be delivered to the applicable Note Registrars, shall be promptly canceled by it and may not be reissued or resold.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture.  All canceled Notes held by either of the Note Registrars shall be destroyed or held by such Note Registrar in accordance with its standard retention policy unless the Issuer, shall direct by an Issuer Order that they be returned to it.

Section 2.9.    No Gross-Up

The Issuer shall not be obligated to pay any additional amounts to the Holders or beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges in respect of the Notes.

Article III

CONDITIONS PRECEDENT

Section 3.1.   General Provisions

(a)   The aggregate principal amount of Notes which may be authenticated and delivered and outstanding under this Indenture and any Supplemental Indenture is not limited, subject to the provisions of this Article 3. Notes may be issued on any Issue Date selected by the Issuer, subject to satisfaction of the terms and conditions of this Indenture and the relevant Supplemental Indenture, provided that the Issuer shall not select any date as an Issue Date unless it is a Business Day on which the applicable Clearing Systems and any other applicable Clearing Agency are operating.

(b)   The Notes may be issued in one or more Series, and each Series may consist of a single Tranche or multiple Tranches. The number of Series and Tranches of Notes that may be issued under this Indenture and any Supplemental Indenture is not limited, subject to the provisions of this Article III. Each Series of Notes shall be secured separately and distinctly from the Notes of any other Series pursuant to the Indenture and the relevant Supplemental Indenture. The Supplemental Indenture applicable to each Tranche of Notes shall contain such itemized information as is applicable to the Notes of that Tranche and its Series and shall be incorporated into the relevant Supplemental Indenture for such Series.

(c)   All Notes of each Series issued under this Indenture and the relevant Supplemental Indenture shall in all respects be equally and ratably entitled to the benefits hereof and thereof in respect of such Series without preference, priority or distinction on account of the actual time of the authentication and delivery of such Series or Tranche, except as specified in the relevant Supplemental Indenture for such Series of Notes.

(d)   Each Series of Notes may consist of a single Tranche or may be subdivided into multiple Tranches. Each Note issued must have a Series and Tranche designation for purposes of this Indenture and the relevant Supplemental Indenture.

Section 3.2.   Denominations

The Notes of any Series shall be issuable in such Minimum Denominations and having such Denomination Currency as is provided in the relevant Supplemental Indenture. The Supplemental Indenture for a particular Series of Notes may specify that the Notes of that Series ("FX Dependent Notes") will be funded and payable in a Settlement Currency that is different than the Denomination Currency.

Section 3.3.   Procedures for Issuance

(a)   No later than the fifth Business Day prior to the Issue Date for any Series or Tranche of Notes, the Issuer shall give written notice to the Trustee of the proposed issue of such Notes, which notice shall include the Supplemental Indenture in respect of the Notes of the relevant Series, in particular the details required for the Trustee to complete each relevant Global Note, each relevant Definitive Registered Note and the settlement details relating thereto.

(b)     The Notes to be issued on any Issue Date shall be executed by the Issuer, and delivered to the Authenticating Agent for authentication and thereupon the same shall be authenticated and delivered by the Authenticating Agent upon Issuer Request, upon Delivery of the relevant Collateral on such Issue Date to the Trustee and receipt by the Trustee of the following (each dated as of the Issue Date):

(i)     an Officer's certificate of the Issuer (A) evidencing the authorization by Board Resolution of the execution, authentication and delivery of such Notes and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Issue Date and (3) the Officers authorized to execute and deliver the Transaction Documents hold the offices and have the signatures indicated thereon;

(ii)     either (A) a certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of such Notes, or (B) an Opinion of Counsel of the Issuer satisfactory in form and substance to the Trustee that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes except as may have been given;

(iii)     an Officer's certificate of the Issuer stating that the Issuer is not in Default under this Indenture or any relevant Supplemental Indenture and that the issuance of the Notes applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Articles of Association of the Issuer, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with; and that all expenses due or accrued in respect of the offering of the Notes or relating to actions taken on or in connection with the applicable Issue Date have been paid;

(iv)     an executed counterpart of this Indenture and the relevant Supplemental Indenture in respect of such Notes;

(v)     the Offering Circular Supplement in respect of such Notes;

(vi)     an executed counterpart of the relevant Default Swap in respect of such Notes; and

(vii)   on the Issue Date of the first Tranche of any Series of Notes, and thereafter in respect of any subsequent Tranche of such Series of Notes if required under the relevant Purchase Agreement:

(A)   an opinion of U.S. counsel to the Issuer as to corporate, securities laws and other matters in substantially the form of <u>Exhibit F</u> hereto;

(B)   an opinion of Cayman Islands counsel to the Issuer as to corporate, tax and security interest matters in substantially the form of <u>Exhibit G</u> hereto;

(C)   an opinion of U.S. counsel to the Trustee, in substantially the form of <u>Exhibit H</u> hereto; and

(viii)   such other documents as the Issuer, the Trustee or the Initial Purchasers of such Notes may reasonably require.

Section 3.4.   <u>Additional Issues of Same Series</u>

(a)   Except as otherwise specified in the relevant Supplemental Indenture, the Issuer may from time to time (without the consent of the Noteholders) issue additional Notes that have, when issued, the same terms and conditions as any existing Notes of the same Series in all respects (or in all respects except for the issue date, issue price and first payment of interest thereon) and that are consolidated and form a single Series with the existing Notes of such Series; provided that (unless otherwise approved by an Extraordinary Resolution of such Series) the following conditions are met:

(i)   no Collateral Principal Amount has been calculated in respect of such Series;

(ii)   the Issuer has provided additional security for such additional Notes that comprises assets that are fungible with, and have the same proportionate composition as, the Collateral in respect of the relevant existing Notes and that has an aggregate principal amount at least equal to the initial principal amount of the existing Collateral for that Series multiplied by a fraction, the numerator of which is the initial aggregate principal amount of such additional Notes and the denominator of which is the aggregate principal amount of the existing Notes;

(iii)   the Issuer enters into an additional or supplemental swap agreement varying the terms of the relevant Default Swap to take account of the additional Notes on terms no less favorable than those of the Default Swap other than the payment of any additional upfront amounts to preserve the economic equivalent of the Default Swap); and

(iv)   such additional Notes, when issued, shall preserve the economic equivalent of the existing Notes, including without limitation any consequential amendments to the principal amounts of the Notes.

(b)   Any additional Notes of a Series which are to be created and issued as provided in paragraph (a) above shall be constituted and secured by the Supplemental Indenture executed in connection with the first Tranche of Notes of that Series and, upon issue of such new Notes, such Notes and the Notes of the same terms and conditions shall form a single Series and be secured by the Collateral relating to that Series and such additional security as is provided by the Issuer in connection with the issuance of the such new Notes.  Any additional Notes issued on a day other than an Interest Payment Date may be issued with or without accrued interest.

Section 3.5.    Restrictions on Further Issues and Transactions

The Company may issue or enter into Other Secured Obligations from time to time and at any time without the consent of the Noteholders; *provided* that such Other Secured Obligations (a) must be secured on assets of the Company other than the Collateral securing any Series of Notes or the Company's share capital and on terms in substantially the form described in this Indenture and (b) must provide for the extinction of all claims in respect of such Other Secured Obligations after application of the proceeds of enforcement of the security over the assets on which such Other Obligations are secured (or arrangements have been entered into that, to the satisfaction of the Trustee, have a similar result).

Section 3.6.    Rights and Liability of the Issuer

(a)   The liability of the Issuer under this Indenture and each of the other Transaction Documents to which it is a party is several and is separate in respect of each Series of Notes. The failure of the Issuer to perform its obligations in respect of any Series under this Indenture or under any of the other Transaction Documents to which it is a party shall not release the Issuer from its obligations under this Indenture or under any of the other Transaction Documents to which it is a party in respect of any other Series.

(b)   The provisions in this Indenture concerning costs, expenses, fees, remuneration and other financial obligations (whether arising under indemnities or otherwise) shall apply separately to each Series of Notes in respect of the costs, expenses, fees, remuneration and financial obligations which arise in respect of such Series of Notes.  No such amount incurred in respect of any Series of Notes will be deducted from any amount payable to Noteholders, as the case may be, in respect of any other Series of Notes nor will any such amount be in any other way charged to any other such Holders.  The provisions of this Indenture shall be construed accordingly.

Article IV

SEGREGATION OF COLLATERAL; DISTRIBUTIONS

Section 4.1.    Segregation of Collateral; Collateral Accounts

All Collateral (including the relevant Collateral Account) pledged to secure any Series of Notes shall be segregated from all Collateral (including the relevant Collateral Account) pledged to secure any other Series of Notes. Under no circumstances shall the Collateral (including the relevant Collateral Account) pledged to one Series of Notes be used to pay amounts due in respect of any other Series of Notes.

Section 4.2.    Distributions

(a)    Prior to the occurrence of an Event of Default for a Series of Notes, on each Interest Payment Date (if such date is not an Interest Payment Date) or any other date on which payment is due in respect of that Series or any Transaction Document in respect of that Series, if the Issuer has insufficient funds from the related Collateral to fulfill its obligations to all of the Trustee, the Note Registrars, the Paying Agents, the Authenticating Agent, the Note Calculation Agent, the Default Swap Counterparty, the counterparties on Hedging Transactions or a Principal Investments and the Noteholders on such date, the Issuer shall apply all moneys in its possession (a) first, in payment or satisfaction of the properly documented fees, costs, charges, expenses and liabilities incurred by the Trustee, the Paying Agents, the Note Registrars, the Note Calculation Agent, the Disposal Agent or any receiver in connection with the Indenture and the relevant Supplemental Indenture (including any taxes required to be paid, the costs of realizing any security and the Trustee's remuneration), (b) second, in payment or satisfaction of any amounts owing to a counterparty on a Hedging Transaction or a Principal Investment (including breakage amounts and termination payments other than those owing to any such party following a counterparty default), (c) third, in meeting the proper claims (if any) of the Default Swap Counterparty under the Default Swaps for that Series, (d) fourth, ratably in meeting the proper claims (if any) of the Holders of Notes of that Series, (e) fifth, ratably in payment or satisfaction of any amounts owing to a counterparty on a Hedging Transaction or a Principal Investment in respect of breakage amounts and termination payments to such counterparty following a default with respect to such counterparty and (f) sixth, in payment of the balance (if any) to the Issuer.

(b)    After the occurrence, and during the continuation, of any Event of Default under this Indenture and the relevant Supplemental Indenture, all monies received by the Trustee in connection with the realization or enforcement of the security constituted hereby and thereby shall be applied by the Trustee in accordance with Section 5.5.

Section 4.3.    Interest and Other Calculations

(a)    Unless otherwise provided in the relevant Supplemental Indenture:

(i)    Each Note will bear interest on its Note Principal Amount from, and including, the Interest Commencement Date to, but excluding, the earlier of the Scheduled Termination Date and the Credit Event Determination Date of the relevant Default Swap, (a) at the rate per annum (expressed as a percentage) for

each Interest Period equal to the sum of the Daily Average of the Spread Fixed Rate specified in the relevant Supplemental Indenture for such Interest Period and the Daily Average of LIBOR, EURIBOR or such other benchmark (if any) as may be specified in the relevant Supplemental Indenture or (b) in an amount equal to the Net Investment Income, such interest in each such case being payable in arrears on each Interest Payment Date

(ii)    In addition, because the fixed amount on the relevant Default Swap will cease to accrue on the earlier of the Scheduled Termination Date and the Credit Event Determination Date, each Note will bear interest on its Note Principal Amount on a daily basis from, and including, the Scheduled Termination Date or Credit Event Determination Date (as applicable) of the related Default Swap to, but excluding, the Final Maturity Date (a) at a rate equal to the Daily Average of LIBOR, EURIBOR or such other benchmark (if any) as may be specified in the relevant Supplemental Indenture or (b) in an amount equal to the Net Investment Income, such interest in each such case being payable in arrears on each Interest Payment Date.

(iii)    In the case of FX Dependent Notes, the amount paid in respect of accrued interest shall be such number of units of the Settlement Currency as can be obtained with an amount of the Denomination Currency equal to the accrued interest, as calculated in clauses (i) and (ii) above, at the relevant Spot Rate.

(b)    If, on any date (each an "Additional Payment Determination Date"), the Note Calculation Agent determines that (i) amounts in the relevant Collateral Account exceed, in aggregate, amounts payable to, without limitation, the Trustee, the Paying Agents, the Note Calculation Agent, the Default Swap Counterparty, the counterparties under Hedging Transactions or Principal Investments and any taxing authority and (ii) such excess does not relate to amounts otherwise provided for payment to Noteholders under the relevant Supplemental Indenture; such excess shall become payable to Noteholders on a *pro rata* basis on the Interest Payment Date immediately following such Additional Payment Determination Date (if any). The amounts payable to the Noteholders pursuant to this Section 4.3 are collectively referred to as the "Interest Amounts."

Section 4.4.    Rounding

For the purposes of any calculations required pursuant to this Indenture and any relevant Supplemental Indenture (unless otherwise specified), (i) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with five hundred thousandths being rounded up), (ii) all figures shall be rounded to seven significant figures (with halves being rounded up) and (iii) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with halves being rounded up), except in the case of euro, which shall be rounded down to the nearest

€ 0.01 and in the case of the United States dollar, which shall be rounded down to the nearest USD 0.01 or an equivalent unit.

Section 4.5.    Calculations

The Note Calculation Agent shall, no later than 10:00 a.m. (New York City time) on the third Business Day immediately preceding each Interest Payment Date in respect of any Notes, give notice to the Trustee and the Paying Agents of the amount of interest payable in respect of such Notes on such following Interest Payment Date.

Section 4.6.    Determination and Publication of Interest Rates, Interest Amounts and Redemption Amounts

As soon as practicable after the relevant time on each Interest Determination Date, or such other time on such date as the Note Calculation Agent may be required to obtain any quote or make any determination or calculation, the Note Calculation Agent shall determine the Interest Rate for the relevant Interest Period and calculate the Interest Amounts in respect of each Series of the Notes for the relevant Interest Payment Date, calculate the Redemption Amount, obtain such quote or make such determination or calculation, as the case may be, and give notice of the Interest Rate and the Interest Amounts for each Interest Period and the relevant Interest Payment Date and, if required to be calculated, the Redemption Amount and any relevant Spot Rate to the Trustee, the Issuer, each of the Paying Agents, the Noteholders and, if the Notes are listed on a stock exchange and the rules of such exchange so require, such exchange as soon as possible after their determination but in no event later than (a) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of an Interest Rate and Interest Amount, or (b) in all other cases (except as provided in the Indenture or the relevant Supplemental Indenture), the fourth Business Day after such determination.  Where any Interest Payment Date is subject to adjustment pursuant to the applicable Business Day Convention, the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements by way of adjustment) without notice in the event of an extension or shortening of the Interest Period.  If the Notes become due and payable as provided in Article V, the accrued interest and the Interest Rate payable in respect of the Notes shall nevertheless continue to be calculated as described above but no publication of the Interest Rate or the Interest Amount so calculated need be made unless otherwise required.  The determination of each  rate or amount as set forth above, the obtaining of each quote and the making of each determination or calculation by the Note Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties.

Section 4.7.    Determination or Calculation by Substitute Agent

If the Note Calculation Agent does not at any time for any reason determine or calculate the Interest Rates, Interest Amounts and Redemption Amounts as required under this Article IV, the Trustee shall appoint an agent to do so and such determination or calculation shall be deemed to have been made by the Note Calculation Agent.  In doing so, such agent shall apply the provisions of this Article 4, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

Section 4.8.   <u>Intentionally Omitted</u>

Section 4.9.   <u>Rate of Interest After a Default</u>

If the Notes comprising any Series become immediately payable, the rate of interest payable in respect of them shall continue to be calculated by the Note Calculation Agent in accordance with this Indenture and the relevant Supplemental Indenture, except that the rates of interest need not be published unless otherwise required.  The first period in respect of which interest shall be so calculable shall commence on the expiry of the Interest Period during which such Notes become so repayable.

Section 4.10.   <u>Receipt of Monies by the Trustee; Deposits to Collateral Accounts</u>

(a)    The Trustee hereby agrees that it shall, promptly on the due date for payment of principal, premium (if any) or interest in respect of any Principal Investments or other Collateral Securities, present or procure the presentation for payment of such Principal Investments or other Collateral Securities or otherwise collect sums due in respect thereof and remit the proceeds to the relevant Collateral Account.  In the event that the Trustee shall not have received a payment in respect of any Principal Investment or other Collateral Security when due in accordance with the terms thereof, the Trustee shall proceed in accordance with Section 6.13 of this Indenture.

(b)    In the event that the Notes of any Series become due for redemption pursuant to Sections 9.2, 9.3, 9.4 or 5.1 and the Collateral for such Series of Notes includes one or more Investment Agreements, the respective Paying Agent shall, in accordance with the terms of each such Investment Agreement, withdraw all available amounts invested thereunder and deposit the proceeds of each such withdrawal in the relevant Collateral Account for application to the Early Redemption Amount of the relevant Series of Notes in accordance with Section 9.5.

(c)    The Trustee shall credit the following moneys to the Collateral Account for the relevant Series of Notes, as and when received:

(i)    any principal payments received under any Principal Investments or other Collateral Securities in respect of such Series of Notes, including any payments at maturity or upon earlier redemption thereof or withdrawal thereunder;

(ii)    any interest, premium or other payments received on or in respect of any Principal Investments or other Collateral Securities in respect of such Series of Notes;

(iii)    any Disposal Collateral Proceeds in respect of the sale of any portion of the Collateral for such Series of Notes on a Disposal Date; and

(iv)    any payments received from the Default Swap Counterparty and owing to the Issuer under the relevant Default Swap in respect of such Series of Notes, including (but not limited to) any initial Fixed Amounts, Fixed Amounts or any ETA payable to the Issuer upon early termination thereof.

Section 4.11.   Deposit Interest

Interest on any Eligible Investment held in, any Collateral Account shall accrue daily in accordance with the terms and conditions of the particular Eligible Investments, and the Trustee shall credit such interest to such Collateral Account on a monthly basis.

Section 4.12.   Payments to Noteholders

(a)     Subject to the Priority of Payments, on each Interest Payment Date in respect of a Series of Notes, the Trustee shall withdraw from the relevant Collateral Account, for payment on behalf of the Issuer to the relevant Noteholders of that Series of Notes, an amount equal to the aggregate Interest Amounts due in respect of the Notes of that Series.

(b)     Subject to the Priority of Payments, on the Interest Payment Date next following any Additional Payment Determination Date in respect of a Series of Notes, the Trustee shall withdraw from the relevant Collateral Account, for payment on behalf of the Issuer to the relevant Noteholders of that Series of Notes, an amount calculated in accordance with Section 4.3(b).

(c)     Subject to the Priority of Payments, on the Scheduled Maturity Date or the Final Maturity Date in respect of a Series of Notes, the Trustee shall withdraw from the relevant Collateral Account, for payment on behalf of the Issuer to the relevant Noteholders of that Series of Notes, an amount equal to the Redemption Amount, if any, in respect of the Notes of that Series.

Section 4.13.   Payments to Default Swap Counterparty

(a)     Subject to the Priority of Payments, on any Physical Settlement Date in respect of a Default Swap, the Trustee upon written directions of the Default Swap Calculation Agent shall withdraw from the relevant Collateral Account and pay to the relevant Default Swap Counterparty an amount equal to the Physical Settlement Amount in respect of such Physical Settlement Date.

(b)     Subject to the Priority of Payments, on any Cash Settlement Date in respect of a Default Swap, the Trustee shall withdraw from the relevant Collateral Account and pay to the relevant Default Swap Counterparty an amount equal to the Cash Settlement Amount in respect of such Cash Settlement Date.

(c)     On any other date on which payment is due from the amounts standing to the credit of a Collateral Account to the relevant Default Swap Counterparty pursuant to the relevant Transaction Documents, subject to the Priority of Payments, the Trustee shall withdraw from such Collateral Account an amount required by the provisions thereof and pay such amount to the Default Swap Counterparty.

Section 4.14.   <u>Intentionally Omitted</u>

Section 4.15.   <u>Eligible Investments</u>

The Trustee shall invest amounts standing to the credit of any Collateral Account in such Eligible Investments as are selected in writing by the Note Calculation Agent.  To the extent that payments are required to be made from any Collateral Account pursuant to the relevant Transaction Documents for the related Series, the Trustee shall liquidate Eligible Investments sufficient to make such payments, where applicable.  In respect of any Collateral Account, funds shall be invested in Eligible Investments denominated in the same currency as the Settlement Currency for the related Notes; *provided*, however, that it is understood that Eligible Investments shall be purchased with United States dollars and that payments of interest on and principal of the Eligible Investments will be paid in United States dollars.

The Issuer and the Note Calculation Agent shall be jointly and severally liable for any loss incurred on funds invested as directed by them hereunder.  The Trustee shall not be liable for any loss incurred on any funds invested pursuant to the provisions of this Section.  In no event shall the Trustee be liable for the selection of investments or for losses incurred as a result of the liquidation of any investment prior to its stated maturity or for the failure of any appropriate person to provide timely written investment direction.  The Trustee shall have no obligation to invest or reinvest the Collateral if deposited with the Trustee after 11:00 a.m. (New York City time) on such day of deposit.  Instructions received after 11:00 a.m.( New York City time) will be treated as if received on the following Business Day. Any interest or other income received on such investment and reinvestment of the Collateral shall become part of the Collateral and any losses incurred on such investment and reinvestment of the Collateral shall be debited against the Collateral. It is agreed and understood that the entity serving as Trustee may earn fees associated with the investments outlined above in accordance with the terms of such investments.   In no event shall the Trustee be deemed an investment manager or adviser in respect of any selection of investments hereunder.  It is understood and agreed that the Trustee or its affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (1) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the investments, (2) using affiliates to effect transactions in certain investments and (3) effecting transactions in investments.

Section 4.16.   <u>Duties of Disposal Agent</u>

(a)     Upon the Notes of any Series becoming due for redemption pursuant to Sections 9.2, 9.3, 9.4 or 5.1, the Disposal Agent shall effect the sale on behalf of the Issuer of such amount of the relevant Collateral for settlement on such date (the "<u>Disposal Date</u>") as specified in Section 4.16(b) below for a price which the Disposal Agent reasonably believes to be the best price then available (which, for the avoidance of doubt, may be a price provided by the Disposal Agent); provided, however, that in the circumstances described in clauses (ii) and (iii) of this Section 4.16(a), if so directed by the Default Swap Counterparty, the Disposal Agent shall deliver such amount of the relevant Collateral to the Default Swap Counterparty on the relevant Cash Settlement Date in settlement of the Cash Settlement Amount due under the relevant Default Swap, in lieu of effecting a sale of such amount of the relevant Collateral.

(b)    The principal amount of the relevant Collateral (for the avoidance of doubt, including any interest accrued thereon) required to be sold under this Section 4.16 on the related Disposal Date or delivered on the relevant Cash Settlement Date with respect to a Series of Notes will be:

(i)    if the relevant Collateral is required to be sold upon the Notes of such Series becoming due for redemption, the balance of the relevant Collateral, with such sale to be settled no later than two Business Days prior to the date set for redemption of the Notes of the relevant Series;

(ii)    upon an early redemption of the Notes of such Series following a Default Swap Counterparty Default, an amount of the relevant Collateral to the extent that the ETA is insufficient to cover any associated delivery costs (including any applicable taxes), such sale to be settled on the day that is no less than two Business Days prior to the date fixed for redemption; or

(iii)    upon a repurchase of any Notes of such Series by the Issuer and the subsequent cancellation of such Notes, an amount of the relevant Collateral with a principal amount equal to the principal amount of the cancelled Notes, such sale to be settled on the day that is no less than five Business Days following notification of such purchase.

(c)    The Disposal Agent hereby agrees to notify the Note Calculation Agent, the Trustee and the Issuer, as soon as practicable after agreeing to sell any Collateral pursuant to Section 4.16(b) above, of the Disposal Collateral Proceeds in respect thereof.

(d)    The Issuer hereby authorizes the Disposal Agent to give settlement instructions to the Trustee in connection with the sale of the relevant principal amount of Collateral in accordance with this Section 4.16.

(e)    If the Disposal Agent at any material time does not take any action that it is required to take pursuant to this Indenture, it shall forthwith notify the Issuer and the Trustee in writing.

(f)    The Disposal Agent may take such steps as it considers appropriate in order to effect an orderly sale of the relevant principal amount of the Collateral but may not delay the sale beyond the Disposal Date in the hope of achieving a higher price and will not be liable to the Issuer or any party to this Indenture or any Holder of Notes merely because a higher price could have been obtained had the sale been delayed.

(g)    The Disposal Agent shall not be liable (i) to account for anything except actual Disposal Collateral Proceeds received by it (if any) or (ii) for any costs, charges, losses, damages, liabilities or expenses arising from or connected with the sale or from any act or omission in respect of the Collateral or otherwise unless such costs, charges, losses, damages, liabilities or expenses shall be caused by its own gross negligence, fraud or willful default.

(h)    With respect to any act, matter, deed, agreement, contract, instrument or arrangement which is to be binding on the Issuer and which is executed by the Settlement

Marketing Agent on behalf of the Issuer, the Disposal Agent will identify or specify, and where in writing indicate that such execution is in the name of, or by, or for the account of the relevant Segregated Portfolio, which shall be identified by name.   The Disposal Agent agrees to indemnify the directors of the Company in respect of any liability arising under Section 238(2) of the Companies Law (2004 Revision) of the Cayman Islands as a result of the Disposal Agent's breach of this undertaking.  The directors of the Company are third party beneficiaries in respect of this indemnity.

Section 4.17.   Disposition of Collateral

(a)     The Trustee shall accept settlement instructions from the Disposal Agent in connection with any sale on behalf of the Issuer, for settlement on the relevant Disposal Date, of the relevant principal amount of the Collateral to any purchaser identified by the Disposal Agent pursuant to Section 4.16.

(b)     The Trustee shall upon the sale of any Collateral by the Disposal Agent for the purposes set forth in Section 4.16, accept delivery of the purchase moneys for the relevant principal amount of the Collateral from the purchaser and shall pay an amount from such purchase moneys equal to the fees, costs and expenses in respect of such sale to the Disposal Agent.

(c)     Against receipt of the purchase moneys pursuant to Section 4.17(b) above, the Trustee shall deliver the relevant principal amount of the Collateral for such Series to, or for the account of, the recipient specified in the instruction of the Disposal Agent.

(d)     The Trustee assumes no responsibility or liability for any loss arising from the sale of the relevant principal amount of the Collateral by or on behalf of the Issuer or for any failure, for whatever reason, to effect any such sale within any specified period or at all.

Section 4.18.   Prescription

Claims against the Issuer for payment in respect of the Notes shall be prescribed and become void unless made within 10 years (in the case of principal) or five years (in the case of interest) from the appropriate Relevant Date in respect of them.

Article V

EVENTS OF DEFAULT; REMEDIES

Section 5.1.   Events of Default

If any of the following events ("Events of Default") occurs in respect of a Series of Notes, the Trustee at its discretion may, and if so requested by Holders of at least a simple majority in aggregate principal amount of the Notes of such Series then outstanding or if so directed by an Extraordinary Resolution of the Holders of the Notes of such Series, shall, accelerate the Notes by giving notice to the Issuer that such Notes are, and they shall immediately become, due and payable at their Early Redemption Amount:

(a)     if default is made for a period of 14 days or more in the payment of any sum due or delivery in respect of such Notes or any of them; or

(b)     if the Issuer fails to perform or observe any of its other obligations under such Notes, the Indenture or the relevant Supplemental Indenture and such failure continues for a period of 45 days following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, such failure is incapable of remedy, in which case no notice shall be required; or

(c)     if any order shall be made by any competent court or any resolution passed for the winding up or dissolution of the Issuer or the appointment of an examiner, liquidator or similar official in respect of the Issuer, other than for the purposes of amalgamation, merger, consolidation, reorganization or other similar arrangement on terms previously approved by an Extraordinary Resolution; or

(d)     if the Issuer or any of the Collateral becomes an investment company required to be registered under the Investment Company Act.

Section 5.2.     Acceleration of Maturity; Rescission and Annulment

(a)     At any time after the Notes of a Series have become due and payable pursuant to Section 5.1, the Trustee shall, if so instructed pursuant to clause (i) below and without further notice, institute such proceedings against the Company as it may think fit to enforce the terms of this Indenture, the relevant Supplemental Indenture and the Notes of that Series, provided that the Trustee need not take any proceedings unless (i) it shall have been so requested in writing by the Holders of a simple majority in aggregate principal amount of the Notes of such Series then outstanding or it shall have been so directed by an Extraordinary Resolution of the Holders of the Notes of such Series, or, if sums are due to the Default Swap Counterparty (except in the case of a Default Swap Counterparty Default), it shall have been so directed in writing by the Default Swap Counterparty, but without liability as to the consequence of such action on individual Holders of Notes, provided that, except in the case of a Default Swap Counterparty Default or as otherwise specified in the relevant Supplemental Indenture, the Trustee shall not act on the directions of the Noteholders to the extent that such directions conflict with the directions of the Default Swap Counterparty, and (ii) it shall have been indemnified and/or secured to its satisfaction.

(b)     The Trustee or, on being so directed by the Trustee, the Disposal Agent shall use its reasonable efforts to solicit offers from third parties to purchase the Collateral for the Notes of the relevant Series in accordance with the terms of this Indenture and the relevant Supplemental Indenture.   Unless otherwise provided in the relevant Supplemental Indenture, the Disposal Agent may itself make an offer to purchase the Collateral.

(c)     Only the Trustee may pursue the remedies available under this Indenture and any Supplemental Indenture to enforce the rights of the Noteholders and none of the Noteholders is entitled to proceed against the Company unless the Trustee, having become bound to proceed in accordance with the terms of this Indenture and the relevant Supplemental Indenture, fails or neglects to do so and such failure or neglect is continuing.   Having realized the security and

distributed the net proceeds in accordance with the provisions of the Indenture and the relevant Supplemental Indenture, the Trustee may not take any further steps against the Company, its directors or its members to recover any sum still unpaid and the Issuer will not be obliged to make any further payment in respect of any such sum and accordingly no debt shall be owed by the Issuer in respect of any such sum.

(d)     At any time after such a declaration of acceleration of maturity of any Series of Notes in accordance with Section 5.1, and before a judgment or decree for payment of the money due has been obtained by the Trustee, the Holders of a majority in aggregate principal amount of all outstanding Notes of such Series, by written notice to the Issuer and the Trustee, may rescind and annul the acceleration and its consequences if the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(i)     all overdue installments of interest and principal of the Notes of such Series,

(ii)     unpaid principal thereof (and premium, if any, thereon) which has become due other than by such declaration of acceleration, and interest on such unpaid principal, if any, and premium, if any, at the prescribed rate or rates;

(iii)     interest on any overdue interest at the prescribed rate or rates, and

(iv)     all other amounts then due and payable under any Transaction Document payable prior to the payment of the principal of and interest on the Notes of such Series in accordance with the Section 5.5 and sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and

(v)     the Trustee has been notified by a majority of the Noteholders that all Events of Default of which it has received notice or is otherwise aware, other than the non-payment of the interest on or principal of the Notes of such Series that have become due solely by such acceleration, have been cured and a simple majority in aggregate principal amount of all outstanding Notes of such Series by written notice to the Trustee have agreed with such determination (which agreement shall not be unreasonably withheld) or waived such Events of Default pursuant to Section 5.12.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

Section 5.3.     Trustee May File Proofs of Claim

(a)     Subject to Article 6 hereof, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Issuer or its property, the Trustee shall be entitled and empowered, by intervention in the proceeding or otherwise, to take one or more of the following actions:

(i)    file and prove claims for the whole amount of the balance of the principal amount of, accrued and unpaid interest on, and all other amounts, if any, owing in respect of, each Series of Notes and file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its Agents and counsel) and the Holders allowed in such judicial proceeding; and

(ii)    collect and receive any moneys or other property payable or deliverable on any such claims and distribute the same; provided that the Trustee shall distribute amounts received in respect of a Series of Notes to Holders of such Series of Notes and not to the Holders of any other Series of Notes;

and, by its acquisition of any of the Notes, each Holder shall be deemed to authorize any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its Agents and counsel and any other amounts due the Trustee under Section 6.7.

(b)    Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept, or adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes of any Series or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding, if the relevant action involves any modification of this Indenture, the relevant Supplemental Indenture or the Notes of such Series, except pursuant to the provisions of Article 8 of this Indenture.

Section 5.4.    <u>Trustee May Enforce Claims Without Possession of Notes</u>

Subject to applicable law, all rights of action and claims under this Indenture, any Supplemental Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of such Notes or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust or fiduciary account, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents, counsel and other professional advisors, be for the ratable benefit of the Holders of the Notes of such Series in respect of which such judgment has been recovered in accordance with their respective rights as set forth in this Indenture or the relevant Supplemental Indenture.

Section 5.5.    <u>Application of Money Collected</u>

After the occurrence, and during the continuation, of an Event of Default under this Indenture and the relevant Supplemental Indenture, the Trustee or the Paying Agent shall, in respect of each Series, apply all moneys received by it in connection with the realization or enforcement of the security constituted thereby in the following order of priority:

(a)    first, in payment or satisfaction of the properly documented fees, costs, charges, expenses and liabilities incurred by the Trustee (in all of its capacities), the

Paying Agents, the Note Registrars, the Note Calculation Agent or the Disposal Agent or any receiver in connection with the Indenture and the relevant Supplemental Indenture (including any taxes required to be paid, the costs of realizing any security and the Trustee's remuneration;

(b)     second, in payment or satisfaction of any properly documented amounts owing to a counterparty on a Hedging Transaction or a Principal Investment or Other Collateral (including breakage amounts and termination payments other than those owing to any such counterparty following an early termination caused by such counterparty's default);

(c)     third, in meeting the properly documented claims (if any) of the Default Swap Counterparty under the Default Swaps for that Series (including termination payments other than those owing to the Default Swap Counterparty following a Default Swap Counterparty Default);

(d)     fourth, ratably in meeting the properly documented claims (if any) of the Holders of Notes of that Series; and

(e)     fifth, ratably in payment or satisfaction of any properly documented amounts owing to the Default Swap Counterparty under the Default Swaps for the relevant Series and to a counterparty on a Hedging Transaction or a Principal Investment in respect of breakage amounts and termination payments to such counterparty following a default with respect to such counterparty; and

(f)     sixth, in payment of the balance (if any) to the Issuer.

If the net proceeds of realization of the Collateral for a Series of Notes are not sufficient for the Issuer to make all payments due in respect of the such Series of Notes and the related secured obligations of the Issuer to the Secured Parties in respect of such Series, the other assets of the Company (whether or not in respect of other Series of Notes) will not be available for payment of any such shortfall nor will any general assets of the Company or any assets of any other Segregated Portfolio. Such shortfall shall be borne by the Issuer and the Secured Parties in respect of such Series in reverse order of the order of priority described above. The Issuer will not be obliged to make any further payment in excess of the net proceeds of realization of the Collateral and accordingly no debt shall be owed by the Issuer in respect of any such shortfall remaining after realization of the Collateral for such Series and application of the proceeds in accordance with the Indenture and the relevant Supplemental Indenture and all claims thereafter shall be extinguished and shall not thereafter revive. None of the Trustee, any Noteholder or any other Secured Party may take any further action against the Issuer or the Company to recover such shortfall. Each of the parties also acknowledges and agrees that the obligations of the Issuer are solely corporate and no action shall be taken against any officer, director, employee or Affiliate of the Company and/or the Issuer, as appropriate, for any amounts due under this Indenture or any other Transaction Documents.

NY-523056 v9

Section 5.6.   Limitation on Suits

(a)   No Holder shall have any right to institute any proceeding, judicial or otherwise, in respect of this Indenture or any Supplemental Indenture or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(i)   an Event of Default has occurred and is continuing in respect of the Notes of the Series held by such Holder, and any Holder of such Series of Notes has previously given written notice to the Trustee of such Event of Default;

(ii)   the Holders of at least twenty-five percent (25%) in principal amount of the outstanding Notes of the relevant Series shall have made written request to the Trustee;

(iii)   those Holders have made available to the Trustee indemnity reasonably acceptable to the Trustee against the costs, expenses and liabilities (including fees and expenses of counsel and other professional advisors) to be incurred in compliance with such request;

(iv)   the Trustee for 60 calendar days after its receipt of the notice, request and indemnity has failed to institute any such proceeding; and

(v)   the Trustee has not received a direction inconsistent with such request within such 60-day period, from the Holders of a majority in principal amount of the outstanding Notes of that Series.

(b)   It is understood and intended that none of the Holders of Notes of any Series, individually or as a group, shall have any right in any manner whatever by virtue of, or by availing itself of, any provision of this Indenture or the relevant Supplemental Indenture to affect, disturb or prejudice the rights of any other Holder, to obtain or seek to obtain priority or preference over any other Holder or to enforce any right under this Indenture, except in the manner and subject to the terms herein provided.

Section 5.7.   Unconditional Rights of Noteholders to Receive Principal and Interest

Notwithstanding any other provision in this Indenture or any Supplemental Indenture, the Holder of a Note of any Series shall have the right, subject to there being sufficient proceeds from the relevant Collateral for such Series of Notes, to receive payment of all amounts due and payable on such Note at the times and places and in the amounts provided for herein or in the relevant Supplemental Indenture, and that right shall not be impaired or affected without the consent of that Holder.

Section 5.8.   Restoration of Rights and Remedies

If the Trustee or the Holder of a Note of any Series has instituted any proceeding to enforce any right or remedy under this Indenture or any Supplemental Indenture and the proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to that Holder, then and in every such case, subject to any

NY-523056 v9

determination in the proceeding, the Issuer, the Trustee and the Holders of such Series of Notes, as the case may be, shall be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and such Holders shall continue as though no such proceeding had been instituted.

Section 5.9.    Rights and Remedies Cumulative

No right or remedy herein conferred upon or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.   The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.10.   Delay or Omission Not Waiver

No delay or omission of any Holder or any party to this Indenture or any Supplemental Indenture to exercise any right or remedy accruing upon any Event of Default or otherwise shall impair any such right or remedy or constitute a waiver of any such Event of Default or any other breach of obligations hereunder or an acquiescence therein.   Every right and remedy given by this Article or otherwise to the Holders or any party to this Indenture or any Supplemental Indenture or any Agent may be exercised from time to time, and as often as may be deemed expedient, by the Holders or the parties to this Indenture or such Supplemental Indenture or such Agent, as the case may be.

Section 5.11.   Control by Noteholders

The Holders of not less than a simple majority of the Notes of any Series shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee in respect of such Series, and the Holders of at least the same percentage of the principal amount of Notes of such Series shall have the right to direct the exercise of any trust or power conferred on the Trustee by this Indenture or the relevant Supplemental Indenture, provided that the direction is in accordance with law and the provisions of this Indenture and such Supplemental Indenture; provided, further, however, that (subject to the provisions of Section 6.1) the Trustee shall have the right to decline to follow any such direction if the Trustee determines that it has not received indemnification satisfactory to it or if the Trustee determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith determines that the action or proceeding so directed would involve the Trustee in personal liability, or if the Trustee in good faith so determines that the actions or forbearances specified in or pursuant to the direction shall be unduly prejudicial to the interests of Holders of such Series not joining in the giving of the direction, it being understood that, subject to Section 6.1, the Trustee shall have no duty to ascertain whether or not any such actions are unduly prejudicial to any such Holders.

Section 5.12.   Waiver of Past Defaults

The Holders of Notes of a Series may waive any default hereunder or under such Series of Notes and its consequences, except a default in the payment of any of the principal amount of,